Appeal Nos. 2014-1822, -1823

---

# United States Court of Appeals
# for the Federal Circuit

---

**CONVATEC TECHNOLOGIES INC.,**
*Appellant,*

v.

**SMITH & NEPHEW, INC.,**
*Appellee.*

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, in Nos. IPR2013-00097 and IPR2013-00102.

---

## NON-CONFIDENTIAL BRIEF FOR APPELLANT, CONVATEC TECHNOLOGIES INC.

Jeffrey Guise
Peter R. Munson
Lorelei P. Westin
Wilson Sonsini Goodrich & Rosati
12235 El Camino Real, Suite 200
San Diego, CA 92130

November 14, 2014

Richard Torczon
Wilson Sonsini Goodrich & Rosati
1700 K Street, NW, Fifth Floor
Washington, D.C. 20006

*Counsel for Appellant, ConvaTec Technologies Inc.*

## CERTIFICATE OF INTEREST

Counsel for the appellant, ConvaTec Technologies Inc., certifies the following:

(1)    The full name of every party represented by me is: ConvaTec Technologies Inc.

(2)    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: ConvaTec Technologies Inc. and ConvaTec Inc.

(3)    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are: Nordic Capital and Avista Capital Partners.

(4)    The names of all law firms and the partners or associates that appeared for the party now represented by me in the agency or are expected to appear in this court are: Richard Torczon, Jeffrey Guise, Peter R. Munson and Lorelei P. Westin, all of Wilson Sonsini Goodrich & Rosati.


November 14, 2014                    */s/ Richard Torczon*
                                     Richard Torczon
                                     Counsel for Appellant
                                     ConvaTec Technologies Inc.

i

# TABLE OF CONTENTS

Page

Statement of Related Cases ................................................................1

Jurisdictional Statement ....................................................................1

Statement of the Issues......................................................................2

Statement of the Case........................................................................2

    A.    Parties ....................................................................2

    B.    Invention................................................................3

    C.    PTAB Trials ...........................................................6

Statement of the Facts .......................................................................8

    D.    Why "Loading" Matters ..........................................8

    E.    Why "Photostable" Matters....................................10

    F.    Why Copying and Failure of Others is Suggested ............11

        1.    FDA filing...........................................................11

        2.    British litigation ...................................................12

Summary of the Argument................................................................13

Argument.........................................................................................15

    G.    The PTAB Erred in Interpreting the Claims Unreasonably Broadly in View of the Specification and the Understanding in the Art........................................................................15

        1.    "to incorporate the desired silver concentration into the polymer".16

        2.    "substantially photostable" ...................................19

      3.     Erroneous construction was prejudicial..........................................23

   H.   The PTAB Erred in Adopting Claim Amendment Practices Inconsistent with the Broadest Reasonable Interpretation Standard..........................................................................................24

   I.   The PTAB Abused its Discretion in Denying ConvaTec's Motion for Additional Discovery of Secondary-Consideration Evidence ..........................................................................................27

   J.   The PTAB's Application of the Prior Art was Flawed......................31

   K.   The PTAB Erred in Denying ConvaTec's Motion to Amend its Claims............................................................................................34

      1.     Standard of review ........................................................34

      2.     Abuse of discretion on the showing support requirement ..............35

      3.     Erroneous construction of gelled fiber .............................................36

      4.     Erroneous burden shift on patentability...........................................37

      5.     Erroneous burden shift on inherency ...............................................40

Conclusion and Statement of Relief Sought ............................................................41

## CONFIDENTIAL MATERIAL OMITTED

The Patent Trial and Appeal Board is maintaining some information under seal at least until the completion of judicial review.  Decision, IPR2013-00097, Paper 91; Decision, IPR2013-00102, Paper 88.  For this brief, information under seal is highlighted in gray in the confidential version and is redacted from the non-confidential version.

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Andersen Corp. v. Fiber Composites LLC*,
    474 F.3d 1361 (Fed. Cir. 2007) ....................................................18

*Aventis Pharma S.A. v. Amphastar Pharmaceuticals, Inc.*,
    525 F.3d 1334 (Fed. Cir. 2008) ....................................................40

*Brooks v. Fiske*,
    56 U.S. (15 How.) 212 (1853) ......................................................16

*Cochran v. Kresock*,
    530 F.2d 385 (CCPA 1976) ..........................................................29

*Ex parte Papst-Motoren*,
    1 USPQ2d 1655 (BPAI 1986) ......................................................24

*Garcia v. United States*,
    469 U.S. 70 (1984)........................................................................29

*Gechter v. Davidson*,
    116 F.3d 1454 (Fed. Cir. 1997) ....................................................29

*Horton v. Stevens*,
    7 USPQ2d 1245 (Bd. Pat. App. & Int. 1988) ..............................38

*Hyatt v. Kappos*,
    625 F. 3d 1320 (Fed. Cir. 2010) (en banc) ..................................35

*Idle Free Sys., Inc. v. Bergstrom, Inc.*, IPR2012-00027, slip op.,
    Paper 66 (PTAB January 7, 2014)................................................39

*In re Glatt Air Techniques, Inc.*,
    630 F.3d 1026 (Fed. Cir. 2011) ....................................................32

*In re Huston*,
    308 F.3d 1267 (Fed. Cir. 2002) ....................................................35

*In re Leithem*,
    661 F.3d 1316 (Fed. Cir. 2011) ....................................................27

*In re Morris*,
    127 F.3d 1048 (Fed. Cir. 1997) ....................................................24

*In re Rambus Inc.*,
    694 F.3d 42 (Fed. Cir. 2012) ........................................................24

*In re Schreiber*,
    128 F.3d 1473 (Fed. Cir. 1997) ....................................................40

iv

*In re Skvorecz,*
    580 F.3d 1262 (Fed. Cir. 2009) ......................................24

*In re Yamamoto,*
    740 F.2d 1569 (Fed. Cir. 1984) ......................................25

*Int'l Flavors & Fragrances Inc. v. United States,* IPR2013-00124
    Paper 12 (PTAB May 20, 2014) ......................................26

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.,*
    744 F.3d 1272 (Fed. Cir. 2014) (en banc) ......................15

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
    572 U.S. _, slip op. 8 (2014) ......................................16

*Patlex Corp. v. Mossinghoff,*
    771 F.2d 480 (Fed. Cir. 1985) ......................................39

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ......................16

*Star Fruits S.N.C. v. United States,*
    393 F.3d 1277 (Fed. Cir. 2005) ......................................29

*Stratoflex, Inc. v. Aeroquip Corp.,*
    713 F.2d 1530 (Fed. Cir. 1983) ......................................31

*Wyers v. Master Lock,*
    616 F.3d 1231 (Fed. Cir. 2010) ......................................28

## STATUTES

5 U.S.C. §704 ...........................................................................1

28 U.S.C. §1295(a)(4)(A) ......................................................1

35 U.S.C. §141(c) ...................................................................1

35 U.S.C. §142 .......................................................................1

35 U.S.C. §316(a)(5) ............................................................27

35 U.S.C. §316(d) .............................................25, 34, 35, 37, 39

35 U.S.C. §316(e) ................................................................37

35 U.S.C. §318(a) ..................................................................1

35 U.S.C. §319 .......................................................................1

## REGULATIONS

37 C.F.R. §41.1(b) ...............................................................38

v

37 C.F.R. §42.1(b) ................................................................36, 38

37 C.F.R. §42.5(b) .....................................................................36

37 C.F.R. §42.20(c) ...................................................................25

37 C.F.R. §42.24(a)(1)(i) ...........................................................26

37 C.F.R. §42.24(a)(1)(v) ..........................................................26

37 C.F.R. §42.51(b)(2) ...............................................................28

37 C.F.R. §42.100(b) .................................................................16

37 C.F.R. §42.121 .....................................................................35

37 C.F.R. §42.121(a) .................................................................25

37 C.F.R. §42.121(a)(2)(i) ..........................................................38

37 C.F.R. §42.121(a)(2)(ii) .........................................................25

37 C.F.R. §42.121(a)(3) .............................................................26

37 C.F.R. §42.121(b) ...........................................................26, 38

37 C.F.R. §42.121(d) .................................................................25

37 C.F.R. §90.3 ...........................................................................1

37 CFR 1.601 .............................................................................38

## MISCELLANEOUS

Chief Admin. Pat. Judge, *Interference Practice - Interference Rules Which Require a Party to "Show the Patentability" of a Claim*, 1217 Off. Gaz. 17 (PTO 6 Nov. 1998) ...........................................37

*Request for Comments on Trial Proceedings Under the America Invents Act Before the Patent Trial and Appeal Board*, 79 Fed. Reg. 36474, 36746 (June 27, 2014).................................................27

## STATEMENT OF RELATED CASES

No appeal in or from the same proceedings in the Patent Trial and Appeal Board ("PTAB") was previously before this or any other appellate court.

Counsel know of no other case pending in this or any other court that will directly affect or be directly affected by this court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The appellant ConvaTec Technologies Inc. ("ConvaTec") is dissatisfied with the final written decisions of the PTAB under 35 U.S.C. §318(a) entered on May 29, 2014 in two inter partes reviews:  *Smith & Nephew, Inc. v. ConvaTec Technologies Inc.*, IPR2013-00097 ("IPR'097") and *Smith & Nephew, Inc. v. ConvaTec Technologies Inc.*, IPR2013-00102 ("IPR'102").  35 U.S.C. §§141(c) & 319.  Each decision is styled "Final Written Decision" and includes an order noting its finality for judicial review.  IPR'097, Paper 90 at 61; IPR'102, Paper 87 at 57; *see also* 5 U.S.C. §704 (all rulings not previously appealable are reviewable after final agency action).  ConvaTec appealed within the time set by statute and rule.  35 U.S.C. §142; 37 C.F.R. §90.3; A169-76.  This Court has exclusive jurisdiction over an appeal from a decision of the PTAB in an inter partes review. 28 U.S.C. §1295(a)(4)(A).

## STATEMENT OF THE ISSUES

(1)     Did the PTAB err in determining the broadest reasonable interpretation of the contested claims by giving inadequate weight to the specification and the perspective of those skilled in the art, particularly when construing "to incorporate the desired silver concentration into the polymer" and "substantially photostable"?

(2)     Is broadest reasonable interpretation (as the PTAB has implemented it in inter partes review) even the appropriate standard for claim construction in view of the relatively limited ability of patent owners to amend contested claims (as the PTAB has implemented claim-amendment motions practice) and to have objective evidence of non-obviousness considered?

(3)     Did the PTAB abuse its discretion in denying ConvaTec's motion for additional discovery of Smith's objective evidence of nonobviousness?

(4)     Did the PTAB err in holding the claims anticipated and obvious?

(5)     Did the PTAB err in denying ConvaTec's motion to amend its claims?

## STATEMENT OF THE CASE

### A. Parties

ConvaTec is a global medical products and technologies company based in the United States with leading market products, including AQUACEL® advanced wound dressings.  The appellee ("Smith") is a global medical technology business

based in Britain with its own wound-treatment products. There is no collateral litigation between the parties over these patents.

## B. Invention

Smith petitioned for review of two ConvaTec patents: 6,669,981 ("'981", A129) and 7,267,828 ("'828", A134), the latter being a divisional application of the former. The patents have the same effective filing date and substantially the same disclosure with no significant changes from the specification as filed; hence, for simplicity, the specifications will be discussed in terms of the '981 patent as issued.

The patents at issue are titled "Light Stabilized Antimicrobial Materials". A129. The contested invention is a method of preparing light-stabilized antimicrobial materials for wound dressings and medical devices. A130, 1:10-12. While the use of silver as an antimicrobial agent was known for such materials, silver made the materials sensitive to light, causing uncontrolled discoloration. *Id*., 1:25-41. Importantly, the product of the claimed method is substantially photostable on drying, but will release the antimicrobial silver when the material is rehydrated. A131, 3:22-24. To a medical professional, a discolored wound dressing is not only unappealing and blemished, but may also signal reliability issues with the product itself. A2692.

3

The invention prepares a material with one or more hydrophilic, amphoteric or anionic polymers, including a material with gel-forming fibers such as ConvaTec's AQUACEL® products. *Id.*, 3:47-58. An advantage of the process is that it may be easily used with water-absorbent or water-swellable materials. *Id.*, 3:58-61. In the inventive method, a solution is prepared with an organic solvent and silver source, the polymer is then subjected to the silver solution to incorporate the silver into the polymer, and the treated polymer is subjected to at least one binding agent such that the silver-containing material becomes photostable when dry, yet the silver will dissociate upon rehydration of the material. *Id.*, 3:13-8 & 4:14-23. "The photostabilizing step of the process can either follow *the* silver-loading step or can be initiated during the course of *the* silver-loading step." A132, 5:38-40 (emphasis added).

This last disclosure is critical to understanding the invention. The phrase "*the* silver-loading step" has only one possible antecedent in the specification: subjecting the polymer to the silver solution to incorporate the silver into the polymer. This nexus is important to understanding the invention because the specification defines "loading" to mean "ionic exchange of the cation to the polymer with silver ions." *Id.*, 5:44-45.

The specification also defines "photostable" and "binding". Photostable "for purposes of the present invention [means c]ontrolled colour change to a desired

4

colour with minimal change thereafter." *Id*., 5:46-48.  Binding, "as meant in the present invention, refers to the formation of a photostable compound." *Id*., 5:49-50.

The written description closes with a single example using a ConvaTec Aquacel wound dressing, silver nitrate in a water/industrial methylated spirit solution and sodium chloride (as the binding agent), which is added toward the end of the silver-loading step. *Id*., 5:55-6:3.  The result is "found to be photostable and possess excellent antimicrobial activity.  Further, irradiation does not adversely affect such silver dressings." *Id*., 6:4-7.  Atypically, the specification does not end with the usual caveat about not limiting the invention to the foregoing disclosure.

Claim 1, a representative claim, defines the invention as:

> 1. A method of preparing a light stabilized antimicrobial material comprising the steps of
>
> a) preparing a solution comprising an organic solvent and a source of silver in a quantity sufficient to provide a desired silver concentration in the light stabilized antimicrobial material;
>
> b) subjecting a polymer to the solution for a time sufficient *to incorporate the desired silver concentration into the polymer*, wherein the polymer is selected from the group consisting of a polysaccharide, a modified polysaccharide, a polyvinylpyrrolidone, a polyvinyl alcohol, a polyvinyl ether, a polyurethane, a polyacrylate, a polyacrylamide, a collagen, a gelatin, and a mixture thereof; and
>
> c) subjecting the polymer, during or after step (b), to one or more agents which facilitate *the binding of the silver on the polymer*;
>
> wherein *the silver is substantially photostable* in the light stabilized antimicrobial material *when dry*, but will dissociate from the light stabilized antimicrobial material upon hydration of the light stabilized antimicrobial material.

A132, 6:14-35 (emphasis added for contested terms).

## C. PTAB Trials

Smith petitioned for inter partes review of both patents. A1641 & A1571. Because the two reviews addressed most of the issues now on appeal in the same way, we refer to IPR'097 (the review of the '981 patent) for simplicity except where otherwise indicated.

The PTAB instituted inter partes review for '981 claims 1-8 and 10-20. A1410. The PTAB held there was a reasonable likelihood of anticipation or obviousness in view of patents to Kriedl, Bahia, Walder, Ronan, Romans, and Gibbins. The PTAB instituted IPR'102 for '828 claims 1-5 and 7-14 on similar grounds. A1441.

ConvaTec moved for discovery of (1) Smith's filing with the Food and Drug Administration (FDA) regarding a product (Durafiber® Ag) approved as "substantially equivalent" to ConvaTec's AQUACEL AG® product; (2) records and data Smith used in support of its filing relating to Smith's inability to produce the material without using the claimed method; (3) records and data Smith used in support of a non-infringement position in the United Kingdom (and thus would not apply to the present claims) but would indicate copying of the invention; (4) records and data showing Smith's inability to produce a photostable product on a commercial scale except by using the claimed method; and (5) any other evidence Smith had of its copying or inability to produce a commercial product

6

without copying. A1231-33. ConvaTec explained that the discovery was in the interest of justice to produce relevant evidence of secondary considerations, specifically copying and failure of others, which would be in Smith's possession but not readily available to ConvaTec. A1326-27 & A1332-33. The PTAB denied the motion, holding that legislative history requires very narrow discovery and that ConvaTec failed to provide evidence that discovery would produce dispositive evidence. A1199-1203. The PTAB subsequently rejected the evidence of Smith's copying and failure to develop alternatives that ConvaTec was able to produce without discovery because that evidence was "of insufficient weight and relevance". A49-51.

ConvaTec also moved to amend (actually, under PTAB rules, replace) its independent claims. A1093-96. For example, ConvaTec moved to amend claim 1 by replacing it with claim 21, adding that the polymer be "a gel forming fiber" and deleting "substantially" from the phrase "substantially photostable". A1093-94. Similarly, claim 22 replaced claim 17, adding a gel-forming fiber limitation and changing "incorporate" to "load". A1094-95. (For the '828 patent, ConvaTec moved to replace claim 1 with claim 15, adding gel-forming fiber limitations, replacing "incorporate" with "load" and deleting "substantially". A1184-85.)

The PTAB denied the motions to amend, noting that ConvaTec had relied on its patented claims and patent disclosure to show written description for the

7

replacement claims.  A54.  The PTAB also held that the gel-forming fiber limitation must apply to cellulose (without citing any evidence for this finding), but that the specification did not teach gel-forming cellulose and that in any case cellulose was in the prior art.  A54-56.  The PTAB gave no weight to the replacement of "incorporate" with "load" because it held that ConvaTec had not demonstrated that loading would not also have been obvious, while again giving no weight to the secondary considerations.  A56-58.  The PTAB did not address the deletion of "substantially".

The PTAB interpreted the claims very broadly, giving very little or no weight to the context provided by the specification and the testimony on the understanding of those in the art.  ConvaTec's opportunities to obtain probative evidence of nonobviousness and to amend its claims, however, were implemented very narrowly.  Congress created inter partes review to test patented claims and to cancel or amend them as necessary, but the PTAB's practices in this case deprived ConvaTec of a fair chance to defend its existing claims or to amend them.

## STATEMENT OF THE FACTS

### D. Why "Loading" Matters

The specification defines "loading" as "ionic exchange of the cation to the polymer with silver ions."  A132, 5:48-49.  This definition is not incidental.  ConvaTec provided testimony from Dr. Kevin Edgar, an expert with over 25 years

8

of experience in polymer chemistry. A2659. Dr. Edgar explains that the use of an organic solvent with the positively charged silver ions promotes transfer of the silver to the negatively charged polymeric material with minimal swelling of the materials. A2665-66. In this context, it is useful to recall that claim 1 requires the polymer to be "hydrophilic, amphoteric or anionic". A132, 6: 27-30. If the claimed incorporation is not loading, then the requirement that the polymers be cation-attracting would be mere surplusage. Dr. Edgar further explains that the claim requires "time sufficient to incorporate" because the invention involves ion exchange rather than simple adsorption, which would be nearly instantaneous. A2667.

The claimed binding step then takes place after incorporation has started, either during or after the incorporation step. A132, 6:31-38. The loading is thus critical to the invention because by the time binding starts, the silver ions have already had a chance to transfer to the charged polymer. Consequently, when the facilitating agent is added, less of the silver will end up as an insoluble silver-salt precipitate. A2668-71. This incorporation of the silver into the polymer itself rather than as an insoluble precipitate in the material sets the invention apart from all of the cited prior art and minimizes the risk of discoloration.

### E. Why "Photostable" Matters

Discolored medical materials might not present a health or safety problem, but they present an aesthetic problem and a confidence problem for clinicians and patients. A bandage with random brown or purple speckles or blotches is not clinically (and thus commercially) desirable. A2692. ConvaTec's expert Tania J. Phillips explained the clinician's expectation that silverized medical products may be silver-gray or white and that such products were known to discolor when exposed to light. A2692. Dr. Phillips explains that in clinical practice, a silverized product that turned purple would be considered discolored. A2694-95. Dr. Phillips further explained that a physician in receipt of a discolored wound dressing would "assume that the dressing was expired and not in optimal condition for clinical use." A2692.

Avoiding discoloration is the problem the invention sets out to solve. A130, 1:39-43. The specification twice describes the invention as "substantially photostable". A131, 3:22-23; A132, 5:55-56. The specification also describes the inventions simply as photostable. A130, 1:39-43; also A131, 4:19-23 ("made photostable"); A132, 5:53-54, 6:5-6 ("have been found to be photostable"). Moreover, the specification defines "photostable" to require that any color change in the final, dried product be "minimal". A132, 5:50-52. The invention is not

10

simply *mostly* not discolored, it is *essentially* not discolored because anything less would not be clinically acceptable.

### F. Why Copying and Failure of Others is Suggested

#### 1. FDA filing

As part of a regulatory review at the FDA, Smith filed a pre-market notification of intent statement regarding its DURAFIBER Ag product, which it described as a "Silver Absorbent, Gelled Dressing". A2888. In support of the review, Smith stated:

> The DURAFIBER Ag dressing is substantial equivalent to Convatec, Aquacel Ag Wound Dressing []. The subject device has all features and benefits associated with, a fibrous gelling dressing and the added benefit of an antimicrobial dressing.

A2889. Smith also stated that:

> The subject device and the predicate device Aquacel Ag [] have *similar design, materials and manufacturing methods*. The intended use, indications and instructions for use for the subject and predicate devices are similar.

A2891 (emphasis added). While "similar" does not mean "identical", Smith's statement does not exclude identity. Moreover, even if the devices are not identical, "similar" suggests that the differences may still be within the scope of claim 1.

ConvaTec requested (1) full copies of Smith's FDA submissions for Durafiber Ag and the FDA's response and (2) Smith's internal documents used in support of the FDA submissions (limited to those documents relevant to copying or

11

failed efforts to design around ConvaTec's patents). A1231-32. It is difficult to imagine that Smith does not have copies of most if not all of these documents as part of its records for its FDA filing so production should not have been onerous.

### 2. *British litigation*

In a claim form filed in the Patents Court in the United Kingdom, Smith requested:

1. A declaration that a binding agent with a concentration of no more than 0.77% w/v of the total volume of treatment falls outside the scope of Claim 1 of [the European counterpart to the '981 patent];

2. A declaration that the Claimants' process of producing silverized Durafiber wound dressing made according to the Confidential Process Description would not infringe any of the claims of [the European patent].

A2877. While the Claim Form does not state that the binding agent concentration is the only difference, it identifies no other difference. Claim 1 of the '981 patent (unlike the European patent) does not set a lower bound for the binding agent concentration so Smith's stated difference would not avoid infringement in the United States. Thus, the Claim Form creates a reasonable inference that Smith's silverized Durafiber would fall within the scope of at least claim 1.

ConvaTec requested Smith's internal records in support of its claim for non-infringement. Again, it is difficult to imagine Smith did not collect such records as part of the litigation so producing them should not have been onerous.

12

## SUMMARY OF THE ARGUMENT

The PTAB construction of the claims, particularly the phrases "to incorporate the desired silver concentration into the polymer" and "substantially photostable", was unreasonably broad in view of the specification and the evidence of the understanding of those in the art.   The specification focuses on a specific problem and contains express definitions that a person of skill in the art would have understood to require a more focused claim construction.  Specifically, a person of skill would have understood "incorporate" to be synonymous with "load", which has an express definition much more precise than the PTAB's construction of the term.  Moreover, the PTAB's construction of "substantially photostable" effectively construes the limitation out of the claim by discounting the purpose of the invention and the evidence of the understanding of those in the art.  The PTAB's holdings on unpatentability are only possible because the claim construction reads out any trace of the problem and solution at the heart of ConvaTec's invention.

As the PTAB has implemented inter partes reviews, its use of the broadest reasonable interpretation standard is unreasonable.  The broadest reasonable interpretation evolved in a context in which claims are freely amended and the inventor has an opportunity to address minor defects.  In inter partes review, the patent owner must move to amend, with only one chance to amend, with tight page

13

limits, with onerous patentability proof requirements, and with no opportunity to correct minor informalities. In this context, either the claim interpretation standard is wrong or the claim amendment practice is wrong. The PTAB's inconsistent practices have prejudiced ConvaTec because, to the extent its claims require amendment, ConvaTec has not been afforded a reasonable opportunity to do so.

The PTAB also unreasonably denied ConvaTec's targeted request for discovery for objective evidence of nonobviousness, particularly evidence regarding a Smith product that Smith described in regulatory filings to be substantially equivalent to ConvaTec's product. Such evidence is facially likely to show copying of the invention and a competitor's failure to achieve comparable success without using the invention. The standard the PTAB set for obtaining the discovery was based on a misapprehension of legislative history and placed the bar so high that ConvaTec was effectively required to prove the facts it sought to discover. The standard the PTAB implemented is based on floor comments of an individual Senator rather than actual legislative history. As implemented, the standard is so stringent that ConvaTec was required to specify precisely the evidence ConvaTec sought to discover and its certain relevance before discovery even occurred. Because the specific evidence in question is in Smith's control, the PTAB's standard was effectively unattainable in this case.

The PTAB's unreasonably broad construction of the claims led the PTAB to err in holding the claims to read on the prior art. Similarly, the PTAB read the prior art unreasonably broadly to find similarities that were actually critical differences. The PTAB's unreasonable denial of targeted discovery likely to lead to highly relevant evidence of nonobviousness effectively deprived ConvaTec of key evidence to defend its claims. Individually and collectively, the PTAB's unreasonable actions led to error in holding the claims to have been obvious.

With regard to ConvaTec's motions to amend the claims, the PTAB lacked substantial evidence when it found that the amended claims would necessarily include cellulose and that consequently the claims lacked written description. The PTAB was unreasonable in the extent to which ConvaTec was required to prove the patentability of its amended claims. Finally, the PTAB repeated the same errors it made in evaluating the original claims to hold the amended claims to have been obvious.

## ARGUMENT

### G. The PTAB Erred in Interpreting the Claims Unreasonably Broadly in View of the Specification and the Understanding in the Art

This Court reviews claim construction as a question of law. *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1276-77, 1284-85 (Fed. Cir. 2014) (en banc). In an inter partes review, a "claim in an unexpired patent shall be given its broadest reasonable construction in light of the

specification of the patent in which it appears." 37 C.F.R. §42.100(b). The rule

expressly states one of the constraints on the broadest reasonable construction: the

specification. *Accord Brooks v. Fiske*, 56 U.S. (15 How.) 212, 215 (1853):

> The claim, or summing up, however, is not to be taken alone, but in
> connection with the specification and drawings; the whole instrument
> is to be construed together. But we are to look at the others only for
> the purpose of enabling us correctly to interpret the claim.

*Accord Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc)

(discussing the broadest reasonable interpretation standard).

The rule does not state another important constraint on the breadth of the

interpretation: the understanding of those in the art. *Nautilus, Inc. v. Biosig

Instruments, Inc.*, 572 U.S. _, slip op. 8 (2014) (reaffirming the primacy of "the

perspective of someone skilled in the relevant art" in understanding a claim);

*accord Phillips*, 415 F.3d at 1316. As explained below in section B, the ability to

amend also acts as a constraint on the reasonable breadth of interpretation.

1. *"to incorporate the desired silver concentration
   into the polymer"*

The PTAB gave no weight to the specification in construing "to incorporate

the desired silver concentration into the polymer," instead interpreting it (A8):

> as requiring the silver to associate with the polymer in a way,
> regardless of the type of interaction (*e.g.*, ionic, Van der Waals, etc.),
> such that it can interact with the polymer and the agent that facilitates
> the binding of silver into the polymer so as to form a substantially
> photostable complex.

16

As explained below, the PTAB also effectively read "substantially photostable" out of the claim.

In the inventive method, a solution is prepared with an organic solvent and silver source, the polymer is then subjected to the silver solution to incorporate the silver into the polymer, and the treated polymer is subjected to at least one binding agent such that the silver-containing material becomes photostable when dry, yet the silver will dissociate upon rehydration of the material. A131, 3:13-8 & 4:14-23. "The photostabilizing step of the process can either follow *the* silver-loading step or can be initiated during the course of *the* silver-loading step." A132, 5:38-40 (emphasis added). The phrase "*the* silver-loading step" has only one possible antecedent in the specification: subjecting the polymer to the silver solution to incorporate the silver into the polymer. In this specification, "incorporate" and "loading" are synonyms for the same step, which is essential to understanding the invention because the specification expressly defines "loading" to mean "ionic exchange of the cation to the polymer with silver ions." *Id*., 5:44-45. The discussion of "loading" occurs in the general description of the invention, not in the sole example.

As ConvaTec's expert Dr. Edgar explains, when read in the light of the specification, one of ordinary skill in the art would have understood that ionic exchange or "loading" of the charged polymer was inevitable because the presence

17

of an organic solvent would promote or favor ion exchange of silver with the

charged polymer.  A2665.  Citing to scientific principles establishing the favorable

effect of organic solvents on the position of equilibrium in ion exchange, Dr. Edgar

explains that the inventors took advantage of this phenomena and used organic

solvents to likewise drive the exchange of the sodium cation in the polymer for the

silver cation in silver salt.  A2666-67.  The requirement of an organic solvent in the

claims, according to Dr. Edgar, made the ionic exchange of silver cations onto the

polymer inevitable.  A2667.

In *Andersen Corp. v. Fiber Composites LLC*, the specification used two

phrases: composite composition, which was restrictively described, and composite

material, which was not.  474 F.3d 1361, 1368 (Fed. Cir. 2007).  The Court

explained that the phrases were not different embodiments, but rather synonyms

for the same thing, and that the restrictions disclosed for the composite

composition were an important part of the invention.

The "incorporate" limitation here presents a similar situation.  The PTAB

misapprehended "loading" in the specification as just an example of

"incorporation", when the term did not appear in the sole example but rather in the

description of the invention.  The PTAB's reading gives no weight to the

significance the specification places on silver-loading as a step of the invention,

which the specification makes a point of expressly defining. The PTAB's reading

18

does violence to the grammar and structure of the specification.  Far from being reasonable in view of the specification, the PTAB's reading is irreconcilable with the specification.

### 2. *"substantially photostable"*

The phrase "substantially photostable" presents a different construction error. The specification expressly defines "photostable" to mean "[c]ontrolled colour change to a desired colour with minimal change thereafter."  A132, 5:46-48.  The specification expressly defines "binding" as "the formation of a photostable compound."  *Id.*, 5:49-50.  The PTAB noted that the specification does not define what a "desired color" might be and held that it could "encompass any color that may be desirable to one of ordinary skill in the art for any purpose," including purple (a color noted as a discoloration in this context).  A11-14.

The PTAB's interpretation is inconsistent with both the specification and the understanding in the art as explained by Dr. Phillips.  The specification identifies discoloration as the problem to be solved.  A130, 1:32-42.  If "discolored" and "desired color" are the same then the problem to be solved in the specification is meaningless.  The PTAB's interpretation of "substantially photostable" is not reasonable in view of the specification: it is at odds with the specification.

Dr. Phillips, a clinician with vast experience in wound care (A10 n.8), explained how those familiar with such products would have understood desired

color and discolored, even supporting her testimony with examples from the prior art that Smith cited.  See, e.g., A2693 (equating "white" with "good" and "eventually purple" and "specks" with discolored).  Her testimony is consistent with the prior art, consistent with solving the problem identified in the specification, and frankly consistent with the ordinary understanding of desired color versus discoloration.

The PTAB placed great weight on cross-examination testimony in which Dr. Phillips was asked about a hypothetical mauve-tinted dressing.  Dr. Phillips reasonably agreed that if the dressing was supposed to be mauve and did not discolor further, then she would not have an objection to it per se.  A1843.  She also, however, made clear that she did not accept the premise of the question (A1844):

> A.  Okay.  So according to the ConvaTec patent, "controlled change to a desired color."  Now, according to Gibbons, purplish is not a desired color.  But if one said purple was a desired color and the dressing change minimally thereafter, then I think that would be considered minimal change and photostable.  But I would state that purple may not be a desired color.

The PTAB overlooked two important points in evaluating her response.  First, Dr. Phillips answered the hypothetical question, but only as a hypothetical because she never conceded the premise.  Second, in answering the hypothetical question she expressly assumed a key fact at issue: that in addition to being purple, the dressing did not subsequently change color.  Her response cannot reasonably be

20

read as a concession that a person skilled in the art would have considered a discolored dressing to have a desired color.

Moreover, the timing of the photostability is important to keep in mind. Unlike the prior art, the claimed invention requires that the dressing be substantially photostable *when dry*. The "minimal color change" must occur after the dressing is dried. The PTAB did not keep this limitation in mind when it discounted Dr. Phillips' testimony for considering a "color change of the dry product from white to purple as being unacceptable" A13. Dr. Phillips was correct in considering discoloration in the dried product unacceptable because her analysis, unlike the PTAB's analysis, stuck to the claimed invention. This is why her measured response emphasized the lack of subsequent color change even for the hypothetical mauve dressing. Thus, even if purple wound dressings were conventional, the PTAB failed to focus on the *subsequent* discoloration that is the focus of the claimed invention.

The PTAB thus misapprehended the clear and consistent thrust of Dr. Phillips' testimony, to wit, discolored is not a desired color. She articulated the unremarkable expectation of those who worked with such dressings that the dressings be a color like white rather than purple and speckled. Her testimony was grounded in the specification, the prior art, and her decades of experience in the art, contrasting sharply with the PTAB's interpretation, which is not consistent with

any of these.  Moreover, the PTAB's analysis assumes a fact not in the record: that a mauve-tinted dressing would not subsequently show discoloration.

Although ConvaTec moved to amend out the qualifying adverb "substantially", in the context of the specification this amendment would barely change the effective scope of the "photostable" in the claims.  The phrase "substantially photostable" appears twice in the specification, once in the summary of the invention and once in the detailed description of the invention (but not in the example).  A131, 3:22-23; A132, 5:55-56.  The term "photostable" appears without modification more often, however, including in the description of the problem to be solved.  A130, 1:39-43; also A131, 4:19-23 ("made photostable"); A132, 5:53-54.  Moreover, the definition of "photostable" in the specification requires that any change after the product is made must be "minimal".  A132, 5:50-52.  This Court has explained that "substantially" can mean "significantly" or "essentially" and that the intrinsic evidence *must* be consulted to determine which meaning is intended.  The PTAB performed no such analysis.

Instead, the PTAB held that "There is nothing to suggest that a controlled color change of a dry product from white to purple would not be encompassed by the scope of the definition of the '981 patent."  A13.  Had the PTAB taken the specification into consideration, it would have appreciated that the interchangeable use of "substantially photostable" and "photostable" plus the use of "photostable"

22

in defining the problem to be solved and "minimal" change in the final product in defining "photostable" itself require the more restrictive reading. In the context of this specification, "substantially" must be understood to mean "essentially". In assuming the broader definition without grounding its interpretation in the specification, the PTAB failed to perform an essential part of the claim interpretation, leading to an erroneous construction. Once again, this narrow construction is consistent not only with the problem to be solved but also with the expert testimony that practicing clinicians would find discolored products objectionable.

### 3. Erroneous construction was prejudicial

While ConvaTec does not concede the aptness of the PTAB's other claim constructions either, the constructions of these two phrases suffice to show reversible error. The error was prejudicial because the PTAB's determinations of anticipation and obviousness depend on these erroneous constructions. If ConvaTec's claimed invention were no more than silver chloride precipitated in wound dressings, then they would have been obvious. ConvaTec disclosed more, claimed more precisely and deserves to have its claims understood as those in the art would have understood them after reading the entire specification.

23

## H. The PTAB Erred in Adopting Claim Amendment Practices Inconsistent with the Broadest Reasonable Interpretation Standard

The PTAB explains its standard of construction by quoting *In re Morris*,

127 F.3d 1048, 1054 (Fed. Cir. 1997):

> the broadest reasonable meaning of the words in their ordinary usage
> as they would be understood by one of ordinary skill in the art, taking
> into account whatever enlightenment by way of definitions or
> otherwise that may be afforded by the written description contained in
> the applicant's specification.

As explained above, the PTAB failed to apply this mode of construction in actual

practice. Significantly, however, *Morris* also explains *why* the broadest reasonable

interpretation standard is used in examination. According to this Court, "the

applicants had an obligation to either demonstrate that the examiner's interpretation

of the claim language was unreasonable or amend the claim to distinguish the prior

art." *Id*. at 1057. The linkage between broadest reasonable interpretation and

claim amendment is well-established. Indeed, the PTAB's predecessor, the Board

of Patent Appeals and Interferences, noted the linkage in applying a more

conservative standard of construction to claims that could no longer be amended.

*Ex parte Papst-Motoren*, 1 USPQ2d 1655, 1656 (BPAI 1986) (expired patent

claims in reexamination), *cited with approval in In re Rambus Inc.*, 694 F.3d 42,

46 (Fed. Cir. 2012). Hence, the broadest reasonable interpretation standard, which

evolved in ex parte examination, is itself reasonable only to the extent that claims

may be amended as freely as they are in ex parte examination. *In re Skvorecz*,

24

580 F.3d 1262, 1267 (Fed. Cir. 2009) ("Its purpose is to facilitate exploring the

metes and bounds to which the applicant may be entitled, and thus to aid in

sharpening and clarifying the claims during the application stage, when claims are

readily changed.")

The Court has also approved the broadest reasonable interpretation standard

in other examination contexts such as for reissue applications and in

reexaminations, in which amendments are almost freely permitted, limited mainly

by the recapture doctrine or the bar on broadening amendments after two years.

*See*, *e.g.*, *In re Yamamoto*, 740 F.2d 1569, 1571-72 (Fed. Cir. 1984).  In practice

these constraints are not significant impediments to amending around prior art

because such amendments must narrow existing claims.

The situation in inter partes review, however, is completely different.  By

statute, the patent owner may file a single motion to amend a challenged claim.

35 U.S.C. §316(d).  Any further motion to amend requires the petitioner's consent

or good cause.  *Id.*; 37 C.F.R. §42.121(d).  Even that single motion requires prior

discussion with the PTAB.  §42.121(a).  As the movant, the patent owner has not

only the burden of justifying relief, but also of disproving the unpatentability of the

substitute claim.  §§42.20(c) & 42.121(a)(2)(ii).  The patent owner must also show

support in the original disclosure and in any benefit or priority disclosure for the

entire claim, not just for the added limitation(s) but for the already patented part of

25

the claim as well.  §42.121(b).   Moreover, despite having only a single

opportunity for success, the patent owner may not reduce the risk by offering a

range of amendments, but is generally limited to a single substitute claim for each

claim to be amended.  §42.121(a)(3).  Finally, all of this must be done in fifteen

pages, even though (as here) the petitioner's unpatentability briefing can be much

longer. *Compare* §42.24(a)(1)(i) (60 page petition) *with* §42.24(a)(1)(v) (15 page

motion).

Taken individually most of these requirements could be considered

reasonable efforts to limit complication and gamesmanship, but collectively they

present an effectively insurmountable barrier to amendment.  The empirical proof

of just how insurmountable comes from the fact that (as of this briefing) only one

patent owner (the United States government) has been able to amend claims

successfully (with an unopposed motion resulting in judgment) and even then the

motion was denied for one claim.  *Int'l Flavors & Fragrances Inc. v. United States*,

IPR2013-00124 paper 12 at 19 (PTAB May 20, 2014) .[1]

Even the United States Patent and Trademark Office has indicated that

reform might be needed.  After the decision in this case, the Deputy Director

---

[1] http://www.uspto.gov/ip/boards/bpai/decisions/inform/IPR2013-

00124_20140520.pdf (visited Nov. 13, 2014).

26

published a notice asking for comments on when the broadest reasonable interpretation standard should not apply and whether amendment practice should be changed. *Request for Comments on Trial Proceedings Under the America Invents Act Before the Patent Trial and Appeal Board*, 79 Fed. Reg. 36474, 36746 (June 27, 2014).

The PTAB's amendment motion practice is analogous to another PTAB practice: the undesignated new ground of rejection. The Court has explained that a new ground of rejection requires reversal—regardless of its merits—because the applicant was denied an opportunity to respond meaningfully by, for example, amending the claims or providing new evidence. *In re Leithem*, 661 F.3d 1316, 1320 (Fed. Cir. 2011). In inter partes review, the patent owner is constrained by PTAB rules and practices from mounting an effective response by amendment. The result is a similar denial of due process. Either PTAB amendment practice must be more liberal or its claim construction must be more conservative. Having it both ways is not reasonable.

## I.  The PTAB Abused its Discretion in Denying ConvaTec's Motion for Additional Discovery of Secondary-Consideration Evidence

ConvaTec moved for additional discovery related to filings Smith made in the FDA and in a British patent litigation. In an inter partes proceeding, discovery is limited in scope and availability. 35 U.S.C. §316(a)(5) (limiting discovery to cross examination and "what is otherwise necessary in the interest of justice");

27

37 C.F.R. §42.51(b)(2). Smith twice filed papers in government proceedings suggesting that its Durafiber Ag product is either similar to ConvaTec's AQUACEL AG product or is manufactured using a process that would infringe the '097 patent. Neither document is facially dispositive: if it were, then the requested discovery would have been unnecessary.

> Our case law holds that copying requires evidence of efforts to replicate a specific product, *which may be demonstrated through internal company documents*, direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a replica, or access to the patented product combined with substantial similarity to the patented product.

*Wyers v. Master Lock*, 616 F.3d 1231, 1246 (Fed. Cir. 2010) (emphasis added). The claims are directed to methods of manufacture, so only the internal company documents would afford the sort of proof the case law requires. By definition, these documents are in Smith's possession and not available to ConvaTec. Smith knows whether it copied or not. Yet, in its opposition, Smith did not unequivocally argue that its Durafiber Ag product is materially different and would not infringe; instead, it argued that the documents in question did not prove what they imply. A1278. The PTAB agreed with Smith that ConvaTec had not proven that the discovery would be productive. A1201-03.

The PTAB also held that the requests were overbroad and burdensome but only gave a reason for the fifth request. It gave no reason why the first four requests were overly burdensome. The first three requests simply asked for

internal records that Smith must have collected for its FDA filing and its British litigation. Producing records that it has already collected is not facially burdensome. Alternatively, if the collected documents are not responsive to the specific questions posed in the request, then there would be no burden of production.

The Court reviews a PTAB decision on authorizing additional discovery for an abuse of discretion. *Cochran v. Kresock*, 530 F.2d 385, 396 (CCPA 1976). The PTAB abuses its discretion if the decision (1) is based on an erroneous interpretation of the law, (2) is based on factual findings that are not supported by substantial evidence, or (3) represents an unreasonable judgment in weighing relevant factors. *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005). A PTAB opinion must contain sufficient findings and reasoning to permit meaningful appellate scrutiny or else it must be vacated. *Gechter v. Davidson*, 116 F.3d 1454, 1457-88 (Fed. Cir. 1997).

The PTAB decision was unreasonable, was based on clear error, and lacked substantial evidence. The PTAB held that all discovery requests must be limited to minor discovery and special circumstances, citing the comments of a single legislator. A1207. It is well established, however, that the comments of an individual legislator are entitled to little weight. *Garcia v. United States*, 469 U.S. 70, 76 (1984). The statute and rule set the standard as "interest of justice". Where

29

the case law requires the patent owner to provide internal documents of the apparent copier, discovery targeted to those documents will almost invariably be in the interest of justice.

The PTAB applies a five-factor test to authorize discovery:  (1) there is more than a possibility and a mere allegation that useful information will be discovered; (2) the proposed discovery does not seek litigation positions or the underlying basis for those positions; (3) the requested information is not available through other means; (4) any instructions associated with the discovery are easily understandable; and (5) the discovery is not overly burdensome to answer. ConvaTec easily met these factors by showing that (1) Smith statements about relevant product similarity and infringement, (2) in different government proceedings, (3) reflecting the contents of Smith internal documents, (4) that Smith should already have gathered for those proceedings, (5) should be easy to produce. The PTAB's analysis to the contrary is superficial or entirely absent.  In essence, the PTAB agreed with Smith that ConvaTec had not shown that discovery would produce relevant evidence, but it is difficult to imagine a movant ever having better evidence about its opponent's internal documents.  The PTAB's implementation of the interest-of-justice standard and the five-factor test is in practice unattainable for copying cases.

"Evidence of secondary considerations may often be the most probative and cogent evidence in the record." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983). In the present case, ConvaTec had sound bases for believing that Smith has discoverable evidence of nonobviousness, specifically evidence that Smith copied ConvaTec's invention, probably because Smith could not produce a commercially viable competing product without using the invention. Smith is a competitor who is not being sued for infringement, yet who filed two petitions (at considerable cost) to cancel ConvaTec's patents on this technology—a surprising business decision if Smith were not copying the patented invention. Common sense should have told the PTAB the discovery requests were no fishing expedition. The PTAB abused its discretion in barring ConvaTec from access to information that would have been relevant and might have been dispositive.

### J.  The PTAB's Application of the Prior Art was Flawed

The PTAB based its findings and conclusions on anticipation and obviousness based on claim constructions that effectively read out the inventive process limitation (loading) and the inventive result (minimal discoloration). E.g., A19. Construing the claims without these improvements, the PTAB found the residual subject matter of the claims to be very similar to the unimproved, substantially photo-unstable insoluble silver-precipitate prior art. Because the claim construction was erroneously broad, the PTAB's application of the prior art

31

was flawed.  This erroneous construction prejudicially removed the real and explicitly delineated differences between the claimed invention and the prior art.

Similarly, the PTAB's refusal to allow reasonable discovery into objective evidence of nonobviousness or to give any weight to the evidence that ConvaTec was nevertheless able to produce led the PTAB to a very one-sided view of the obviousness case.  For example, the PTAB discounted evidence of ConvaTec's evidence of commercial success for an insufficient showing of nexus.  A45-46. This Court has explained, however, that commercial reality will rarely exactly match the precise scope of the claim so that practical considerations, such as whether the product is within the scope of the claims, is sufficient to establish nexus.  *In re Glatt Air Techniques, Inc.*, 630 F.3d 1026, 1030 (Fed. Cir. 2011).

████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████  These strong indications of commercial success also reinforce ConvaTec's basis for believing that Smith is copying ConvaTec's invention because it has not been able to create a commercially viable alternative.

32

**CONFIDENTIAL INFORMATION REDACTED**

The PTAB's effective removal of the "loading" and "substantially photostable" limitations also led the PTAB to discount ConvaTec's evidence of unexpected results and long-felt need evidence based on the "loading" of the silver ions onto the charged polymer fibers.  Ms. Fiona Adams, ConvaTec's Vice President and General Manager for Wound Therapeutics testified that the superior performance of the AQUACEL® Ag dressings was attributable "to a unique property allowing the highest ionic silver concentration in the wound environment over time due to the ionic interaction between active silver ions and the wound dressing polymers."  A1085 (original emphasis).  Importantly, "[b]ecause of this ability to incorporate and release silver in an ionic form, AQUACEL® Ag is able to provide an antimicrobial environment for up to 14 days through the sustained release of silver ions."  Id.  This ability to maintain an antimicrobial environment in turn enabled physicians to keep wound dressings on patients for an extended period of time, minimizing the need to further traumatize a wound by repeated wound dressing changes.  A1175.  For physicians, this meant "ease of application, simplicity of subsequent dressing changes, decreased pain with its use and cost effectiveness."  A1174, citing to Study at Children's Hospital in Columbus, Ohio of AQUACEL® Ag use in pediatric patients with partial-thickness burns. This sustained release property, which is directly attributed to the "incorporation" of silver ions into the polymer, translated to real-world treatment of patients that

33

would otherwise not have healed with conventional therapeutics, such as topical silver sulfadiazine and hydrotherapy, and thus fulfilled a long-felt need in the industry.  A1176.

The PTAB's erroneous claim construction and denial of discovery led it to decide patentability on an incomplete record with a flawed understanding of the invention and of the state of the art in the silverized wound dressing field at the relevant time.

### K. The PTAB Erred in Denying ConvaTec's Motion to Amend its Claims

#### 1.  Standard of review

As of the filing date of this brief, the Court has not articulated a standard of review for the denial of a motion to amend claims in the new PTAB proceedings. The overall decision based on those subordinate elements involves an application of the statute (§316(d)) to the facts of the case, which suggests at least a question of law based on underlying facts.  The subordinate elements of the decision can be reviewed under the usual standards, for example, claim construction would be reviewed for error.

In practical terms, ConvaTec's consistent position on what its claims mean has created an "inter partes review history" that would effectively prevent any effort to enforce the claims more broadly.  Thus, the PTAB's refusal to grant the motion to amend the claims to reflect that position more expressly is curious.  The

34

PTAB's reliance in part on onerous formalities unreasonably elevates form over substance and due process.

### 2. *Abuse of discretion on the showing support requirement*

As a formal matter, the PTAB held that ConvaTec failed to show the support for the amended claims properly.  A54.  The statute has no such requirement, §316(d), but the Director promulgated a rule requiring the movant to a show support in every disclosure for which benefit is sought.  §42.121.  The PTAB requires the movant to show support, not only for the proposed changes to the claims, but also for the portions of the patent claims that have not changed, while also proving the patentability of the claim, all of which is hard to do in fifteen pages.  In the present case, ConvaTec mistakenly relied on the patented claims and the patent disclosure to show support.  This technical mistake was harmless: the PTAB did not identify an instance where it would have made a difference.  ConvaTec is not aware of any material difference.  *Cf. Hyatt v. Kappos*, 625 F. 3d 1320, 1324 (Fed. Cir. 2010) (en banc) (noting PTAB's independent obligation to review the specification); *In re Huston*, 308 F.3d 1267, 1270 n.1 (Fed. Cir. 2002) (Board citation of patent rather than application disclosure was error harmless because disclosure were the same).  Using this formal mistake as a basis for denying the motion was an abuse of discretion.  The PTAB is also supposed to

seek just, speedy and inexpensive resolutions and has the power to overlook

formalities when no prejudice has occurred.  37 C.F.R. §§42.1(b) and 42.5(b).

### 3. *Erroneous construction of gelled fiber*

More troubling is the PTAB's finding that an added limitation for gelled

fiber was improper because there is no support for gelled cellulose.  The PTAB

reasoned that the fibers of the claim could include a polysaccharide and that

cellulose is a polysaccharide, therefore the claim must include gelled cellulose and

by extension the specification must support gelled cellulose: since the specification

does not support gelled cellulose, the claim must be defective.  The PTAB's

reasoning starts with another flawed claim construction: nothing in the claim

requires gelled cellulose.  The relevant portion of the amended claim is "wherein

the polymer is a gel forming fiber selected from the group consisting of a

polysaccharide, a modified polysaccharide, …."  A52.  "Gel forming" is not a

requirement of every element of within the group but rather a restriction on what

kind of fiber could be selected from the group.  If cellulose is not a gel-forming

fiber, it cannot be a gel-forming fiber selected from the group.  Nothing in the

record indicates that those in the art would expect unmodified cellulose to gel.  The

PTAB's argument is a flawed syllogism, with erroneous claim construction and no

evidence in the record.  Hence, the PTAB lacked substantial evidence to find this

limitation unsupported.

### 4. Erroneous burden shift on patentability

The PTAB also denied the motion because ConvaTec had failed to prove that the claims are patentable over all possible prior art. This requirement is not found in the statute or the rules. Indeed, the statute places the burden of proving unpatentability on the petitioner without exception in §316(e), which immediately follows the subsection on amending claims, §316(d). Nothing in §316(d) indicates a statutory scheme in which the burden on patentability would shift to the patent owner. The PTAB's burden shift on patentability for amended claims lacks statutory support and is facially inconsistent with the statutory scheme.

Moreover, the long-standing guidance for trials at the board is that a movant who is required to show patentability need only show support and, where there are unpatentability arguments already of record, address those arguments as well. Chief Admin. Pat. Judge, *Interference Practice - Interference Rules Which Require a Party to "Show the Patentability" of a Claim*, 1217 Off. Gaz. 17 (PTO 6 Nov. 1998):[2]

> The requirement of the rules that a party "show the patentability" of a claim may have led to some confusion as to precisely what is required to comply with the rules. This notice

---

[2] Posted on the PTAB web site as of November 13, 2014:

http://www.uspto.gov/ip/boards/bpai/procedures/og/cons118.pdf.

provides guidance with respect to the requirement to "show the patentability."

The requirement that a party "show the patentability" of a claim should not be construed as requiring a party to prove a negative, i.e., that there is no prior art which would anticipate the claim under 35 U.S.C. 102 or render the claim unpatentable under 35 U.S.C. 103. In this respect, the burden of establishing that a claim is not patentable generally falls on the party or individual alleging unpatentability. See, e.g., 35 U.S.C. 102 which provides that an applicant is "entitled to a patent unless ***. " See also, *Horton v. Stevens*, 7 USPQ2d 1245, 1246-47 (Bd. Pat. App. & Int. 1988). Consistent with 37 CFR 1.601 [now §41.1(b)], which provides that the rules should be construed to secure the just, speedy and inexpensive determination of interferences, the rules requiring a party to "show the patentability" of a claim normally should be interpreted as requiring that a party establish that the subject matter of the claim is described in the specification in the manner required by the first paragraph of 35 U.S.C. 112.

The Chief Judge's published guidance is consistent with statute and case law (including board case law). The guidance also wisely avoids the difficulties in proving a negative (that a claim is not unpatentable), while generally only imposing a positive burden to show written description. It is also consistent with the present rules for inter partes reviews. §42.1(b) ("This part shall be construed to secure the just, speedy, and inexpensive resolution of every proceeding."); §42.121(a)(2)(i) (must address grounds of patentability already raised) and §42.121(b) (must show support). The PTAB erred in imposing yet further substantive requirements on the patent owner beyond what the statute, the rules and the PTAB's posted guidance require. Instead of following its own posted guidance, the PTAB in this case chose to rely on a non-precedential opinion, *see*

*Idle Free Sys., Inc. v. Bergstrom, Inc.*, IPR2012-00027, slip op. at 33, Paper 66 (PTAB January 7, 2014), A56, which was decided months after ConvaTec filed its motion to amend.  A1109.  The PTAB did not explain the basis for the holding in *Idle Free*, why it overruled past guidance, or why a different PTAB panel's later-published reasoning in a different case was nevertheless appropriate to apply in this case.

This Court faced a similar problem when reexaminations were created and the USPTO promulgated standards and processes for the new procedures.  In *Patlex Corp. v. Mossinghoff*, 771 F.2d 480 (Fed. Cir. 1985), the patent owner complained that USPTO processes not only barred the owner from participating in the initial decision to reexamine, but that its instructions to the examiners also created a rule of doubt that biased the determination against the patent.  *Id*. at 486.  The Court held that the rule of doubt was not grounded in the statute and was contrary to legislative intent.  *Id*. at 487.  In the present case, the PTAB amendment practice violates the clear intent expressed in the statute itself that the PTAB provide an effective mechanism for patent owners to address curable problems in the patent by amendment.  §316(d).  The constraints that the PTAB places on motions to amend beyond those required in the statute effectively violate the purpose of the statute and should be set aside.

### 5. *Erroneous burden shift on inherency*

For substitute claim 22, the PTAB held that ConvaTec also "fails on the basis that Gibbins '751 teaches a substantially identical process, and thus would inherently produce a light stabilized antimicrobial material as required by proposed substitute claims 22." A57. Inherency is a question of fact. *In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir. 1997). The PTAB cited no evidence in support of its finding on inherency. Thus, the PTAB's finding lacks substantial evidence. Moreover, the PTAB erred because it has no authority to shift the burden of proof on inherency to the patent owner in an inter partes proceeding. *Cf. Aventis Pharma S.A. v. Amphastar Pharmaceuticals, Inc.*, 525 F.3d 1334, 1345 (Fed. Cir. 2008) (explaining that the burden shift is permitted during ex parte examination because an examiner is unable to perform tests). In any case, the PTAB had already found that in Gibbins '751 "most samples, including (m), turned a purplish color eventually when exposed to light, with those sample[s] containing a higher concentration of silver turning more quickly", A1407, which is inconsistent with the claim limitation that the silver be substantially photostable when dry. Thus, the PTAB's finding lacks substantial evidence.

In sum, ConvaTec has not been afforded a reasonable opportunity to amend its claims. The PTAB abused its discretion in unreasonably punishing ConvaTec for citing the wrong version of its disclosure in showing support (a mistake that

this Court has excused when the PTAB has done it in the past). The PTAB erred in imposing a non-statutory patentability burden on the patent owner and then abused its discretion in changing the requirements for showing patentability without any notice and comment or some comparably regular administrative process. The PTAB abused its discretion in shifting the burden of proof on inherency. The PTAB erred in construing the gel-forming fiber amendment. The PTAB has made findings without substantial evidence about cellulose and inherency. In short, the decision denying ConvaTec's motion to amend is deeply flawed and must be set aside.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

As explained above, the PTAB erred by construing the contested claims unreasonably broadly in view of the record and the limited amendment practice and by holding the claims to have been obvious based on erroneous claim construction without permitting the appellant to obtain key objective evidence of non-obviousness. The final decisions in IPR'097 and IPR'102 should be reversed. Alternatively, the final decisions should be vacated and the cases remanded to the PTAB for further proceedings consistent with guidance the Court provides.

November 14, 2014                    */s/ Richard Torczon*
                                      Richard Torczon
                                      Counsel for Appellant
                                      ConvaTec Technologies Inc.

41

# ADDENDUM

Trials@uspto.gov                                           Paper 90
Tel: 571-272-7822                                  Entered: May 29, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

SMITH & NEPHEW, INC.
Petitioner,

v.

CONVATEC TECHNOLOGIES, INC.
Patent Owner

——————

Case IPR2013-00097
Patent 6,669,981 B2

———————————

Before LORA M. GREEN, RAE LYNN P. GUEST, and
SHERIDAN K. SNEDDEN *Administrative Patent Judges.*

GUEST, *Administrative Patent Judge.*

SNEDDEN*, Administrative Patent Judge, concurring-in-part.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

**A1**

Case IPR2013-00097
Patent 6,669,981 B2

## I.     BACKGROUND

### A.  Introduction

On December 21, 2012, Smith & Nephew, Inc. ("Smith & Nephew"), filed a Petition under 35 U.S.C. §§ 311-319, for *inter partes* review of claims 1-8 and 10-20 of U.S. Patent No. 6,669,981 B2 (Ex. 1001, "the '981 patent"). Paper 4 ("Pet."). ConvaTec Technologies, Inc. ("ConvaTec") filed a Preliminary Response on April 1, 2013. Paper 11. On May 31, 2013, we granted the Petition, and instituted an *inter partes* review of claims 1-8 and 10-20. Paper 12 ("Dec. on Inst.").

After institution of this proceeding, ConvaTec filed its Patent Owner's Response ("PO Resp."). Paper 29. ConvaTec also filed a Corrected Motion to Amend ("Mot. Amend") in which ConvaTec moved to substitute proposed claims 21 and 22 for 1 and 17, respectively. Paper 28. Both ConvaTec and Smith & Nephew filed Motions to Exclude. Paper 55; Paper 60. Oral hearing was held on March 5, 2014.[1]

The Board has jurisdiction under 35 U.S.C. § 6(c). This final written decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons that follow, we determine that Smith & Nephew has shown by a preponderance of the evidence that claims 1-8 and 10-20 of the '981 patent are unpatentable. ConvaTec's Motion to Amend is *denied*.

### B.  The '981 Patent

The '981 patent describes methods of enhancing the photostability of silver in antimicrobial materials for use in wound dressing and medical

---

[1] A transcript of the oral hearing is included in the record as Paper 83.

devices.  Ex. 1001, 1:10-12.  Silver-containing materials are generally
sensitive to light, and can cause uncontrolled discoloration of the silver-
containing material.  *Id.* at 1:32-35.  The silver-containing materials made in
accordance with the '981 patent, however, are disclosed as being
substantially photostable, but will release silver when rehydrated.  *Id.* at
3:23-25.

The '981 patent discloses a method wherein antimicrobial materials
are prepared by subjecting a material containing hydrophilic, amphoteric, or
anionic polymers to a solution comprising an organic solvent and a source of
silver ("the silver solution").  *Id.* at 2:56-3:4.  Examples of appropriate
organic solvents include ethanol, methanol, acetone, and isopropyl alcohol.
*Id.* at 4:18-21.

The polymer is subjected to the silver solution for a time that is
sufficient to incorporate the desired silver concentration into the polymer.
*Id.* at 3:13-15, *see id.* 4:11-13.  The '981 patent also refers to a "silver-
loading step," where "loading" is defined as "ionic exchange of the cation to
the polymer with silver ions."  *Id.* at 5:38-46.

In the next step, during the course of, or following, the period where
the polymer is subjected to the silver solution, the polymer is further
subjected to agent(s) that facilitate the binding of the silver and the polymer
together; "binding" is defined as "the formation of a photostable
compound."  *Id.* at 3:15-23, 5:49-50.  Chlorides are examples of such
facilitating agents.  *Id.* at 3:18-21.

### C. Exemplary Claims

Claims 1 and 17 are the independent claims among the challenged
claims of the '981 patent.  All the claims are directed to methods of

Case IPR2013-00097
Patent 6,669,981 B2

preparing a light stabilized antimicrobial material.  The independent

challenged claims, which are illustrative of the claims at issue in this *inter*

*partes* review, recite:

> 1. A method of preparing a light stabilized antimicrobial
> material comprising the steps of
>     a) preparing a solution comprising an organic solvent and
> a source of silver in a quantity sufficient to provide a desired
> silver concentration in the light stabilized antimicrobial
> material;
>     b) subjecting a polymer to the solution for a time
> sufficient to incorporate the desired silver concentration into the
> polymer, wherein the polymer is selected from the group
> consisting of a polysaccharide, a modified polysaccharide, a
> polyvinylpyrrolidone, a polyvinyl alcohol, a polyvinyl ether, a
> polyurethane, a polyacrylate, a polyacrylamide, a collagen, a
> gelatin, and a mixture thereof; and
>     c) subjecting the polymer, during or after step (b), to one
> or more agents which facilitate the binding of the silver on the
> polymer;
>     wherein the silver is substantially photostable in the light
> stabilized antimicrobial material when dry, but will dissociate
> from the light stabilized antimicrobial material upon hydration
> of the light stabilized antimicrobial material.

> 17. A method of preparing a light stabilized antimicrobial
> material comprising the steps of
>     a) preparing a solution comprising an organic solvent and
> a source of silver in a quantity sufficient to provide a desired
> silver concentration in the light stabilized antimicrobial
> material;
>     b) subjecting a polymer to the solution for a time
> sufficient to incorporate the desired silver concentration into the
> polymer; and
>     c) subjecting the polymer, after step (b), to one or more
> agents which facilitate the binding of the silver on the polymer;
>     wherein the silver is substantially photostable in the light
> stabilized antimicrobial material when dry, but will dissociate

Case IPR2013-00097
Patent 6,669,981 B2

from the light stabilized antimicrobial material upon hydration
of the light stabilized antimicrobial material.

Claims 2-8 and 10-16 depend from claim 1, either directly or
indirectly.  Claims 18-20 depend directly from claim 17.

Dependent claims 2 and 18 add step (d) using the light stabilized
material in a medical device.

Dependent claims 3 and 19 add step (d) using the light stabilized
material in a wound dressing.

Dependent claim 4 adds step (d) using the light stabilized material in
an ostomy device.

Dependent claim 5 specifies that the source of silver is a silver salt,
while dependent claim 6 lists specific silver salts.  Dependent claims 7 and 8
list specific agents that facilitate the binding of the silver to the polymer.
Dependent claim 10 limits the method to specific polysaccharides, and
dependent claim 11 limits the method to the listed organic solvents.
Dependent claim 20 limits the method of claim 17 to certain polymers.

Dependent claims 12 and 13 specify the desired silver concentration.
Dependent claims 14 and 15 limit the time sufficient to incorporate the
desired silver concentration into the polymer, and claim 16 limits the amount
of time that the polymer is subjected to the agent that facilitates the binding
of the silver to the polymer.

*D. Challenges to the Patentability of Claims*

We instituted this *inter partes* review in connection with the following
challenges to the patentability of claims in the '981 patent:

Case IPR2013-00097
Patent 6,669,981 B2

1. Claims 1-3, 5-8, 12, 13, and 17-19 are anticipated, or rendered obvious, by Kreidl.[2]

2. Claim 11 is rendered obvious by the combination of Kreidl and Bahia.[3]

3. Claims 12-16 are rendered obvious by Kreidl, Walder,[4] Ronan,[5] and Romans.[6]

4. Claims 10 and 20 are rendered obvious by the combination of Kreidl, Bahia, and Ronan.

5. Claims 1, 2, 5-8, 10, 12-15, 17, 18, and 20 are anticipated or rendered obvious by Ronan, as evidenced by Kreidl and Romans.

6. Claims 3, 11, and 19 are rendered obvious by the combination of Ronan and Bahia.

7. Claims 1-8, 10, 11, and 17-20 are anticipated under 35 U.S.C. § 102(e) by Gibbins '751.[7]

8. Claims 12-15 are rendered obvious by the combination of Gibbins '751, as combined with Walder, Ronan, Romans, and Kreidl.

---

[2] Kreidl et al. ("Kreidl"), U.S. Patent No. 2,396,514 (issued Mar. 12, 1946) (Ex. 1002).

[3] Bahia et al. ("Bahia"), WO 94/16746 A1, published August 4, 1994 (Ex. 1005).

[4] Walder, U.S. Patent No. 5,848,995 (issued Dec. 15, 1998) (Ex. 1004).

[5] Ronan et al. ("Ronan"), U.S. Patent No. 5,820,918 (issued Oct. 13, 1998) (Ex. 1006).

[6] Romans, U.S. Patent No. 3,092,552 (issued June 4, 1963) (Ex. 1003).

[7] Gibbins et al. ("Gibbins '751"), U.S. Patent No. 6,605,751 B1 (issued Aug. 12, 2003) (Ex. 1007).

Case IPR2013-00097
Patent 6,669,981 B2

9. Claim 16 is rendered obvious by the combination of Gibbins '751
and Kreidl.

## II.    ANALYSIS

### A. Claim Interpretation

We interpret patent claim language in an *inter partes* review by
ascribing to that language its broadest reasonable meaning in light of the
specification of the patent.  37 C.F.R. § 42.100(b); Office Patent Trial
Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).  Under that
standard, we construe claim terms using "the broadest reasonable meaning
of the words in their ordinary usage as they would be understood by one of
ordinary skill in the art, taking into account whatever enlightenment by way
of definitions or otherwise that may be afforded by the written description
contained in the applicant's specification."  *In re Morris*, 127 F.3d 1048,
1054 (Fed. Cir. 1997).  We presume that claim terms have their ordinary and
customary meaning.  *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257
(Fed. Cir. 2007) ("The ordinary and customary meaning is the meaning that
the term would have to a person of ordinary skill in the art in question.")
(internal quotation marks and citation omitted).  A patentee may rebut that
presumption, however, by acting as his own lexicographer, providing a
definition of the term in the specification with "reasonable clarity,
deliberateness, and precision."  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir.
1994).

We expressly interpret below only those claim terms that require
analysis to resolve arguments related to the patentability of the challenged
claims in this proceeding.

Case IPR2013-00097
Patent 6,669,981 B2

> 1. *"to incorporate the desired silver concentration into the polymer"*

ConvaTec contends that the above quoted phrase requires a chemical interaction between silver ions solubilized from a silver salt and a polymer. PO Resp. 7. ConvaTec contends also that the phrase "incorporate the desired silver concentration into the polymer" is construed properly to involve an ionic interaction. *Id.* To support that position, ConvaTec contends that the specification of the '981 patent associates the "incorporate . . . into" step with "loading" of silver onto the polymer, as required by independent claims 1 and 17, where "loading" is expressly defined in the '981 patent to mean "ionic exchange of the cation to the polymer with silver ions." *Id.* at 6-7 (citing Ex. 1001 at 5:38-40).

We agree with ConvaTec that the claims encompass an ionic interaction between free silver ions and a polymer; we do not agree, however, that the claims are limited to that single type of interaction. The claims do not recite the term "loading," and we decline to construe the claims to be limited to the express definition given to that term. Further, the '981 patent provides a list of suitable polymers that includes substances incapable of ionic interaction with silver ions including, for example, unmodified polysaccharides (i.e. cotton) and polyurethane. Ex. 1001, 3:61-4:7; Ex. 1045 ¶ 52; Ex. 2029 ¶¶ 30, 58. Rather, we interpret the phrase "incorporate . . . into" as requiring the silver to associate with the polymer in a way, regardless of the type of interaction (*e.g.*, ionic, Van der Waals, etc.), such that it can interact with the polymer and the agent that facilitates the binding of silver into the polymer so as to form a substantially photostable complex. Thus, in addition to ionic exchange, the term "incorporate . . .

into" includes other types of adsorptive interactions with the polymer that result in a substantially photostable complex, such as adsorption of the silver on the polymer, with the subsequent conversion of the silver cation to insoluble silver chloride.

### 2. *"a solution comprising an organic solvent"*

The '981 patent discloses that silver is dissolved in an organic solvent to solubilize the source of silver, such as a silver salt. Ex. 1001, 5:34-36. The organic solvent also functions to prevent hydration of the polymer, and as such should include less than 50% w/w water to alcohol so as to prevent hydration of the polymer. *Id.* at 4:63-64. ConvaTec further relies on the declaration of Dr. Kevin Edgar to establish that the presence of an organic solvent creates an environment favorable for ion exchange. PO Resp. at 7; *see* Ex. 2029 ¶¶ 17-18.

The express language of the claims, however, merely requires a solution comprising an organic solvent, and does not recite expressly any specific range as to the ratio of, for example, water to alcohol. The claims may encompass a ratio of water to alcohol that favors the ionic exchange of silver onto an ionized polymer, but are not so limited. The claims, thus, broadly encompass any solution comprising an organic solvent in an amount sufficient to prepare a silver solution, regardless of whether the amount of organic solvent is sufficient to create an environment favorable for ionic exchange.

### 3. *"binding of silver on the polymer"*

The '981 patent expressly defines "binding" as "the formation of a photostable compound." Ex. 1001, 5:50-51. As with the

Case IPR2013-00097
Patent 6,669,981 B2

"incorporate . . . into" language discussed above, the term "binding" has not been defined in the specification as being particularly limited to binding of the silver to the polymer via ionic exchange. Accordingly, the term "binding" can refer to any formation of a photostable compound on the polymer.

### 4. "substantially photostable"

The '981 patent defines "photostable" as "[c]ontrolled colour change to a desired colour with minimal change thereafter." *See, e.g.*, Ex. 1001, 5:47-49. The '981 patent does not define what is or is not a "desired color," and it does not exclude any particular color as a "desired color."

ConvaTec seeks a definition of "desired color" that excludes any colors other than a white or a "grayish white," and particularly excludes purple as a "desired color." PO Resp. 13-14, 42-43. ConvaTec relies substantially on the testimony of Dr. Tania Phillips[8] (Ex. 2028) in support of that interpretation. *Id.*

Smith & Nephew contends that the term "photostable" should be interpreted broadly due to a lack of evidence to support what a skilled artisan would have considered to be a "desired color," as required by the claims. Paper 45:7-10.

---

[8] Dr. Phillips testifies to having extensive experience in the field of wound care, as both a practicing clinician and researcher, for almost 30 years, and being very familiar with issues related to the wound care and management field. Ex. 2028 ¶ 9. Dr. Phillips appears to be qualified to testify as to wound care practices at the time of the invention described in the '981 patent.

Case IPR2013-00097
Patent 6,669,981 B2

Dr. Phillips testifies that if she "were presented with an AQUACEL®
Ag dressing[9] that was purple out of its package, or turned purple shortly
after exposure to light, [she] would assume that the dressing was expired and
not in optimal condition for clinical use."  Ex. 2028, ¶ 16.  Dr. Phillips
further testifies that

> It is my experience that the "desired color" of a silverised
> antimicrobial material in the '981 patent and '828 patent is
> white. . . .  [i]nstead, a color change from "white" to "purplish"
> is in my opinion a discoloration, and does not equate with a
> "substantially photostable" product, or a "photostable" product
> that has minimal color change from the "desired color" of
> white.

Ex. 2028 ¶ 21.  Dr. Phillips also references a table found in Gibbins '751,
which lists "Ag Aquacel" when dry as "[w]hite, good, eventually purplish,"
to support her testimony that white is a desired color for a silverized
antimicrobial material.  Ex. 2028, ¶ 18 (citing Ex. 1007, 33:36); Ex. 2041,
88:17-20.

We are not persuaded by Dr. Phillips' testimony.  Dr. Phillips only
testifies as to the desired color for the AQUACEL® Ag product, with which
she is familiar in clinical practice, and not to desired colors of wound
dressings in general.  We note that the claims and specification of the '981
patent are not limited to any particular product.  The specification also does
not limit "desired colour" to any particular desired colors for any particular
product.  *See, e.g.*, Ex. 1001, 5:46-48 (defining "photostable" as requiring a
"[c]ontrolled colour change to a desired colour," without specifying a

---

[9] AQUACEL® Ag dressing is a silverised wound dressing product marketed
by ConvaTec that is said to be covered by the '981 patent.  Ex. 2045, ¶ 2.

desired color).    Upon cross-examination, Dr. Phillips further states that there was nothing inherently wrong with purple if the wound dressing did not change further after turning purple.[10]

Dr. Phillips' testimony is based on her experience,[11] as well as the statements of the Gibbins '751 patent.  Dr. Phillips' testimony does not address what was recognized as a "desired color" in the art of wound dressings as a whole.  Dr. Phillips testifies that she has no knowledge of the technical details of why color change may occur in a silverized wound dressing[12] on which to base her opinion as to what would be a "desired color" in the art of wound dressings as a whole.

---

[10] Exhibit 2041, 88:21-89:14 ("I would say that in my experience, I have not used a mauve tinted dressing as a silverized dressing.  However, if there was a new dressing introduced that was purple and it was exposed to the air and it did not change color significantly during air exposure and it was as effective as all the other silver containing antimicrobial dressings, then I would have to see the data on it, but the color, per se, would not be an objection."); Exhibit 1046, 65:18-21 ("I think if the dressing had a purplish tinge to it and it was exposed to light and it didn't change color and didn't look any different, then it would be acceptable.") (emphasis removed).

[11] Ex. 1046, 65:7-21 ("Q.  What about white with a purplish tinge to it, would that also be a desired color?  A.  I haven't seen that color in any of the dressings I'm currently using."); Exhibit 1046, 61:20-62:4 ("Q.  You have no understanding as to whether any other practitioners have a different understanding as to the desired color of wound dressings? [] A.  I can only comment on my own experience. Q.  Did you ask any other practitioners whether they think purple is a desirable color for a wound dressing?  A.  I did not.") (objection omitted).

[12] Exhibit 1046, 39:17-21("I'm a clinician.  I'm somebody who uses the dressings in practice.  I can see when they change color, but I could not give you the scientific details why they change color.").

Case IPR2013-00097
Patent 6,669,981 B2

Moreover, Dr. Phillips' testimony seems to suggest that any change of color is undesirable,[13] and reads Gibbins '751's color change of the dry product from white to purple as being unacceptable.[14]  The claims recite, however, that the material must be "substantially photostable . . . upon drying," and the '981 patent defines the term "photostable," as having a "[c]ontrolled colour change to a desired colour with minimal change thereafter."  There is nothing to suggest that a controlled color change of a dry product from white to purple would not be encompassed by the scope of the definition of the '981 patent.

Dr. Phillips also characterizes desirability based on whether the material "was expired and not in optimal condition for clinical use."  Ex. 2028 ¶ 16.  The '981 patent defines photostability, however, not in terms of suitability for use, antimicrobial activity, or chemical stability, but in terms of controlled color change, with minimal change thereafter.  Dr. Phillips' testimony that a color change from white or greyish white would appear "unsuitable for clinical use" or "expired" also is controverted by Gibbins '751's disclosure that, despite the purple color, *Staph. aureus* was nonetheless inhibited.  Ex. 1007, 34:42-54.

---

[13] Exhibit 2028 ¶ 16; Exhibit 1046, 61:7-16 ("Well, I think in my experience working with wound dressings, I know that most, in fact, all the silver wound products that I've worked with are in the color spectrum between white to gray.  So if I open a packet with a wound dressing that's a silverite that I know is in this color spectrum and the color has changed to purple or brown or green, I think that's outside the normal color change that I would expect to see within those dressings.").

[14] Ex. 2028 ¶¶ 18-19; Ex. 2041, 88:7-20.

Case IPR2013-00097
Patent 6,669,981 B2

Accordingly, we interpret the term "desired color" reasonably broadly to encompass any color that may be desirable to one of ordinary skill in the art for any purpose. On the testimony of record, we do not find any reason to conclude that one of ordinary skill in the art would not consider purple as a desired color.

There is no discussion in the '981 patent as to whether or not a "minimum color change" is a change of color to an undesirable color or simply a change in the shade or spectrum of a single color. The broadest reasonable meaning therefore includes both, and thus, we construe term "photostable" to permit a minimal color change from a desired color, and also to permit minimal discoloration to an undesired color.

As to "substantially," the Federal Circuit has noted that "the term 'substantially' is capable of multiple interpretations." *Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc*., 347 F.3d 1314, 1323 (Fed. Cir. 2003) (citation omitted). "[S]ubstantially" can be interpreted as "'significantly' or 'considerably,'" or also "'largely' or 'essentially.'" *Id*. at 1322-23 (citing *Webster's New 20th Century Dictionary* 1817 (1983)). In view of those possible meanings, the broadest reasonable interpretation of "substantially," when read in the context of the '981 patent, is that the claim is open to at least some degree of additional color change beyond that described in the definition of the term "photostable."

In view of the above discussion, we determine that the broadest reasonable interpretation of the term "substantially photostable" is that the material may undergo a controlled color change to desired color, some minimal discoloration, even to an undesirable color, from the controlled

Case IPR2013-00097
Patent 6,669,981 B2

color, and even some degree beyond a "minimal discoloration," and still be
considered "substantially [i.e., essentially] photostable."

### B. Patentability of Original Claims

To prevail in its challenges to the patentability of claims, the
petitioner must establish facts supporting its challenges by a preponderance
of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). The Court of
Appeals for the Federal Circuit summarized the analytical framework for
determining whether prior art anticipates a claim as follows:

> If the claimed invention was "described in a printed
> publication" either before the date of invention, 35 U.S.C.
> § 102(a), or more than one year before the U.S. patent
> application was filed, 35 U.S.C. § 102(b), then that prior art
> anticipates the patent. Although § 102 refers to "the invention"
> generally, the anticipation inquiry proceeds on a claim-by-claim
> basis. *See Hakim v. Cannon Avent Group, PLC*, 479 F.3d 1313,
> 1319 (Fed. Cir. 2007). To anticipate a claim, a single prior art
> reference must expressly or inherently disclose each claim
> limitation. *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150
> F.3d 1354, 1361 (Fed. Cir. 1998). But disclosure of each
> element is not quite enough—this court has long held that
> "[a]nticipation requires the presence in a single prior art
> disclosure of all elements of a claimed invention *arranged as in
> the claim.*" *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542,
> 1548 (Fed. Cir. 1983) (citing *Soundscriber Corp. v. United
> States*, 175 Ct.Cl. 644, 360 F.2d 954, 960 (1966) (emphasis
> added)).

*Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1334–35 (Fed. Cir.
2008). We must analyze prior art references as a skilled artisan would. *See
Scripps Clinic & Res. Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed.
Cir. 1991), *overruled on other grounds by Abbott Labs. v. Sandoz, Inc.*, 556
F.3d 1282 (Fed. Cir. 2009) (to anticipate, "[t]here must be no difference

Case IPR2013-00097
Patent 6,669,981 B2

between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention").

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). The level of ordinary skill in the art usually is evidenced by the references themselves. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995); *In re Oelrich*, 579 F.2d 86, 91 (CCPA 1978).

For an obviousness analysis, prior art references must be "considered together with the knowledge of one of ordinary skill in the pertinent art." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (quoting *In re Samour*, 571 F.2d 559, 562 (CCPA 1978)). Moreover, "it is proper to take into account not only specific teachings of the reference, but also the inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d 825, 826 (CCPA 1968). That is because an obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."

Case IPR2013-00097
Patent 6,669,981 B2

*KSR*, 550 U.S. at 418; *see also In re Translogic Tech., Inc.*, 504 F.3d. at 1259 .

We analyze the instituted grounds of unpatentability in accordance with the above-stated principles.

> 1.  *Claims 1-3, 5-8, 12, 13, and 17-19 as anticipated and/or obvious over Kreidl (Ex. 1002)*

Kreidl discloses a disinfectant material being impregnated with light-stabilized silver halide compositions.  Ex. 1002, 1, 1:2-5, 39-46.  Kreidl discloses a method in which bandage gauze is soaked in silver nitrate solution, dried, and then placed in a sodium chloride solution.  *Id.* at 3, 2:37-46.  In Example 5 of Kreidl, a bandage gauze is dipped into a solution of 1% silver nitrate and dried.  *Id.* at 6, 1:20-21.  The bandage is then placed into a 20% sodium chloride solution for an hour, and washed.  *Id.* at 6, 1:20-23.  According to Kreidl, the gauze bandage does not discolor when exposed to light.  *Id.* at 6, 1:23-24.

Example 6 is very similar to Example 5, except the bandage is immersed in a 5% sodium chloride solution for 24 hours.  *Id.* at 6, 1:25-29.  The time the gauze spends in the halide solution depends on the concentration of the halide, such that using a 20% sodium chloride solution only requires one hour, while a 5% solution requires 24 hours.  *Id.* at 3, 2:57-61.

Kreidl also teaches that wherever solutions are mentioned, the term "is not to be limited to aqueous solutions but is meant to comprise other suitable solvents such as alcohol, glycerine, carbon tetrachloride, and the like."  *Id.* at 6, 2:20-26.  While Kreidl states that aqueous solutions are

Case IPR2013-00097
Patent 6,669,981 B2

preferred for silver halide preparations, it nonetheless discloses further that mixed solvents, such as diluted alcohol, may be used. *Id.* at 6, 2:26-31.

### a. Claims 1, 2, 3, 5, 8, and 17-19

ConvaTec contends that Kreidl does not anticipate claims 1 and 17, and contends further that the claims are not rendered obvious by Kreidl, because the bandage gauze of Kreidl is made from cotton fibers. PO Resp. 15-16, 18-20. According to ConvaTec, cotton—being made primarily of pure cellulose containing no readily ionizable groups—is incapable of carrying out ion exchange reactions, and thus, Kreidl does not disclose a chemical association of silver ions with the polymer. *Id.* (citing Ex. 2029 ¶ 30).

ConvaTec presents evidence that the process of Kreidl results in the impregnation of precipitated and insoluble silver chloride into fibrous cotton gauze in a process referred to as *in situ* incorporation. *See e.g.*, Ex. 1026 ¶¶ 14, 15, 20, 26, 27, 39. The insoluble silver chloride precipitate occurs when the sodium chloride is added either before or at the same time as the silver source, because the silver ions are more attracted to the chloride ions than to any negative charges associated with the polymer. *Id.*; Ex. 2029 ¶ 23. Nonetheless, both parties agree that, due to the proximity of silver chloride to the polymer, there necessarily will be adsorption of silver chloride to the polymer. Ex. 1026 ¶ 26; *see* Ex. 2029 ¶ 32.

ConvaTec further argues that "Kreidl does not appreciate the use of organic solvents for shifting the ion exchange equilibria, and 'driv[ing] the exchange of sodium for silver' in the incorporation of silver into the polymer." PO Resp. 17, 21.

Case IPR2013-00097
Patent 6,669,981 B2

ConvaTec's arguments are substantially directed to an interpretation of the phrase "incorporate . . . into" and "binding" as requiring an ionic exchange of the silver onto only anionic polymer fibers. We reject that interpretation of the claim language, as set forth above, and thus, we are not persuaded by ConvaTec's arguments. Although ConvaTec's evidence shows that ionic exchange is not possible for the cotton fibers and the lower alcohol content described in Kreidl, the claims are not so limited, and encompass any adsorption of the silver taught by Kreidl to the cotton, which is an unmodified polysaccharide expressly recited in the claims. Both parties agree that adsorption of silver chloride onto the cotton fiber occurs, which is encompassed by the term "incorporate . . . into" and "binding" recited in the claims. Ex. 1026 ¶ 26; Ex. 2029 ¶ 32.

Kreidl expressly states that the resulting silverized antimicrobial materials do not discolor when exposed to light. Ex. 1002, 6, 1:23-24. ConvaTec has not presented any persuasive evidence to undermine that teaching.

ConvaTec further argues that Kreidl does not exemplify a solution comprising an organic solvent, and the use thereof constitutes inappropriate picking and choosing of embodiments for a finding of anticipation. PO Resp. 17 (citing Ex. 2029 ¶ 31 (calling the use of an organic solvent an "afterthought")). Alternatively, ConvaTec argues that Kreidl's preference for aqueous solutions teaches away from the skilled artisan adding an organic solvent. *Id.* at 20-21.

Smith & Nephew contends that Kreidl expressly discloses the use of an organic solvent, particularly diluted alcohol, with the silver source. Pet.

31-34, 39-42; Ex. 1002, 6, 2:20-31.  As discussed above, the claims do not require any particular concentration of an organic solvent.

We are not persuaded that the use of an organic solvent in addition to water is not taught expressly by Kreidl.  The disclosure in Kreidl is not limited to the examples, and a disclosure that the described solutions may comprise an organic solvent is sufficient.  *See Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1325 n.6 (Fed. Cir. 2003) ("The anticipation analysis asks solely whether the prior art reference discloses and enables the claimed invention, and not how the prior art characterizes that disclosure or whether alternatives are also disclosed.").

Moreover, it would have been obvious to one of ordinary skill in the art to have selected an organic solvent as part of the silver nitrate solution taught by Kreidl based on the explicit teaching in Kreidl.  We are not persuaded that the disclosure of an aqueous solution as preferred constitutes a teaching away.  *Merck & Co v. Biocraft Labs.*, 874 F.2d 804, 807 (Fed. Cir. 1989) ("[A]ll disclosures of the prior art, including unpreferred embodiments, must be considered.") (quoting *In re Lamberti,* 545 F.2d 747, 750 (CCPA 1976)).  Disclosed examples and preferred embodiments do not constitute a teaching away from a broader disclosure of non-preferred embodiments.  *In re Susi*, 440 F.2d 442, 446 n.3 (CCPA 1971).

ConvaTec presents no additional arguments as to dependent claims 2, 3, 5, 8, 18, and 19 other than those discussed above as to claims 1 and 17.  Based on our review of the evidence presented by Smith & Nephew, we conclude that Smith & Nephew has established by a preponderance of evidence that Kreidl anticipates claims 1, 2, 3, 5, 8, and 17-19 under 35 U.S.C. § 102(b).  We conclude further that when weighed with the evidence

Case IPR2013-00097
Patent 6,669,981 B2

of secondary considerations, discussed below, Smith & Nephew has shown by a preponderance of the evidence that claims 1, 2, 3, 5, 8, and 17-19 would have been obvious over Kreidl.

b.  Claims 12 and 13

Claim 12 is drawn to the method of claim 1, "wherein the desired silver concentration is between 0.1 and 20 wt %," and claim 13 recites that "the desired silver concentration is between 1 and 20 wt %."  Smith & Nephew note Kreidl teaches that "'[a]s a rule, for a standard bandage gauze[,] not more than about 4% silver nitrate should be retained on the fiber . . . .'"  Pet. 32-34 (quoting Ex. 1002, 3, 2:41-44).  Smith & Nephew contends, citing the Declaration of Dr. Stephen L. Coulter ("Coulter Declaration," Ex. 1026 ¶ 27), that levels of silver below 4% are within the ranges of silver claimed in claims 12 and 13.  Pet. 34.  ConvaTec argues that claims 12 and 13 are not anticipated by Kreidl, as Kreidl does not disclose the level of silver in the finished product, but "merely discloses that a bandage gauze was 'dipped into 1% AgNO3 solution.'"  PO Resp. 24 (citing Ex. 1002, 6: 1:20-29).

ConvaTec does not challenge the Coulter Declaration in its Response, nor does ConvaTec show why the Declaration is incorrect in its conclusions. We thus credit the Declaration of Dr. Coulter.

For those reasons, we conclude that Smith & Nephew has established by a preponderance of evidence that Kreidl renders claims 12 and 13 unpatentable as anticipating under 35 U.S.C. § 102(b).  We conclude further that Smith & Nephew has shown by a preponderance of the evidence that claims 12 and 13 would have been obvious over Kreidl.

Case IPR2013-00097
Patent 6,669,981 B2

2.  *Claim 11 as obvious over Kreidl (Ex. 1002) in view of Bahia (Ex. 1005)*

Claim 11 depends from claim 1 and further recites "wherein the organic solvent is selected from the group consisting of industrial methylated spirit, denatured ethanol, methanol, acetone, isopropyl alcohol and ethanol."

Kreidl describes a solution comprising a "diluted alcohol" but does not disclose any of the recited alcohols of claim 11.  Ex. 1002, 6, 2:30-31.  Smith & Nephew contends:

> Bahia discloses that industrial methylated spirits and industrial alcohol (ethanol) are suitable solvents for use in processing wound dressings, Bahia at 13:24-25, and that an antiseptic can be added in alcohol containing wash compositions.  Bahia at 13:10-18, 14:29-33.  It would have been obvious to use industrial methylated spirits or ethanol as the alcohol in the process of Kreidl as these were well known forms of alcohol used to wash wound dressings at the time of the invention as demonstrated by Bahia.

Pet. 35-36.

ConvaTec's arguments for patentability are similar to those discussed above regarding the anticipation of claim 1, namely that, unlike Bahia, Kreidl considers the use of an alcohol as an "afterthought," while the carboxymethylcellulose ("CMC") described in Bahia would be capable of ionic exchange with silver ions and would dissolve in an aqueous solution.  PO Resp. 22-23.  According to ConvaTec, the teachings of Bahia cannot be combined properly with the teachings of Kreidl because of the "vast differences between the . . . processes disclosed in Bahia and Kreidl."  *Id.* at 24.

Case IPR2013-00097
Patent 6,669,981 B2

As above, ConvaTec's arguments are presented as if the claims require an ionic exchange between the silver and the polymer, which we have determined they do not. Moreover, ConvaTec provides no persuasive evidence that Smith & Nephew's reasoning is in error. Thus, we agree with Smith & Nephew that it would have been obvious to one of ordinary skill in the art to have used the ethanol of Bahia as the alcohol solvent described for the bandage gauze in Kreidl, because Bahia is evidence that ethanol was a known solvent for wound dressings. *See KSR*, 550 U.S. at 417 (The question to be asked is "whether the improvement is more than the predictable use of prior art elements according to their established functions.").

We conclude that, when weighed with the evidence of secondary considerations, discussed below, Smith & Nephew has shown by a preponderance of the evidence that claim 11 would have been obvious over Kreidl in view of Bahia.

### 3. *Claims 12-16 as obvious over Kreidl (Ex. 1002), Walder (Ex. 1004), Ronan (Ex. 1006), and Romans (Ex. 1003)*

#### a. Claims 12 and 13

As to claims 12 and 13, those claims have been discussed above in the analysis of the challenge over Kreidl alone. Therefore, we need not address those claims further.

#### b. Claims 14 and 15

Claims 14 and 15 specify the time during which the dressing material is exposed to a silver nitrate solution. Smith & Nephew acknowledges that Examples 5 and 6 of Kreidl do not disclose the duration in which the gauze is exposed to the silver nitrate solution. Pet. 37. Smith & Nephew relies on

Case IPR2013-00097
Patent 6,669,981 B2

Walder, Ronan, and Romans, which each teach exposing a polymer to a silver nitrate solution for a duration of time encompassed by the ranges set forth in claims 14 and 15. *Id.* Smith & Nephew, therefore, contends that it would have been within the level of skill of the ordinary artisan to "have readily appreciated that the amount of time for which the polymer must be exposed to silver nitrate will depend on the type and dimensions of the polymer subject to *in situ* silver chloride precipitation and the level of silver chloride in the final product," rendering claims 14 and 15 obvious. *Id.* (citing Coulter Dec., Ex. 1026 ¶¶ 68, 70).

ConvaTec's arguments that each of Walder, Ronan, and Romans fails to teach ionic exchange of silver with a polymer (PO Resp. 25-28) are not persuasive for the reasons discussed above.

ConvaTec further argues that Walder cannot properly be combined with Kreidl, because Walder describes only an aqueous silver nitrate solution. PO Resp. 25. ConvaTec also argues that Romans cannot properly be combined with Kreidl because Romans is directed to "non-analogous products, such as ointments and skin antiseptics," and discloses a preferred silver concentration outside of the claimed range. PO Resp. 28.

ConvaTec's arguments are not persuasive. ConvaTec has not shown why the aqueous solution of Walder or the differences described in Romans are a basis for determining that the skilled artisan would not consider the silver nitrate exposure times disclosed therein as being suitable for the process described in Kreidl, as Smith & Nephew has shown that each of Walder, Ronan, and Romans is directed to incorporating the antimicrobial properties of silver into a polymer. Moreover, ConvaTec's arguments fail to

direct us to any persuasive additional arguments regarding the teachings of Ronan.

We thus conclude that, when weighed with the evidence of secondary considerations, discussed below, Smith & Nephew has shown by a preponderance of the evidence that claims 14 and 15 would have been obvious over Kreidl, Walder, Ronan, and Romans.

### c. Claim 16

Claim 16 further recites the time during which the polymer is exposed to the binding agents in step (c) of claim 1. Smith & Nephew notes that Kreidl teaches exposing the gauze to a sodium chloride solution for one hour when a 20% sodium chloride solution is used, and for 24 hours when a 5% sodium chloride solution is used. Pet. 38. Smith & Nephew asserts that Kreidl teaches that the amount of time the material is soaked in a sodium chloride solution is a result-effective variable. *Id.* (citing Ex. 1002, 3, 2:44-51). Smith & Nephew contends it would have been obvious to optimize the time the gauze of Kreidl is soaked in the sodium chloride solution, such as soaking for 5 to 30 minutes, because Kreidl specifically teaches that it is a result-effective variable. *Id.* (citing Coulter Dec., Ex. 1026 ¶ 70).

ConvaTec's Response demonstrates no error in Smith & Nephew's challenge to patentability to claim 16 over those arguments discussed above. PO Resp. 24-29. Namely, ConvaTec's arguments do not respond to Smith & Nephew's evidence and argument that the amount of time the material is exposed to an agent that facilitates the binding of silver is a result-effective variable based on the teachings of Kreidl.

We thus conclude that, when weighed with the evidence of secondary considerations, discussed below, Smith & Nephew has shown by a

Case IPR2013-00097
Patent 6,669,981 B2

preponderance of the evidence that claim 16 would have been obvious over
Kreidl, Walder, Ronan, and Romans.

>    *4. Claims 10 and 20 as obvious over Kreidl (Ex. 1002), Bahia
>    (Ex. 1005), and Ronan (Ex. 1006)*

Claims 10 and 20 further recite that the polymer comprises "a
carboxymethylcellulose [CMC], an alginate, or a mixture thereof."  Smith &
Nephew has presented a detailed argument that "it would have been obvious
to replace the cotton gauze of Kreidl with the gel fiber [CMC] dressing of
Bahia, or to apply the Kreidl process to provide the silver chloride as an
antiseptic in the gel fiber dressing of Bahia."  Pet. 50-52.   ConvaTec's
Response demonstrates no error in Smith & Nephew's challenge to the
patentability of these dependent claims over those arguments discussed
above with respect to claims 1 and 17 as well as claim 11 above.  Namely,
ConvaTec argues that Ronan's aqueous solution would not allow for
incorporation of silver ions into the polymer by ionic exchange.  PO Resp.
29-30.  ConvaTec further argues that, unlike Bahia, Kreidl considers the use
of an alcohol as an "afterthought," while the CMC described in Bahia would
be capable of ionic exchange with silver ions and would dissolve in an
aqueous solution.  PO Resp. 30-31.

As above, ConvaTec's arguments are presented as if the claims
require an ionic exchange between the silver and the polymer, which we
have determined they do not.  We agree with Smith & Nephew that it would
have been obvious to one of ordinary skill in the art to have used the CMC
polymer of Bahia for the bandage gauze in Kreidl, because the skilled artisan
would have been aware of the advantages of Bahia's wound dressing,
namely in promoting healing, ease of handling, and translucency.  Pet. 51.

Case IPR2013-00097
Patent 6,669,981 B2

*See KSR*, 550 U.S. at 417 (The question to be asked is "whether the improvement is more than the predictable use of prior art elements according to their established functions.").

We thus conclude that, when weighed with the evidence of secondary considerations, discussed below, Smith & Nephew has shown by a preponderance of the evidence that claims 10 and 20 would have been obvious over Kreidl, Bahia, and Ronan.

> 5. *Claims 1, 2, 5-8, 10, 12-15, 17, 18, and 20 as anticipated or obvious over Ronan (Ex. 1006), as evidenced by Kreidl (Ex. 1002) and Romans (Ex. 1003)*

Ronan discloses a method of making an antiseptic article, in which the article is immersed in an infiltration solution comprising an aqueous solution of silver acetate, and then immersed into a solution that contains an anion, such as chloride. Ex. 1006, 4:40-56. The infiltration solution may contain up to about 50% of a water miscible solvent such as an alcohol, glycol, ether, or ester solvent. *Id.* at 5:20-25.

Ronan provides an example in which calcium alginate hydrogel tubing is soaked for one hour in an aqueous 1% silver acetate solution, and then soaked in an aqueous calcium chloride solution for an hour. *Id.* at 7, Example 3.

ConvaTec contends that Ronan discloses insoluble alginate cross-linked hydrogels that are not designed for ion-exchange, and thus, Ronan does not disclose or suggest "incorporation" of silver onto anionic polymers substrates. PO Resp. 32 (citing Ex. 2029 ¶¶ 37-38).

As discussed above with respect to Kreidl, ConvaTec's arguments are substantially directed to an interpretation of the phrase "incorporate . . . into"

Case IPR2013-00097
Patent 6,669,981 B2

as requiring an ionic exchange of the silver onto only anionic polymer fibers. We are not persuaded by ConvaTec's arguments because we reject this interpretation for the reasons discussed above. Although ConvaTec's evidence shows that Ronan's alginate cross-linked hydrogels would likely be destroyed by ion exchange, the claims are not so limited, and encompass adsorption or other bonding of the silver, taught by Ronan, to the alginate cross-linked hydrogels, which is a type of polymer expressly recited in claims 10 and 20. Both parties agree the silver chloride is provided in the alginate polymers of Ronan, which is encompassed by the term "incorporated . . . into" recited in the claims. Ex. 1026 ¶ 46; Ex. 2029 ¶ 39.

Ronan does not state expressly that the resulting silverized antimicrobial materials do not discolor when exposed to light. Smith & Nephew contends that because Ronan discloses a process substantially similar to the process taught by the '981 patent, it would result inherently in a material that is substantially photostable. Pet. 39-40 (citing Coulter Dec., Ex. 1026 ¶ 50). We agree with Smith & Nephew that Ronan describes a process that is essentially the same as the claimed process. The realization of a new benefit of an old process does not render that process patentable. *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1377-78 (Fed. Cir. 2005); *see also Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1376 (Fed. Cir. 2001) (stating in the context of a claimed process that was drawn to the same use comprising the same steps of the prior art, "[n]ewly discovered results of known processes directed to the same purpose are not patentable because such results are inherent"). ConvaTec has not presented any persuasive evidence or argument to undermine this reasoning. *See*, *e.g.*, PO Resp. 34.

Case IPR2013-00097
Patent 6,669,981 B2

Smith & Nephew contends that Ronan expressly discloses the use of organic solvents, particularly alcohols, glycols, ether, and ester solvents, with the silver source. Pet. 39; Ex. 1006, 5:20-25.

ConvaTec argues that Ronan does not exemplify a solution comprising an organic solvent. According to ConvaTec, the disclosure in Ronan of "infiltration solutions" that may contain organic solvents "does not constitute a disclosure of preparing a solution comprising an organic solvent," and the use thereof constitutes inappropriate picking and choosing of embodiments for a finding of anticipation. PO Resp. 33. Alternatively, ConvaTec argues that Ronan's requirement for water soluble salts teaches away from the skilled artisan adding an organic solvent. *Id.* at 35 (citing Ex. 1006, 3:59-64).

We disagree with ConvaTec that the use of an organic solvent in addition to water is not taught by Ronan. The disclosure in Ronan is not limited to the examples, and a disclosure that the described solutions may comprise an organic solvent is sufficient. *See Hewlett-Packard*, 340 F.3d at 1325 n.6.

Moreover, we agree with Smith & Nephew (Pet. 43) that it would have been obvious to substitute the aqueous solvent with a solvent that contained 50% alcohol as Ronan teaches that such a substitution may be made. We are not persuaded that the disclosure of water soluble salts constitutes a teaching away from including miscible organic solvents. *Merck*, 874 F.2d at 807; *In re Susi*, 440 F.2d at 446 n.3.

Smith & Nephew has presented a detailed argument that each of claims 1, 2, 5-8, 10, 12-15, 17, 18, and 20 are anticipated by or, in the alternative, would have been obvious over the teachings of Ronan. Pet. 39-

43.   ConvaTec's Response demonstrates no error in Smith & Nephew's challenge to patentability to any particular claim so challenged.  PO Resp. 31-36.  For those reasons, we conclude that Smith & Nephew has established by a preponderance of evidence that Ronan anticipates claims 1, 2, 5-8, 10, 12-15, 17, 18, and 20 under 35 U.S.C. § 102(b).  We conclude further, that when weighed with the evidence of secondary considerations, discussed below, Smith & Nephew has shown by a preponderance of the evidence that claims 1, 2, 5-8, 10, 12-15, 17, 18, and 20 would have been obvious over Ronan.

> ### 6.  Claims 3, 11, and 19 as obvious over Ronan (Ex. 1006) and Bahia (Ex. 1005)

Claims 3 and 19 depend from claims 1 and 17, respectively, and recite "further comprising:  (d) using the light stabilized antimicrobial material in a wound dressing."  Claim 11 depends from claim 1, and recites "wherein the organic solvent is selected from the group consisting of industrial methylated spirit, denatured ethanol, methanol, acetone, isopropyl alcohol and ethanol."

Ronan describes "medical devices," which "include films, stents, catheter or cannulas, plugs and constrictors."  Ex. 1006, 5:26-29.  Ronan further describes "[l]inear device or pre-device shaped configurations such as fibers, rods, tubes or ribbons."  *Id.* at 5:36-37.  Ronan does not expressly teach a "wound dressing," as recited in claims 3 and 19.  Smith & Nephew argues:

> Bahia . . . demonstrates that gel forming polymers similar to those disclosed by Ronan can be made into wound dressings. Accordingly, it would have been obvious to a person having ordinary skill in the art to apply Ronan's process for making

Case IPR2013-00097
Patent 6,669,981 B2

> antiseptic medical devices to the wound dressings of either [sic]
> Bahia.

Pet. 44.

Ronan describes a solution comprising an "alcohol" but does not

disclose any of the recited alcohols of claim 11. Smith & Nephew argues:

> Bahia discloses that industrial methylated spirits is a suitable
> solvent for use in processing wound dressings, Bahia at
> 13:24-25, and that an antiseptic can be added in alcohol
> containing wash compositions. Bahia at 13:10-18, 14:29-33. It
> would have been obvious to use industrial methylated spirits or
> ethanol as the alcohol in the process of Ronan as these were
> well known forms of alcohol used to wash wound dressings at
> the time of the invention as demonstrated by Bahia.

*Id*. at 43-44

ConvaTec's arguments that Ronan does not teach, but instead

discourages, the use of organic solvents (PO Resp. 36) are not persuasive for

the reasons discussed above with respect to anticipation based on Ronan.

ConvaTec argues further that, unlike the alginate fibers of Ronan, the

CMC described in Bahia would be capable of ionic exchange with silver

ions, and thus, would dissolve in an aqueous solution. *Id*. at 37. According

to ConvaTec, the teachings of Bahia cannot be combined properly with the

teachings of Ronan, because the Bahia process does not contain silver, and

Ronan's process is "very different" and there are different "considerations

necessary in treating anionic polymers." *Id.*

ConvaTec's arguments directed to ionic exchange between the silver

and the polymer are not persuasive for the reasons discussed above. Further,

ConvaTec has shown no error in the reasoning that it would have been

obvious to one of ordinary skill in the art to have used the alginate material

described in Ronan for a wound dressing. Specifically, Bahia evidences that

Case IPR2013-00097
Patent 6,669,981 B2

the use of alginate hydrogels as wound dressings was known in the art, and the skilled artisan would have used the ethanol of Bahia as the alcohol solvent described in Ronan, because Bahia is evidence that ethanol was a known solvent for such wound dressings. *See KSR*, 550 U.S. at 417.

We thus conclude that, when weighed with the evidence of secondary considerations, discussed below, Smith & Nephew has shown by a preponderance of the evidence that claims 3, 11, and 19, would have been obvious over Ronan and Bahia.

> 7. *Claims 1-8, 10, 11, and 17-20 are anticipated under 35 U.S.C. § 102(e) by Gibbins '751 (Ex. 1007)*

Gibbins '751 discloses methods for incorporating silver chloride into various substrates by nucleation of silver chloride into the matrix. *See, e.g.*, Ex. 1007, 31:26 (Section heading "AGCL Colloid Nucleation in Solvent for Aquacel"); Ex. 1026 ¶ 51.

Gibbins '751 discloses a solution of a chloride salt, such as sodium chloride, that is made using water combined with an alcohol solvent, such as ethanol or isopropyl alcohol, wherein the aqueous portion of the solution is not greater than 50%. Ex. 1007, 18:13-17, 28-30. A polymeric material is immersed into the chloride bath, and then immersed into a similar solution of water and an alcohol solvent that contains silver ions. *Id.* at 18:20-25. Gibbins '751 specifically teaches that the immersion sequence may also be reversed without affecting the success of the method. *Id.* at 18:30-32.

Case IPR2013-00097
Patent 6,669,981 B2

Example 24D of Gibbins '751 added silver to Aquacel® fibers.[15]  *Id.* at 31, Example 24.  In Example 24D of Gibbins '751, the polymer was added to a solution of sodium chloride comprising ethanol as the solvent, to which was added, after "a few seconds," a silver nitrate solution comprising ethanol as the solvent.  *Id.* at 32:61-67.  Gibbins '751 noted that, while the silver Aquacel® eventually turned purplish, the material did not discolor appreciably in light.  *Id.* at 33:35-50.

Gibbins '751 also provides Examples 25(a) through 25(n).  *Id.* at 34:4-39.  In each example, reagents were prepared and used to impregnate CMC (Aquacel).  *Id.* at 33:66 to 34:1.  From those Examples, Gibbins '751 states that "[t]he stability of the material to light is controlled by the amount of NaCl, and the location and concentration of Cu ions in the material."  *Id.* at 33:62-65.

Examples 25(a)-25(h) use the following notation, with X used to describe amounts that vary between the different examples:

X g NaCl in 2 ml $H_2O$, add to 50 g EtOH, add dressing, add X mL $AgNO_3$ sol., add X µl Cu.

*Id.* at 34:4-20.  We interpret that notation as describing providing a sodium chloride solution in 2 ml water, to which 40 g ethanol is added.  The CMC dressing is added.  A silver nitrate solution then was added, followed optionally with a copper solution in ethanol.  *See* Ex. 1045 ¶ 6.  These examples systematically vary the sodium chloride concentration, the silver nitrate concentration, and the copper concentration.

---

[15] Aquacel® is a trade name for carboxymethoylcellulose (CMC).  Gibbins '751, 33:67-34:1; Exhibit 1045 ¶ 65.

Case IPR2013-00097
Patent 6,669,981 B2

Examples 25(i)-25(l) use the following notation, with X used to describe amounts that vary between the different examples:

X g AgNO$_3$ to 100 µl H$_2$O, add to 25 g EtOH/0.0888 g NaCl in 2 ml H$_2$O, add X µl Cu, add to 25 g EtOH, add dressing, add AgNO$_3$ solution.

*Id.* at 34:21-33.  We interpret that notation to describe first preparing a silver nitrate solution in 100 µl of water, which is added to 25 g of ethanol.  Then a sodium chloride solution is prepared in 2 ml water, optionally adding copper, and added to 25 g ethanol.  The CMC dressing is then added to the sodium chloride solution, followed by the silver nitrate solution.  *See* Ex. 1045 ¶ 7.  The concentration of silver nitrate and the copper concentration are varied in these examples.

Examples 25(m) and 25(n) use the following notation with X used to describe amounts that vary between the two examples:

0.006795 g AgNO$_3$ to 100 µl H$_2$O, add to 25 g EtOH, add dressing/X NaCl in 2 ml H$_2$O, add 0 µl Cu, add to 25 g EtOH, add to AgNO$_3$ solution.

*Id.* at 34:34-39.  What this notation means is at issue in this proceeding.  Based on a consistent reading of this notation with the other examples, we agree with Smith & Nephew that this notation describes first, preparing a silver nitrate solution in 100 µl of water, to which is added to 25 g of ethanol.  The CMC dressing is then added to the silver nitrate solution.  A sodium chloride solution then is prepared in 2 ml water, without adding copper, and added to 25 g ethanol.  The sodium chloride solution is then added to the silver nitrate solution.  *See* Pet. 52-56; Paper 45, 6-7 (Ex. 2047 (redacted version of Paper 45)); *see* Ex. 1045 ¶¶ 8, 9, 20.

Gibbins '751 at column 34, line 40, further states "[a]dd 10 g H$_2$O to 25 g EtOH, add dressing."  That disclosure may be a control example, which

34
**A34**

Case IPR2013-00097
Patent 6,669,981 B2

only adds water to ethanol, followed by adding a CMC dressing, and no silver nitrate or sodium chloride is added.

Each of the Examples was exposed to light and *Staph. aureus* to determine antimicrobial activity.  Ex. 1007, 34:42-44.

Gibbins '751 states that:

> Samples that contained higher concentrations of silver discolored more quickly in light with most samples eventually turning a purplish color.  The exceptions were samples "n" and "o" which remained white.  With the exception of the sample developed from the combination in "o", the samples had an acceptable feel and texture.  Sample "o" was stiff following processing.  All samples produced the same size zone of inhibition on the staph plate except for sample "o", which had no zone of inhibition.

*Id.* at 34:46-54.  We note that there is no example "o" identified by Gibbins '751, but that Gibbins '751 does include a possible additional control example, as discussed above.  *Id.* at 34:10.  The results would be consistent with sample "o" being a control example with no expected antimicrobial activity or color change, as no silver was added.

Smith & Nephew argues that Example 25(m), as well as the disclosure in Gibbins '751 that the steps of Example 24 can be prepared in the opposite order without affecting the success of the method, anticipates claims 1-8, 10, 11, and 17-20 of the '981 patent.  Pet. 53-57.

ConvaTec argues that Gibbins '751 intends the "immersion" or "impregnation" of "an insoluble silver chloride precipitate," which is not "the incorporation of silver ions into polymers by ion exchange."  PO Resp. 39-40.  According to ConvaTec, even though the CMC dressing of Gibbins '751 is capable of ionic exchange with silver, only by immersing the dressing in silver first, absence the presence of chloride ions, is the silver

allowed to ionically exchange with the dressing, and Gibbins '751 "failed to teach, disclose, or appreciate that the order of addition . . . was important and critical" to ionic exchange. *Id.* (citing Ex. 2029, ¶ 42); *see* Ex. 2029 ¶ 43. As Dr. Edgar explains, "[t]he presence of soluble sodium ions from sodium chloride will retard the exchange of sodium counterions on the anionic polymer for soluble silver ions." Ex. 2029 ¶ 42. Dr. Edgar concludes that the sequence of addition of reagents, i.e., substrate in sodium chloride, then addition of silver salt "is precisely the opposite of the sequence that would promote the incorporation or loading of a desired silver salt concentration into the polymer." *Id.*

ConvaTec's arguments are not persuasive. First, as discussed in detail above, ConvaTec's arguments are presented as if the claims required an ionic exchange between the silver and the polymer, which we have determined they do not.

Second, claim 1 of the '981 patent states that the addition of the agent (e.g., chloride) in step (c) may be performed "during or after step (b)," step (b) being the step of subjecting the polymer to the silver and organic solvent solution. Thus, independent claim 1 of the '981 patent, as well as the claims dependent thereon, are not limited to separately subjecting the polymer to the silver first, followed by subjecting the polymer to the chloride agent.

ConvaTec argues that step (b) requires a "time sufficient to incorporate the desired silver concentration into the polymer," which requires some ionic exchange of the silver prior to step (c), but that the ionic exchange does not have to be complete before beginning step (c). PO Resp. 12 (citing Ex. 2029 ¶ 26).

Case IPR2013-00097
Patent 6,669,981 B2

ConvaTec's argument is not persuasive because, as discussed above, the "incorporation . . . into" step of step (b) is not limited to ionic exchange. Moreover, the fact that claim 1 specifically states that step (c) can take place "during or after step (c)," as well as the evidence provided by Dr. Edgar, further supports our interpretation of the "incorporating . . . into" language of claims 1 and 17 of the '981 patent as including interactions in addition to ionic exchange.

Finally, because Gibbins '751 discloses the same steps in the same order recited in the claims of the '981 patent, the silver ions would necessarily ionically exchange with the CMC polymer prior to the addition of the sodium chloride agent, based on the evidence provided by ConvaTec.

ConvaTec contends that neither Example 24, nor Example 25(m), discloses the same process recited in the claims of the '981 patent, but rather should be understood to mean that the "dressing is in 0.0888 (presumably grams) of sodium chloride dissolved in 2 milliliters of water prior to mixing with the silver nitrate solution." PO Resp. 41; *see* Ex. 2029 ¶¶ 46-48. ConvaTec argues that the "/" in the Examples means "in." For example, the stock silver aqueous solution is described in Gibbins '751 as "0.11325 g Ag/50 mL H2O," which means "0.11325 grams of silver in 50 milliliters of water." PO Resp. 41 (citing Ex. 1007, 34:2); *see* Ex. 2029 ¶ 48.

While we agree that the stock solutions are characterized by a "/" which appears, in that instance to mean "in," we are not persuaded that the "/" means the same thing in the Examples. We find that it is the last step of each Example that best explains the order. *See* Ex. 1045 ¶¶ 23-24.

Examples 25(a)-25(h) include no "/" designations and clearly state that each of the components are additive. Examples 25(i)-25(l) recite

preparing the silver nitrate solution first, a "/," then preparing the sodium chloride solution, with the "add dressing" as an additive step of the sodium chloride solution. What is most instructive, however, is that Examples 25(i)-25(l) each recites "add AgNO$_3$ solution" as the last additive step of the sodium chloride solution, clarifying that, despite the fact that the silver nitrate solution was prepared first; it was added to the sodium chloride solution after the dressing. *See* Ex. 1045 ¶ 24.

Examples 25(m) and 25(n) are similar to these earlier examples in that they recite preparing the silver nitrate solution first, a "/," then preparing the sodium chloride solution. They are distinguished, however, in that Examples 25(m) and 25(n) recite adding the dressing before the "/" as an additive step in preparing the silver nitrate solution, and finally recite "add *to* AgNO$_3$ solution" as the last step for preparing the sodium chloride solution (emphasis added). *Id.*

Smith & Nephew's interpretation of the notation used in Gibbins '751 is further supported by Example 24B, which previously concluded that "[i]t was not appropriate to pre-mix separate solutions that are later combined to form the bath for the immersion of hydrophilic matrix material for impregnating with silver" because "a heavy rapidly forming precipitate developed in the mixture." Ex. 1007, 32:22-27. Thus, ConvaTec's interpretation would have Examples 25(i)-25(j) adding the dressing to a pre-mixed solution, in contravention of the earlier teaching in Gibbins '751 against pre-mixing.

Further, Smith & Nephew's interpretation is consistent with the further disclosure in Gibbins '751 that the order of immersion may be reversed without consequence to the success of impregnation (Ex. 1007,

Case IPR2013-00097
Patent 6,669,981 B2

18:30-32). Example 25(m) and Example 25(k) recite the dressing being immersed in the silver nitrate and sodium chloride solutions in the opposite order and Gibbins '751 reports no distinctions in the results for those Examples. *See* Ex. 1007, 34:28-30, 34-36, 45-54; Ex. 1045 ¶ 28.

We credit the testimony of Dr. Coulter as to the interpretations of the Examples 25(a)-25(n). Patent Owner states that "like all of the other examples in Example 25, the Aquacel substrate in 25(m) is contacted to sodium salt *prior to* admixing with soluble silver salt," but does not address the distinctions between the notations of Examples 25(a)-25(n). PO Resp. 41 (emphasis original).

Moreover, even if the steps of Example 25(m) are in the same order as Example 24D, we find it persuasive that Gibbins '751 expressly teaches reversing the order. The reverse order of Example 24D clearly reads on the steps of claims 1 and 17. Thus, we agree with Smith & Nephew that the same process is recited in claims 1 and 17 and is described in the '981 patent in the reverse order of Example 24D and that the resulting material necessarily would be "substantially photostable."

ConvaTec further argues that, even if the steps of Example 25(m) are in the same order as recited in the claims of the '981 patent, Gibbins '751 "failed to produce a substantially photostable product." PO Resp. 42. In addition to the testimony of Dr. Edgar, ConvaTec relies on the testimony of Dr. Phillips in arguing that "that the 'purplish' or 'purple' color change from white of Examples 24 and 25 [of Gibbins '751] was not, in her experience, 'substantially photostable.'" PO Resp. 42-43 (citing Ex. 2028 ¶¶ 16, 18-21; Ex. 2029 ¶ 49).

Case IPR2013-00097
Patent 6,669,981 B2

As discussed above, the term "photostable" is defined in the '981 patent as having a "controlled colour change to a desired colour with minimal change thereafter." As discussed above, we interpret the term "desired colour" broadly to encompass any color that may be desirable to one of ordinary skill in the art for any purpose, and do not find sufficient evidence to particularly exclude purple as a "desired colour." Further, as also discussed above, with the definition allowing for "minimal change thereafter," and the qualifier "substantially" in the claim, we interpret the phrase "substantially photostable" to mean that the material may undergo a controlled color change to a desired color, with some minimal discoloration, even to an undesirable color, from the desired color, and even some degree beyond a "minimal discoloration," and still be considered "substantially photostable."

Accordingly, we do not find ConvaTec's arguments persuasive. Gibbins '751 states that "[s]amples that contained higher concentrations of silver discolored more quickly in light with most samples eventually turning a purplish color. The exceptions were samples 'n' and 'o' which remained white." Ex. 1007, 34:46-49. Gibbins '751 states also that its materials "possess antimicrobial activity and do not appreciably discolor in the presence of light." *Id.* at 33:49-50. A controlled color change to "purplish" would not be excluded from the phrase "substantially photostable" because purple is not excluded as a "desirable color" within the meaning of the '981 patent.

Even if purple were shown to be an undesirable color, Gibbins '751 reports a change to "purplish" or having "purple, specks." *Id.* at 33:37-43; 34:46-49. Such a description indicates only a substantially minimal color

change to purple that is encompassed by the broad language recited in the claims and the broad definition of "photostable" in the '981 patent.

Smith & Nephew has presented a detailed argument that each of claims 1-8, 10, 11, and 17-20 are anticipated by the teachings of Gibbins '751. Pet. 52-56. ConvaTec's Response demonstrates no error in Smith & Nephew's challenge to the patentability of any particular claim so challenged. PO Resp. 38-44. For those reasons, Smith & Nephew has established by a preponderance of evidence that Gibbins '751 anticipates claims 1-8, 10, 11, and 17-20 under 35 U.S.C. § 102(e).

> 8. *Claims 12-15 as obvious over Gibbins '751 (Ex. 1007), Walder (Ex. 1004), Ronan (Ex. 1006), Romans (Ex. 1003), and Kreidl (Ex. 1002)*

Claim 12 is drawn to the method of claim 1, "wherein the desired silver concentration is between 0.1 and 20 wt %," and claim 13 recites that "the desired silver concentration is between 1 and 20 wt %." Smith & Nephew argue that Walder, Ronan, and Romans teach "that the levels of silver within the claimed ranges would have been considered desirable at the time of the invention[,]" and that "silver concentrations within the claimed ranges would have been desirable for antimicrobial effect[,] and a skilled person would have sought to optimize these levels." Pet. 56.

Claims 14 and 15 specify the time during which the material is exposed to a silver nitrate solution. Smith & Nephew acknowledges that Gibbins '751 does not expressly disclose the duration in which the gauze is exposed to the silver nitrate solution. Pet. 57. Smith & Nephew relies on Walder, Ronan, and Romans, each of which teaches exposing a polymer to a silver nitrate solution for a duration of time encompassed by the ranges set

Case IPR2013-00097
Patent 6,669,981 B2

forth in claims 14 and 15. *Id.* Smith & Nephew contends, therefore, that it would have been within the level of skill of the ordinary artisan to "have readily appreciated that the amount of time for which the polymer must be exposed to silver nitrate will depend on the type and dimensions of the polymer subject to *in situ* silver chloride precipitation and the level of silver chloride in the final product," rendering claims 14 and 15 obvious. *Id.* (citing Coulter Dec., Ex. 1026 ¶¶ 68, 70).

ConvaTec argues that Walder, Ronan, and Romans cannot properly be combined with Gibbins '751 because (1) they each describe only an aqueous silver solution; (2) "Walder relates to anti-infective urinary catheters" and Romans is directed to "non-analogous products, such as ointments and skin antiseptics;" and (3) Romans discloses a preferred silver concentration outside of the claimed range. PO Resp. 44-45. According to ConvaTec, because of

> the significant differences in the methods described in claims 1-8, 10, 11 and 17-20 of the '981 patent and the processes described in Walder, Ronan, and Romans, a person of skill in the art would have had no reasonable expectation of success in the claimed processes over the cited combination.

*Id.*

ConvaTec's arguments are not persuasive. ConvaTec failed to show the differences between the processes described in Walder, Ronan, and Romans are a basis for determining that the skilled artisan would not consider the silver concentrations or silver nitrate exposure times disclosed therein as being suitable for the process described in Gibbins '751, given that each of Walder, Ronan, and Romans is directed to incorporating the antimicrobial properties of silver into a polymer. Moreover, ConvaTec's arguments do not respond to Smith & Nephew's evidence and argument that

the silver concentration and the amount of time for which the polymer must be exposed to silver nitrate are result-effective variables based on the teachings of Walder, Ronan, and Romans.

We thus conclude that, when weighed with the evidence of secondary considerations, discussed below, Smith & Nephew has shown by a preponderance of the evidence that claims 12-15 would have been obvious over Gibbins '751, Walder, Ronan, Romans, and Kreidl.

### 9. *Claim 16 as obvious over Gibbins '751 (Ex. 1007) and Kreidl (Ex. 1002)*

Claim 16 further recites the time during which the polymer is exposed to the binding agents in step (c) of claim 1. Smith & Nephew notes that Gibbins '751 does not disclose the duration of exposure to sodium chloride in its process. Pet. 57-58. Smith & Nephew asserts that Kreidl teaches that the amount of time the material is soaked in a sodium chloride solution is a result-effective variable. *Id.* at 58 (citing Ex. 1002, 3, 2:44-51). Smith & Nephew contends it would have been obvious to optimize the time the gauze of Kreidl is soaked in the sodium chloride solution, such as soaking for 5 to 30 minutes, because Kreidl specifically teaches that it is a result-effective variable. *Id.* (citing Coulter Dec., Ex. 1026 ¶ 70).

ConvaTec argues that Kreidl discloses exposure times are far outside the claimed range: "For example, when having about 1% silver nitrate retained on the fibers of such a bandage gauze a cold treatment in a 20% sodium chloride solution for one hour or in a 5% solution for twenty-four hours will give good results." PO Resp. 46 (citing Ex. 1002, 3, 2:57-61).

Case IPR2013-00097
Patent 6,669,981 B2

ConvaTec's arguments do not respond to Smith & Nephew's evidence and argument that the amount of time the material is exposed to an agent that facilitates the binding of silver is a result-effective variable based on the teachings of Kreidl. The time periods outside of the claimed range recited in Kreidl are exemplary only, and do not overcome the suggestion in Kreidl that the skilled artisan would have optimized the time the gauze is soaked in the sodium chloride solution, depending on the temperature, concentration, or desired completeness of the ensuing reaction.

We thus conclude that, when weighed with the evidence of secondary considerations, discussed below, Smith & Nephew has shown by a preponderance of the evidence that claim 16 would have been obvious over Gibbins '751 and Kreidl.

### 10. Secondary Considerations of Nonobviousness

Before we can determine that the obviousness determinations above render the challenged claims unpatentable, we must consider the evidence of obviousness anew in light of any evidence of secondary considerations of nonobviousness presented by ConvaTec. *See Graham*, 383 U.S. at 17-18 ("Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012) ("This objective evidence must be 'considered as part of all the evidence, not just when the decision maker remains in doubt after reviewing the art.'") (quoting *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538-39 (Fed. Cir. 1983)).

Case IPR2013-00097
Patent 6,669,981 B2

ConvaTec presents the following evidence of commercial success, industry acclaim, long-felt but unsolved need, and copying.  PO Resp. 47-58.

### (1) *Commercial Success*

Commercial success involves establishing success in the marketplace of a product encompassed by the claims, as well as a nexus between the commercial product and the claimed invention.  "Evidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success."  *Ormco Corp. v. Align Tech. Inc.*, 463 F.3d 1299, 1311-12 (Fed. Cir. 2006). "For objective evidence to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention."  *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995).

While objective evidence of nonobviousness lacks a nexus if it exclusively relates to a feature that was "known in the prior art," *Ormco Corp.* 463 F.3d at 1312, the obviousness inquiry centers on whether "the claimed invention as a whole" would have been obvious, 35 U.S.C. § 103; *Rambus Inc. v. Rea*, 731 F.3d. 1248, 1257-58 (Fed. Cir. 2013).

With regard to whether a nexus has been established between the products upon which commercial success has been based and the claimed invention, ConvaTec's arguments are based on ConvaTec's AQUACEL® Ag product line.  PO Resp. 48-49.  Ms. Fiona Adams testified that she is "aware of and familiar with the AQUACEL® Ag line," which she "understand[s] contain products manufactured using the methods claimed in the '981 and '828 patents."  Ex. 2030 ¶¶ 3-4 (*see* Ex. 2045 (redacted version

Case IPR2013-00097
Patent 6,669,981 B2

of Ex. 2030)).  Ms. Adams testifies as to the reason for success of

AQUACEL® Ag as follows:

> ConvaTec's success with AQUACEL® Ag products came
> about because it created a new commercial opportunity that was
> not realized previously in the wound dressing field.  Although
> silverised wound dressings, including Smith & Nephew's
> ACTICOAT product, were previously available, the market was
> not established.  It was only with the introduction of
> AQUACEL Ag products and its unique features that customers
> expanded the market and purchased these products. AQUACEL
> Ag products created a commercially viable opportunity for this
> segment, doubling the size of the market in the US within just
> two years and taking dominant share in under a year from
> launch.

*Id.* at ¶ 9.

The patent owner has the burden of showing that the commercial

success derives from a feature recited in the claims, in this case, for

example, the particular process steps or the resulting photostability.  *Tokai*

*Corp., v. Easton Enters. Inc.*, 632 F. 3d 1358, 1369 (Fed. Cir. 2011).  In

order to establish a proper nexus, the patent owner must offer proof that the

sales were a direct result of the unique characteristics of the claimed

invention—as opposed to other economic and commercial factors unrelated

to the quality of the patented subject matter.  *See Microsoft v. Proxyconn,*

*Inc.*, IPR2012-00026, slip op. at 4 (PTAB Mar. 8, 2013) (Paper 32).  We

have considered the testimony of Ms. Adams (Ex. 2045), which purports to

show that the AQUACEL® Ag product line includes the features of claims 1

and 17 of the '981 patent.  ConvaTec has not shown, however, that the sales

of the AQUACEL® Ag product line are a result of the claimed invention.

Ms. Adams provides no supporting evidence that the features recited

in the claims of the '981 patent are responsible for the success of the

commercial AQUACEL® Ag products.  Ms. Adams provides no details of the manufacturing process for AQUACEL® Ag products as supporting evidence that the products are manufactured using the steps recited in the claims.  Upon cross-examination, Ms. Adams testified that she has no technical knowledge of the patents and could not confirm whether specific products in the AQUACEL® Ag line were covered by the claims of the '981 patent.  Ex. 1049, 29:18-31:9; *see* Ex. 1048, 105:14-20.  Considering we have no evidence of the manufacturing process for any of the products in the AQUACEL® Ag product line, we have no means to assess whether any of the products are covered by the claims of the '981 patent.

We have considered ConvaTec's evidence of commercial success, but find it of insufficient weight and relevance to deem it persuasive as to the merits of the claimed invention, particularly when we consider it within the totality of the evidence before us.

### (2) *Industrial Acclaim*

ConvaTec presents evidence that the company has received praise for "the development of innovative technologies that produce a major improvement in business performance and/or patient benefit."  PO Resp. 49 (citing Ex. 2013).  For example, ConvaTec presents evidence that "many studies and publications have praised the Aquacel Ag line and demonstrated its effectiveness in antimicrobial wound care," namely due to "the reduction of pain, dressing changes, and decreased length of hospital stays."  PO Resp. 49; *see generally id.* at 50-53 (citing Ex. 2030 ¶¶ 12-21 and supporting documentation).  ConvaTec also presents evidence of "the dramatic recovery of patients treated with AQUACEL® Ag."  *Id.* at 54 (citing Ex. 2025).

Case IPR2013-00097
Patent 6,669,981 B2

As with commercial success, evidence of industrial acclaim is only relevant to a determination of nonobviousness when it is directed to the merits of the invention claimed.  Secondary considerations may presumptively be attributed to the claimed invention only where the product being claimed '"embodies the claimed features, and is coextensive with them."' *Ormco Corp,* 463 F.3d at 131 (quoting *Brown & Williamson Tobacco Corp. v. Phillip Morris, Inc.,* 229 F.3d 1120, 1130 (Fed. Cir. 2000)).

Although ConvaTec cites comments lauding ConvaTec as an innovator, as well as the effectiveness of the AQUACEL® Ag product line, ConvaTec has not explained how such praise is directed to any particular feature of the method recited in the claims.  For example, ConvaTec has not shown that the evidence of praise is directed to a particular step recited in the claims or to the photostability of the product.  We have thus considered ConvaTec's evidence of industrial acclaim, but find it of insufficient weight and relevance to deem it persuasive as to the merits of the claimed invention, particularly when we consider it within the totality of the evidence before us.

### *(3) Long-felt but unmet need*

The relevance of long-felt need and the failure of others to the issue of obviousness depend on several factors.  First, the need must have been a persistent one that was recognized by those of ordinary skill in the art. *Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376 (Fed. Cir. 1983); *see In re Gershon*, 372 F.2d 535, 539 (CCPA 1967). Second, the long-felt need must not have been satisfied by another before the invention by applicant.  *Newell Companies v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988) ("[O]nce another supplied the key element, there

Case IPR2013-00097
Patent 6,669,981 B2

was no long-felt need or, indeed, a problem to be solved"). Third, the

invention must in fact satisfy the long felt need. *In re Cavanagh*, 436 F.2d

491, 496 (CCPA 1971) ("[I]t was still incumbent upon appellant, if he

wished by this method to rebut the inference of obviousness arising from the

similarity of his process to the prior art, to bring forward evidence of his

satisfaction of the need.").

ConvaTec presents evidence of the need for "a less painful and

traumatic treatment of burn wounds" and that the AQUACEL® Ag product

line has "reduced number of required dressing changes, decreased pain, and

earlier patient discharge as compared with the traditional SSD [silver

sulfadiazine] treatment."  PO Resp. 55 (citing Ex. 2026, Ex. 2017, Ex.

2016).  ConvaTec then argues that its evidence of "clinical and research

results," "commercial success," and dominant market share are additional

evidence of "a long-felt need in the field for an efficacious and cost-effective

silverized wound dressing which reduced patient discomfort and decreased

hospital stays." *Id.* at 55-56.

ConvaTec's evidence of a long-felt but unmet need is not persuasive.

While ConvaTec describes advantages of the AQUACEL® Ag product line

over a traditional "silver sulfadiazine (SSD) ointment," ConvaTec has not

demonstrated that advantages of the claimed invention are not met by

silverized hydrogels of the prior art, such as that taught by Gibbins '751.

Moreover, ConvaTec has not shown that the evidence of long-felt and unmet

need is solved by the particular steps recited in the claims, or to the

photostability of the product, to the extent they are distinguishable from the

prior art of record.

Case IPR2013-00097
Patent 6,669,981 B2

We have considered ConvaTec's evidence of long-felt but unmet
need, and find it of insufficient weight and relevance to deem it persuasive
as to the merits of the claimed invention, particularly when we consider it
within the totality of the evidence before us.

### (4) Copying

Although, "copying by a competitor may be a relevant consideration
in the secondary factor analysis[,]" "[n]ot every competing product that
arguably falls within the scope of a patent is evidence of copying." *Iron
Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir.
2004). Copying, as objective evidence of nonobviousness, requires evidence
of effort to replicate a specific product. *Wyers v. Master Lock Co.*, 616 F.3d
1231, 1246 (Fed. Cir. 2010); *Iron Grip*, 392 F.3d at 1325.

ConvaTec argues that "[d]irect evidence of copying by Petitioner
Smith & Nephew also exists . . . ." PO Resp. 56. ConvaTec provides
evidence of an FDA statement that Smith & Nephew's Durafiber Ag is
"substantially equivalent" to ConvaTec's Aquacel Ag product and has
"*similar design, materials, and manufacturing methods*." *Id.* (citing Ex.
2001). ConvaTec also produces evidence that "Smith & Nephew admitted
[in a submission against the European equivalent of the patent at issue in the
instant proceeding] that it has no other non-infringement argument in
relation to the process it uses to produce its silverised Durafiber wound
dressing" other than arguments based on amended claim language not
present in this proceeding. *Id.* at 57 (citing Ex. 2002).

ConvaTec's evidence of copying is not persuasive. A statement of
"similar manufacturing methods" is not sufficient to demonstrate that Smith
& Nephew's Durafiber product is identical to AQUACEL® Ag, is made

Case IPR2013-00097
Patent 6,669,981 B2

using the particular steps of the claimed invention, or even that it has the recited photostability. Moreover, even if Smith & Nephew's Durafiber Ag is made using the exact same process as any of ConvaTec's AQUACEL® Ag products, ConvaTec has not shown that the AQUACEL® Ag product line is manufactured according to the steps of the claims of the '981 patent, or has the claimed photostability. Further, ConvaTec has not produced any evidence of the actual manufacturing process for Smith & Nephew's Durafiber Ag product, and we are not persuaded that a decision not to pursue an alternative litigation strategy in its submission against the European equivalent of the patent at issue in the instant proceeding is sufficient evidence of a process that includes the steps and recited photostability of the claims of the '981 patent.

We have considered ConvaTec's evidence of copying but find it of insufficient weight and relevance to deem it persuasive as to the merits of the claimed invention, particularly when we consider it within the totality of the evidence before us.

*Determination with respect to obviousness*

After weighing all the evidence of obviousness and nonobviousness of record, on balance, we conclude that the strong evidence of obviousness outweighs the weak evidence of nonobviousness. For the foregoing reasons, we determine that Smith & Nephew has demonstrated by a preponderance of the evidence that claims 1-8 and 10-20 are unpatentable over the prior art of record.

Case IPR2013-00097
Patent 6,669,981 B2

### C. Motion to Amend

ConvaTec filed a Motion to Amend.  Paper 28.  For the reasons set forth below, ConvaTec's Motion to Amend is *denied*.

As the moving party, ConvaTec bears the burden of proof to establish that it is entitled to the relief requested.  37 C.F.R. § 42.20(c).  Entry of the proposed amendment, therefore, is not automatic, but only upon ConvaTec's having demonstrated the patentability of the proposed substitute claims.

ConvaTec requests cancellation of claims 1 and 17, to be replaced with proposed substitute claims 21 and 22, reproduced below, with underlined text indicating material inserted relative to original claims 1 and 17, and bracketed text indicating material deleted relative to original claims 1 and 17:

> 21.  A method of preparing a light stabilized antimicrobial material comprising the steps of
> a) preparing a solution comprising an organic solvent and a source of silver in a quantity sufficient to provide a desired silver concentration in a light stabilized antimicrobial material;
> b) subjecting a polymer to the solution for a time sufficient to incorporate the desired silver concentration into the polymer, wherein the polymer is <u>a gel forming fiber</u> selected from the group consisting of a polysaccharide, a modified polysaccharide, a polyvinylpyrrolidone, a polyvinyl alcohol, a polyvinyl ether, a polyurethane, a polyacrylate, a polyacrylamide, a collagen, a gelatin, and a mixture thereof; and
> c) subjecting the polymer, during or after step (b), to one or more agents which facilitate the binding of the silver on the polymer; wherein the silver is [substantially] photostable in the light stabilized antimicrobial material when dry, but will dissociate from the light stabilized antimicrobial material upon hydration of the light stabilized antimicrobial material.

Case IPR2013-00097
Patent 6,669,981 B2

      22.   A method of preparing a light stabilized antimicrobial material comprising the steps of
      a) preparing a solution comprising an organic solvent and a source of silver in a quantity sufficient to provide a desired silver concentration in the light stabilized antimicrobial material;
      b) subjecting a polymer <u>comprising a gel-forming fiber</u> to the solution for a time sufficient to [incorporate] <u>load</u> the desired silver concentration into the polymer; and
      c) subjecting the polymer, after step (b), to one or more agents which facilitate the binding of the silver on the polymer; wherein the silver is substantially photostable in the light stabilized antimicrobial material when dry, but will dissociate from the light stabilized antimicrobial material upon hydration of the light stabilized antimicrobial material.

Paper 28 at 2-4 (emphasis removed, alterations added).

### 1. Written Description Support

Pursuant to 37 C.F.R. § 42.121(b)(1), a motion to amend in an *inter partes* review must set forth "[t]he support in the original disclosure of the patent for each claim that is added or amended."

In our Order dated July 3, 2013, we pointed ConvaTec's attention to . *Nichia Corp. v. Emcore Corp.*, IPR2012-00005, slip op. at 4 (PTAB June 13, 2013) (Paper 27), for a discussion of the burden for identifying written descriptive support for the proposed substitute claims. Paper 17 at 4.

As set forth in *Nichia*, "37 C.F.R. § 42.121(b)(1) requires the patent owner to set forth the support in the *original disclosure* of the patent for each proposed substitute claim." *Id.* at 3. Specifically,

[T]he Board noted that the written description test is whether the original disclosure of the application relied upon reasonably conveys to a person of ordinary skill[ ] in the art that the inventor had possession of the claimed subject matter as of the

Case IPR2013-00097
Patent 6,669,981 B2

> filing date. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d
> 1336, 1351 (Fed. Cir. 2010) (en banc). Therefore, the written
> description support must be shown in the *original disclosure of
> the application* . . . that issued as the . . . patent, unless [patent
> owner] indicates, in its motion, that there was no change to the
> original disclosure when the patent issued.

*Id.*

ConvaTec, in its Motion to Amend, points to issued claims 1 and 17, as well as sections of the issued '981 patent, as support for proposed substitute claims 21 and 22. Mot. Amend 5-6. As noted above, however, that is not sufficient, as ConvaTec did not state where support could be found in the disclosure as originally filed for the substitute claims, nor did ConvaTec state in its Motion that the specification of the issued patent was identical to the specification originally filed in Application Number 09/997,545 (the '545 application"). ConvaTec's Motion to Amend, therefore, fails on that point alone.

Moreover, proposed substitute claim 21 adds the limitation that the "polymer is a gel forming fiber," wherein the fiber may be "a polysaccharide, a modified polysaccharide, a polyvinylpyrrolidone, a polyvinyl alcohol, a polyvinyl ether, a polyurethane, a polyacrylate, a polyacrylamide, a collagen, a gelatin, and a mixture thereof." ConvaTec points to column 3, line 41, through column 4, line 7, of the '981 patent for support. Mot. Amend 5. As proposed substitute claim 21 lists both a "polysaccharide" and a "modified polysaccharide," the term "polysaccharide" must necessarily be limited to an unmodified polysaccharide, such as cellulose.

Case IPR2013-00097
Patent 6,669,981 B2

The section of the '981 patent relied upon by ConvaTec states that preferred gel-forming fibers include Aquacel[TM], orthose, Versiva[TM], DuoDerm[TM], or a blend of two or more fibers such as Carboflex[TM]. Ex. 1001, 3:46-56. The '981 patent discloses further:

> Polymers suitable for the present invention include, but are not limited to, polysaccharides or modified polysaccharides, polyvinylpyrrolidone, polyvinyl alcohols, polyvinyl ethers, polyurethanes, polyacrylates, polyacrylamides, collagen, gelatin, or mixtures thereof. In preferred embodiments, the polymers contain carboxymethylcellulose (CMC) such as sodium CMC. In one embodiment, the polymer can be a polysaccharide comprising a carboxymethylcellulose or alginate, or a mixture of carboxymethylcellulose and alginate. In other embodiments, the polymers contain gel-forming fibers comprising sodium CMC, and which can be incorporated into wound dressings such as Aquacel™ (ConvaTec, Skillman, N.J.).

*Id.* at 3:62-4:7.

ConvaTec does not explain, however, how that section of the patent supports a gel forming fiber of an unmodified polysaccharide, such as cellulose; nor does ConvaTec explain how that section provides support of a gel forming fiber of several other of the listed polymers in proposed substitute claim 21, which were not identified in the '981 patent as being "gel-forming fibers," namely polyvinylpyrrolidones, polyvinyl alcohols, polyvinyl ethers, polyurethanes, or polyacrylates. In fact, cellulose is an unmodified polysaccharide, and the cotton gauze of Kreidl is primarily made up of cellulose. ConvaTec's expert, Dr. Edgar, testified that Kreidl does not teach anything about using gel forming fibers as substrates. Ex. 2029 ¶ 30.

Case IPR2013-00097
Patent 6,669,981 B2

As we conclude that ConvaTec has not established that the disclosure of the issued '981 patent provides written descriptive support for proposed substitute claim 21, we do not address it further.

### 2. Claim Interpretation

Proposed substitute claim 22 replaces the term "load" for the term "incorporate." ConvaTec cites the '981 patent as defining the "term 'load' or 'loading' . . . to mean 'ionic exchange of the cation to the polymer with silver ions." Mot. Amend 6 (*citing* Ex. 1001, 5:46-48).

### 3. Patentability over Prior Art

ConvaTec notes that proposed substitute claim 22 requires that the polymer is a gel forming fiber, and also requires that the silver be loaded into the polymer. Mot. Amend 12. ConvaTec contends that the references cited by Smith & Nephew in its Petition "fail to disclose or suggest an ion exchange reaction between cations in the polymer and silver ions as required by proposed substitute claim 22." Instead, the references teach the formation of insoluble silver chloride precipitate on or at the surface of the material. *Id.* at 13. It is insufficient, however, for ConvaTec simply to explain why the proposed substitute claims are patentable in consideration of the grounds of unpatentability on which the Board instituted review. Mot. Amend 12-15. ConvaTec's Motion does not discuss other prior art known to ConvaTec, the level of ordinary skill in the art, and also does not explain the basic knowledge and skill set already possessed by one of ordinary skill in the art, with respect to the new claim features. We agree with the reasoning in *Idle Free Sys., Inc. v. Bergstrom, Inc.*, IPR2012-00027, slip op. at 33 (PTAB January 7, 2014 (Paper 66)) that limiting the discussion to the

references relied upon in the instituted grounds of unpatentability does not provide a meaningful analysis.

Specifically, for proposed substitute claim 22, ConvaTec focuses on the added feature of requiring loading of the silver ion onto the polymer via ionic exchange. ConvaTec does not discuss, however, what was known by the ordinary artisan about loading cations, such as silver cations, on a gel by ionic exchange. Importantly, ConvaTec does not explain what would have been known to the ordinary artisan as to the effect, if any, on the photostability of silver cations, as a result of loading the silver cation on a polymer by ionic exchange. Without having discussed sufficiently prior art references that may have been known to ConvaTec, the level of ordinary skill in the art, and what was known previously regarding the new claim features, ConvaTec fails to demonstrate the patentability of proposed substitute claim 22. Thus, the Motion fails as to proposed substitute claim 22 for that reason as well. Moreover, as discussed above in the analysis of the patentability challenges of the original claims, Patent Owner's argument as to proposed substitute claim 22 also fails on the basis that Gibbins '751 teaches a substantially identical process, and thus would inherently produce a light stabilized antimicrobial material as required by proposed substitute claims 22.

Finally, ConvaTec contends that its "strong evidence of secondary considerations" is sufficient to rebut any conclusion of obviousness, and specifically refers to the success of its AQUACEL® Ag product line. Mot. Amend 15-16. ConvaTec's evidence of secondary considerations has been discussed above, and has been found not to be convincing as to the patentability of the original claims. And similarly, as in that discussion,

Case IPR2013-00097
Patent 6,669,981 B2

ConvaTec has not demonstrated how the evidence of commercial success, industry acclaim, long-felt but unsolved need, and copying, is due to the features provided by the method of the proposed substitute claims.

### D. Motion to Exclude Evidence

#### 1. Smith & Nephew's Motion to Exclude Evidence

A party wishing to challenge the admissibility of evidence must identify the grounds of the objection and explain why the evidence is not admissible.  37 C.F.R. § 42.64(c).  Here, Smith & Nephew seeks to exclude testimony of Ms. Fiona Adams (Ex. 2030 (Ex. 2045 (redacted version))) and Ex. 2012 related to the commercial success of ConvaTec's Aquacel Ag line of products without identifying any rule of evidence or other authority to support its position that the testimonial evidence in question is inadmissible. Paper 55, 2.  Rather, Smith & Nephew's rationale for excluding Ms. Adams' testimony is that ConvaTec has never established that any of the Aquacel Ag products are covered by the claims of the '981 patent.  Contending that the evidence is inadequate for a determination of nexus, however, is not sufficient to establish the impropriety of the evidence, much less the inadmissibility of the evidence under the Federal Rules of Evidence.  *See* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,758 (August 14, 2012) (A motion to exclude may not be used to challenge the sufficiency of the evidence to prove a particular fact.).

Accordingly, Smith & Nephew's Motion to Exclude is *denied*.

#### 2. ConvaTec's Motion to Exclude Evidence

ConvaTec seeks to exclude the following:  (1) testimony of Dr. Stephen Coulter (Ex. 1045); (2) Ex. 1037; and (3) Ex. 1038.  Paper 60 ("PO

Case IPR2013-00097
Patent 6,669,981 B2

Mot. Exclude"). As the movant, ConvaTec has the burden of proof to establish that it is entitled to the requested relief. 37 C.F.R. § 42.20(c).

ConvaTec argues that the declaration testimony of Dr. Stephen Coulter should be excluded because he is not qualified to testify as an expert with respect to the claimed subject matter of the '981 patent, specifically with regards to the photostability of a wound dressing. *Id.* at 2-4. ConvaTec points to paragraph 30 of the Coulter Declaration (Ex. 1045) as being the inadmissible portion of Dr. Coulter's testimony. ConvaTec further argues that Dr. Coulter's testimony reveals that he does not understand what a person of ordinary skill in the art would consider to be a "desired color" for a silverized wound dressing. *Id.*

We are not persuaded by ConvaTec's arguments. Initially, ConvaTec's objections to Dr. Coulter's testimony go to the weight and sufficiency of his testimonial evidence, rather than its admissibility. *See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1221 (Fed. Cir. 2006) (*citing Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1344-45 (11th Cir. 2003)); *In re TMI Litig.*, 193 F.3d 613, 692 (3d Cir. 1999) ("So long as the expert's testimony rests upon 'good grounds,' it should be tested by the adversary process—competing expert testimony and active cross-examination . . . ." (quoting *Ruiz–Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir.1998))); *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 920 (8th Cir.1986) ("Virtually all the inadequacies in the expert's testimony urged here by [the defendant] were brought out forcefully at trial . . . . These matters go to the weight of the expert's testimony rather than to its admissibility."). It is within our discretion to assign the appropriate weight to be accorded to Dr. Coulter's

testimonial evidence.  Moreover, we have reviewed Dr. Coulter's testimony, and note that the testimony in question is not relied upon in our claim construction of the term "photostable" or in our determination of what would be considered a "desired color" for a silverized wound dressing to a person of ordinary skill in the art.  Thus, the objection to paragraph 30 of Dr. Coulter's testimony is moot.

Smith & Nephew relies on Exhibits 1037 and 1038, in its opposition to ConvaTec's Motion to Amend, as evidence to support its conclusion that Example 25(m) of Gibbins '751 discloses the same order of addition of silver source (silver nitrate) and agent (sodium chloride) as claimed in the '981 patent.  Paper 44, 9.  ConvaTec argues that the Petitioner's Exs. 1037 and 1038 should be excluded because they are inadmissible hearsay, are not properly authenticated, or are otherwise improper under Federal Rule of Evidence 901.  Paper 60, 4-6.

We find it unnecessary to consider the objections to the admissibility of Exhibits 1037 and 1038.  Exhibits 1037 and 1038 were not relied upon in our determination as to the meaning of Example 25(m) of Gibbins '751.  Even excluding Smith & Nephew's evidence, we have determined that Smith & Nephew has demonstrated, by a preponderance of the evidence, that the challenged claims of the '981 patent are unpatentable.

Accordingly, ConvaTec's motion to exclude is *dismissed* as moot.

### III.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1-8 and 10-20 of the '981 patent are unpatentable;

FURTHER ORDERED that ConvaTec's Motion to Amend is *denied*,

Case IPR2013-00097
Patent 6,669,981 B2

FURTHER ORDERED that Smith & Nephew's Motion to Exclude is *denied*;

FURTHER ORDERED that ConvaTec's Motion to Exclude is *dismissed as moot*; and

FURTHER ORDERED that because this is a final decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

Case IPR2013-00097
Patent 6,669,981 B2

SNEDDEN, *Administrative Patent Judge, concurring-in-part.*

I concur in the majority's conclusion that claims 1-8 and 10-20 are anticipated or obvious, but I dissent from the majority in their interpretation of the term "photostable." The '981 patent defines "photostable" as "controlled colour change to a desired color with a minimal change thereafter." Ex. 1001, 5: 47-49. Under the majority's claim construction, the "desired colour" referenced within the meaning of "photostable" includes any color, including purple, desirable for any purpose, including aesthetic purposes. It is clear from the evidence on this record, however, that the interpretation of "desired colour" should be interpreted from a more technical viewpoint—that is, color is a measure of photostability.

In this regard, the evidence on this record supports a finding that purple is not a "desired colour." Gibbins '751, for example, explains that products containing silver undergo light-mediated discoloration, which leads to discoloration of skin touching the product. Ex. 1007, 4:28-31. Gibbins '751 suggests that purple, in particular, is an undesirable color in the field of medical devices containing silver. In Example 24 of Gibbins '751, various samples of silver impregnated materials are made and subjected to a light-stability test. *Id.* at 31-33. The results are:

| Dressing | Dry | Wet |
|---|---|---|
| Ag Aquacel | White,    good,    eventually purplish | Brown |
| Hi Ag-Aquacel | Purple, specks | Dark gray |
| Aquacel C | White | Clear |

*Id.* at 33:36-42. The references to "eventually purplish" and "purple, specks" indicate that purple is the color of silver after exposure to light.

Case IPR2013-00097
Patent 6,669,981 B2

Such discoloration is undesirable for silverized medical devices meant for coming into contact with skin.

ConvaTec also presents evidence that purple is not a "desired colour" within the meaning of "photostable." Ex. 2028 ¶ 16; Ex. 1046, 61:5-16. Dr. Phillips, for example, testified that a silverized wound dressing that was purple out of its package, or turned purple shortly after exposure to light, would be considered expired or not in optimal condition for clinical use.[16] Ex. 2028 ¶ 16. Dr. Phillips testified that the "desired colour" of a silverized wound dressing is white to a "grayish white." *See, e.g.*, Ex. 2028 ¶ 21; *see,* Ex. 1046, 64:24–65:6, 86:13–87:3. Smith & Nephew presents no evidence as to what color(s) would be desirable or undesirable to a person of ordinary skill in the art. Thus, the weight of the evidence on the present record suggests that, to a person of ordinary skill in the art, the "desired colour" of a silverized wound dressing for purposes of photostability is white to a grayish white, and that purple, specifically, is not a desirable color.

Further, I disagree with the majority's determination that "minimal change," as referenced within the meaning of "photostable," may refer to a

---

[16] Although the majority finds Dr. Phillips' testimony to be controverted by the disclosure in Gibbins '751 that a purplish color did not render the product ineffective for inhibiting the growth of *Staph. aureus*, there is insufficient evidence on this record suggesting that the clinical effectiveness of a product with regard to its antimicrobial properties is a surrogate for photostability. Rather, Gibbins '751 suggests that the problem with silverized products related to photostability is discoloration because discoloration in the product causes discoloration of skin touching the product. Ex. 1007, 4:28-31. Thus, a purple dressing is "unsuitable for clinical use" because of its discoloration, not solely because the antimicrobial effectiveness of the products may be reduced to some unknown but less than optimal degree.

change of color from a desirable color to an undesirable color. ConvaTec provides testimonial evidence that a color change from the "desired colour" (*e.g.*, white) to purple would not be understood to be a "minimal change" to a person of ordinary skill in the art. Pet. 13, 43; Ex. 2028 ¶ 16-21 (Dr. Phillips concluding that "a color change from 'white' to 'purplish' is in my opinion a discoloration, and does not equate with a 'substantially photostable' product . . . that has minimal color change from the 'desired color' or white."); Ex. 2029 ¶ 50 (Dr. Edgar stating "I fully agree with Dr. Phillips' statements from a scientific point of view that a change in color of the product from 'white' to 'purple' would not be considered 'substantially photostable' or 'photostable.'"); *see* Ex. 1050, 19-20. Smith & Nephew presents no evidence as to what would be considered a "minimal change" to a person of ordinary skill in the art. Thus, the weight of the evidence suggests that a change of color from a desirable color to an undesirable color would not be considered a "minimal change."

The claims, however, simply do not require silver to be photostable, but require the silver to be "substantially photostable." Here, I agree with the majority that "substantially," in the context of the '981 patent, means "largely" or "essentially." Under the broadest reasonable interpretation of "substantially photostable," silver may undergo some minimal discoloration to an undesirable color and still be considered "substantially [i.e., essentially] photostable."

Using the above claim construction, I disagree with the majority's reliance on Example 25 of Gibbins '751, but agree with the outcome because Example 24 of Gibbins '751 discloses the results of an experiment producing a product that is substantially photostable. Specifically, Example

Case IPR2013-00097
Patent 6,669,981 B2

24 describes an experiment in which the prepared product produced purple specks when subjected to a light-stability test. Ex. 1007, 33:37-43. A person of ordinary skill in the art would understand a "speck" to represent a color change within the meaning of the terms "substantially photostable." This disclosure in Example 24, combined with other teachings in Gibbins '751 suggesting that the order of steps used in Example 24 may be reversed (*id.* at 18: 30-32), reaches the "substantially photostable" element of the claims.

The results of Example 25 of Gibbins '751, however, describe an experiment in which the prepared products eventually turned "purplish." *Id.* at 34:46-54. There is insufficient evidence presented on this record to support a finding that a disclosure of a product "eventually turning a purplish color" would be considered a minimal color change. *See id.*

With regard to the Motion to Amend, although substitute claim 21 deletes the term "substantially," potentially addressing the problem of finding a product producing only purple specks to be within the scope the claim, I agree with the majority opinion that ConvaTec's Motion to Amend remains deficient. With regard to substitute claim 22, the term "substantially" is not deleted, and thus, the substitute claim fails to cure the deficiency discussed in this concurring opinion. Accordingly, I join the majority with regard to the denial of the Motion to Amend.

Case IPR2013-00097
Patent 6,669,981 B2

Petitioner:

Jeff B. Vockrodt
Rodger L. Tate
Christopher H. Yaen
Hunton & Williams, LLP
jvockrodt@hunton.com
rtate@hunton.com
cyaen@hunton.com

Patent Owner:

Jeffrey Guise
Peter R. Munson
Lorelei P. Westin
Wilson Sonsini Goodrich & Rosati, PC
jguise@wsgr.com
pmunson@wsgr.com
lwestin@wsgr.com

ELD

Trials@uspto.gov                                            Paper 87
Tel: 571-272-7822                              Entered: May 29, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

SMITH & NEPHEW, INC.
Petitioner

v.

CONVATEC TECHNOLOGIES, INC.
Patent Owner

——————

Case IPR2013-00102
Patent 7,267,828 B2

———————————

Before LORA M. GREEN, RAE LYNN P. GUEST, and
SHERIDAN K. SNEDDEN, *Administrative Patent Judges.*

GUEST, *Administrative Patent Judge*.

SNEDDEN*, Administrative Patent Judge, concurring-in-part.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

Case IPR2013-00102
Patent 7,267,828 B2

# I.    BACKGROUND

## A.  Introduction

On December 22, 2012, Smith & Nephew, Inc. ("Smith & Nephew"),
filed a Petition under 35 U.S.C. §§ 311-319, for *inter partes* review of
claims 1-5 and 7-14 of U.S. Patent No. 7,267,828 B2 (Ex. 1001, "the '828
patent").  Paper 2 ("Pet.").  ConvaTec Technologies, Inc. ("ConvaTec"),
filed a Preliminary Response on April 3, 2013.  Paper 8.  On May 31, 2013,
we granted the Petition, and instituted an *inter partes* review of claims 1-5
and 7-14.  Paper 9 ("Dec. on Inst.").

After institution of this proceeding, ConvaTec filed its Patent Owner's
Response ("PO Resp.").  Paper 26.  ConvaTec also filed a Corrected Motion
to Amend ("Mot. Amend"), in which ConvaTec moved to substitute
proposed claim 15 for claim 1.  Paper 25.  Both ConvaTec and Smith &
Nephew filed Motions to Exclude.  Papers 52; Paper 57.  Oral hearing was
held on March 5, 2014.[1]

The Board has jurisdiction under 35 U.S.C. § 6(c).  This final written
decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons that follow, we determine that Smith & Nephew has
shown by a preponderance of the evidence that claims 1-5 and 7-14 of the
'828 patent are unpatentable.  ConvaTec's Motion to Amend is *denied*.

## B.  The '828 patent

The '828 patent describes methods of enhancing the photostability of
silver in antimicrobial materials for use in wound dressing and medical
devices.  Ex. 1001, abstract; 1:13-15.  Silver-containing materials are

---

[1] A transcript of the oral hearing is included in the record as Paper 80.

2
**A68**

Case IPR2013-00102
Patent 7,267,828 B2

generally sensitive to light, and can cause uncontrolled discoloration of the silver-containing material. *Id.* at 1:35-38. The silver-containing materials made in accordance with the '828 patent, however, are disclosed as being substantially photostable, but will release silver when rehydrated. *Id.* at 3:28-30.

The '828 patent discloses a method wherein antimicrobial materials are prepared by subjecting a material containing hydrophilic, amphoteric, or anionic polymers to a solution comprising an organic solvent and a source of silver ("the silver solution"). *Id.* at 2:60-3:7. Examples of appropriate organic solvents include ethanol, methanol, acetone, and isopropyl alcohol. *Id.* at 4:24-27.

The polymer is subjected to the silver solution for a time that is sufficient to incorporate the desired silver concentration into the polymer. *Id.* at 3:18-20, 4:17-19. The '828 patent also refers to a "silver-loading step," where "loading" is defined as "ionic exchange of the cation to the polymer with silver ions." *Id.* at 5:42-49.

In the next step, during the course of or following the period where the polymer is subjected to the silver solution, the polymer is further subjected to agent(s) that facilitate the binding of the silver and the polymer together; "binding" is defined as "the formation of a photostable compound." *Id.* at 3:20-23, 5:53-54. Chlorides are examples of such facilitating agents. *Id.* at 3:23-26.

   *C. Exemplary Claim*

Claim 1 is the sole independent claim among the challenged claims of the '828 patent. All the claims are directed to methods of preparing a light

Case IPR2013-00102
Patent 7,267,828 B2

stabilized antimicrobial material.  The independent challenged claim, which is illustrative of the claims at issue in this *inter partes* review, recites:

> 1. A method of preparing a light stabilized material comprising a hydrophilic, amphoteric or anionic polymer, or a mixture thereof, having antimicrobial activity comprising the steps of
>
> a) preparing a solution comprising an organic solvent and a source of silver in a quantity sufficient to provide a desired silver concentration in said light stabilized material;
>
> b) subjecting a hydrophilic, amphoteric or anionic polymer, or a mixture thereof, to said solution for a time sufficient to incorporate the desired silver concentration into said polymer; and
>
> c) subjecting the hydrophilic, amphoteric or anionic polymer, or a mixture thereof, during or after step (b), to one or more agents which facilitate the binding of said silver into said polymer, wherein the silver is substantially photostable in the light stabilized material upon drying of said material, but will dissociate from the light stabilized material upon hydration of said material.

Claims 2-5 and 7-14 depend from claim 1, either directly or indirectly.

Dependent claims 2 and 3 specify the source of silver.  Dependent claims 4 and 5 specify the agents which facilitate the binding of said silver into said polymer.  Dependent claims 7 and 8 limit the polymer, and dependent claim 9 limits the organic solvent.  Dependent claims 10 and 11 specify the desired silver concentration.  Dependent claims 12 and 13 specify the time to which the polymer is exposed to the silver solution, while claim 14 specifies the time the polymer is exposed to the agents which facilitate the binding of the silver into the polymer.

4

Case IPR2013-00102
Patent 7,267,828 B2

### D. Challenges to the Patentability of Claims

We instituted this *inter partes* review in connection with the following challenges to the patentability of claims in the '828 patent:

1. Claims 1-5, 7, 10, and 11 are anticipated, or rendered obvious, by Kreidl.[2]

2. Claim 9 is rendered obvious by the combination of Kreidl and Bahia.[3]

3. Claims 10-14 are rendered obvious by Kreidl, Walder,[4] Ronan,[5] and Romans.[6]

4. Claims 8 and 9 are rendered obvious by the combination of Kreidl, Bahia, and Ronan.

5. Claims 1-5, 7, 8, and 10-13 are anticipated or rendered obvious by Ronan as evidenced by Kreidl and Romans.

6. Claim 9 is rendered obvious by the combination of Ronan and Bahia.

7. Claims 1-5 and 7-9 are anticipated under 35 U.S.C. § 102(e) by Gibbins '751.[7]

---

[2] Kreidl et al. ("Kreidl"), U.S. Patent No. 2,396,514 (issued Mar. 12, 1946) (Ex. 1002).

[3] Bahia et al. ("Bahia"), WO 94/16746, published August 4, 1994 (Ex. 1005).

[4] Walder, U.S. Patent No. 5,848,995 (issued Dec. 15, 1998) (Ex. 1004).

[5] Ronan et al. ("Ronan"), U.S. Patent No. 5,820,918 (issued Oct. 13, 1998) (Ex. 1006).

[6] Romans, U.S. Patent No. 3,092,552 (issued June 4, 1963) (Ex. 1003).

[7] Gibbins et al. ("Gibbins '751"), U.S. Patent No. 6,605,751 B1 (issued Aug. 12, 2003) (Ex. 1007).

Case IPR2013-00102
Patent 7,267,828 B2

8. Claims 10-13 are rendered obvious by the combination of Gibbins '751 as combined with Walder, Ronan, Romans, and Kreidl.

9. Claim 14 is rendered obvious by the combination of Gibbins '751 and Kreidl.

## II.    ANALYSIS

### A. *Claim Interpretation*

We interpret patent claim language in an *inter partes* review by ascribing to that language its broadest reasonable meaning in light of the specification of the patent.  37 C.F.R. § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).  Under that standard, we construe claim terms using "the broadest reasonable meaning of the words in their ordinary usage as they would be understood by one of ordinary skill in the art, taking into account whatever enlightenment by way of definitions or otherwise that may be afforded by the written description contained in the applicant's specification."  *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997).  We presume that claim terms have their ordinary and customary meaning.  *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art in question.") (internal quotation marks and citation omitted).  A patentee may rebut that presumption, however, by acting as his own lexicographer, providing a definition of the term in the specification with "reasonable clarity, deliberateness, and precision."  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

Case IPR2013-00102
Patent 7,267,828 B2

We expressly interpret below only those claim terms that require
analysis to resolve arguments related to the patentability of the challenged
claims in this proceeding.

> 1. *"to incorporate the desired silver concentration into said polymer"*

ConvaTec contends that the above quoted phrase requires a chemical
interaction between silver ions solubilized from a silver salt and a polymer.
PO Resp. 6. ConvaTec contends also that the phrase "incorporate the
desired silver concentration into the polymer" is construed properly to
involve an ionic interaction. *Id.* To support that position, ConvaTec
contends that the specification of the '828 patent associates the "incorporate
. . . into" step with "loading" of silver onto the polymer, where "loading" is
expressly defined in the '828 patent to mean "ionic exchange of the cation to
the polymer with silver ions." *Id.* at 6-7 (citing Ex. 1001 at 5:48-49).

We agree with ConvaTec that the claims encompass an ionic
interaction between free silver ions and a polymer; we do not agree,
however, that the claims are limited to that single type of interaction. The
claims do not recite the term "loading," and we decline to construe the
claims to be limited to the express definition given to that term. Further, the
'828 patent provides a list of suitable polymers that includes substances
incapable of ionic interaction with silver ions including, for example,
unmodified polysaccharides (i.e., cotton) and polyurethane. Ex. 1001,
4:1-13; Ex. 1045, ¶ 52; Ex. 2029, ¶¶ 30, 58. Rather, we interpret the phrase
"incorporate . . . into" as requiring the silver to associate with the polymer in
a way, regardless of the type of interaction (*e.g.*, ionic, Van der Waals, etc.),
such that it can interact with the polymer and the agent that facilitates the

binding of silver into the polymer so as to form a substantially photostable complex.  Thus, in addition to ionic exchange, the term "incorporate . . . into" includes other types of adsorptive interactions with the polymer that result in a substantially photostable complex, such as adsorption of the silver on the polymer, with the subsequent conversion of the silver cation to insoluble silver chloride.

### 2.  *"a solution comprising an organic solvent"*

The '828 patent discloses that silver is dissolved in an organic solvent to solubilize the source of silver such as a silver salt.  Ex. 1001, 5:38-40.  The organic solvent also functions to prevent hydration of the polymer, and as such should include less than 50% w/w water to alcohol so as to prevent hydration of the polymer.  *Id.* at 4:53-64.  ConvaTec further relies on the declaration of Dr. Kevin Edgar to establish that the presence of an organic solvent creates an environment favorable for ion exchange.  PO Resp. at 7-8; *see* Ex. 2029 ¶¶ 17-18.

The express language of the claims, however, merely requires a solution comprising an organic solvent, and does not recite expressly any specific range as to the ratio of, for example, water to alcohol.  The claims may encompass a ratio of water to alcohol that favors the ionic exchange of silver onto an ionized polymer, but are not so limited.  The claims thus broadly encompass any solution comprising an organic solvent in an amount sufficient to prepare a silver solution, regardless of whether the amount of organic solvent is sufficient to create an environment favorable for ionic exchange.

Case IPR2013-00102
Patent 7,267,828 B2

### 3. *"binding of said silver into said polymer"*

The '828 patent expressly defines "binding" as "the formation of a photostable compound." Ex. 1001, 5:53-54. As with the "incorporate . . . into" language discussed above, the term "binding" has not been defined in the specification as being particularly limited to binding of the silver to the polymer via ionic exchange. Accordingly, the term "binding" can refer to any formation of a photostable compound on the polymer.

### 4. *"substantially photostable"*

The '828 patent defines "photostable" as "[c]ontrolled colour change to a desired colour with minimal change thereafter." *See, e.g.*, Ex. 1001, 5:50-52. The '828 patent does not define what is or is not a "desired color" and does not exclude any particular color as a "desired color."

ConvaTec seeks a definition of "desired color" that excludes any colors other than a white and particularly excludes purple as a "desired color." PO Resp. 13-14 and 42-43. ConvaTec relies substantially on the testimony of Dr. Tania Phillips[8] (Ex. 2028) in support of that interpretation. *Id.*

Smith & Nephew contends that the term "photostable" should be interpreted broadly due to a lack of evidence to support what a skilled artisan

---

[8] Dr. Phillips testifies to having extensive experience in the field of wound care, as both a practicing clinician and researcher, for almost 30 years, and being very familiar with issues related to the wound care and management field. Ex. 2028 ¶ 9. Dr. Phillips appears to be qualified to testify as to wound care practices at the time of the invention described in the '981 patent.

Case IPR2013-00102
Patent 7,267,828 B2

would have considered to be a "desired color," as required by the claims.
Paper 41 (Ex. 2047 (redacted version of Paper 41)), 7-10.

Dr. Phillips testifies that if she "were presented with an AQUACEL®
Ag dressing[9] that was purple out of its package, or turned purple shortly
after exposure to light, [she] would assume that the dressing was expired and
not in optimal condition for clinical use."  Ex. 2028, ¶ 16.  Dr. Phillips
further testifies that

> It is my experience that the "desired color" of a silverised
> antimicrobial material in the '981 patent and '828 patent is
> white. . . .  Instead, a color change from "white" to "purplish" is
> in my opinion a discoloration, and does not equate with a
> "substantially photostable" product, or a "photostable" product
> that has minimal color change from the "desired color" of
> white.

Ex. 2028 ¶ 21.  Dr. Phillips also references a table in Gibbins '751 which
lists "Ag Aquacel" when dry as "[w]hite, good, eventually purplish," to
support her testimony that white is a desired color for a silverized
antimicrobial material.  Ex. 2028 (citing Ex. 1007, 33:36), ¶ 18; Ex. 2041,
88:7-20.

We are not persuaded by Dr. Phillips' testimony.  Dr. Phillips only
testifies as to the "desired color" for the AQUACEL® Ag product, with
which she is familiar in clinical practice, and not to desired colors of wound
dressings in general.  We note that the claims and specification of the '828
patent are not limited to any particular product.  The specification also does
not limit "desired color" to any particular desired colors for any particular
product.  *See, e.g.*, Ex. 1001, 5:46-48 (defining "photostable" as requiring a

---

[9] AQUACEL® Ag dressing is a silverised wound dressing product marketed
by ConvaTec that is said to be covered by the '981 patent.  Ex. 2045, ¶ 2.

Case IPR2013-00102
Patent 7,267,828 B2

"[c]ontrolled colour change to a desired colour," without specifying a
desired color).  Upon cross-examination, Dr. Phillips further states that there
was nothing inherently wrong with purple if the wound dressing did not
change further after turning purple.[10]

Dr. Phillips' testimony is based on her experience[11] as well as the
statements of the Gibbins '751 patent.  Dr. Phillips' testimony does not
address what was recognized as a "desired color" in the art of wound
dressings as a whole.  Dr. Phillips testifies that she has no knowledge of the
technical details of why color change may occur in a silverized wound
dressing[12] on which to base her opinion as to what would be a "desired
color," in the art of wound dressing as a whole.

---

[10] Exhibit 2041, 88:21-89:14 ("I would say that in my experience, I have not
used a mauve tinted dressing as a silverized dressing. However, if there was
a new dressing introduced that was purple and it was exposed to the air and
it did not change color significantly during air exposure and it was as
effective as all the other silver containing antimicrobial dressings, then I
would have to see the data on it, but the color, per se, would not be an
objection."); Exhibit 1046, 65:18-21 ("I think if the dressing had a purplish
tinge and it was exposed to light and it didn't change color and didn't look
any different, then it would be acceptable.") (emphasis removed).

[11] Ex. 1046, 65:7-10 ("Q. What about white with a purplish tinge to it, would
that also be a desired color?  A.  I haven't seen that color in any of the
dressings I'm currently using."); Exhibit 1046, 61:20-62:4 ("Q.  You have
no understanding as to whether any other practitioners have a different
understanding as to the desired color of wound dressings? [] A. I can only
comment on my own experience. Q. Did you ask any other practitioners
whether they think purple is a desirable color for a wound dressing? A. I did
not.") (objection omitted).

[12] Exhibit 1046, 39:15-21("I'm a clinician.  I'm somebody who uses the
dressings in practice. I can see when they change color, but I could not give
you the scientific details why they change color.").

11
A77

Case IPR2013-00102
Patent 7,267,828 B2

Moreover, Dr. Phillips' testimony seems to suggest that any change of color is undesirable,[13] and reads Gibbins '751's color change of the dry product from white to purple as being unacceptable.[14]  The claims recite, however, that the material must be "substantially photostable . . . upon drying" and the '828 patent defines the term "photostable," as having a "[c]ontrolled colour change to a desired colour with minimal change thereafter."  There is nothing to suggest that a controlled color change of a dry product from white to purple would not be encompassed by the scope of the definition of the '828 patent.

Dr. Phillips also characterizes desirability based on whether the material "was expired and not in optimal condition for clinical use."  Ex. 2028 ¶ 16.  The '828 patent defines photostability, however, not in terms of suitability for use, antimicrobial activity, or chemical stability, but in terms of controlled color change, with minimal change thereafter.  Dr. Phillips' testimony that a color change from white or greyish white would appear "unsuitable for clinical use" or "expired" is also controverted by Gibbins '751's disclosure that, despite the purple color, *Staph. aureus* was nonetheless inhibited.  Ex. 1007, 34:42-54.

---

[13] Exhibit 2028 ¶ 16; Exhibit 1046, 61:5-16 ("Well, I think in my experience working with wound dressings, I know that most, in fact, all the silver wound products that I've worked with are in the color spectrum between white to gray.  So if I open a packet with a wound dressing that's a silverite that I know is in this color spectrum and the color has changed to purple or brown or green, I think that's outside the normal color change that I would expect to see within those dressings.").

[14] Ex. 2028 ¶¶ 18-19; Ex. 2041, 88:7-20.

Case IPR2013-00102
Patent 7,267,828 B2

Accordingly, we interpret the term "desired color" reasonably broadly to encompass any color that may be desirable to one of ordinary skill in the art for any purpose. On the testimony of record, we do not find any reason to conclude that one of ordinary skill in the art would not consider purple as a desired color.

There is no discussion in the '828 patent as to whether or not a "minimum color change" is a change of color to an undesirable color or simply a change in the shade or spectrum of a single color. The broadest reasonable meaning therefore includes both, and thus, we construe term "photostable" to permit a minimal color change from a desired color, and also to permit minimal discoloration to an undesired color.

As to "substantially," the Federal Circuit has noted that "the term 'substantially' is capable of multiple interpretations." *Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc*., 347 F.3d 1314, 1323 (Fed. Cir. 2003) (citation omitted). "[S]ubstantially" can be interpreted as "'significantly' or 'considerably,'" or also "'largely' or 'essentially.'" *Id*. at 1322-23 (*citing Webster's New 20th Century Dictionary* 1817 (1983)). In view of those possible meanings, the broadest reasonable interpretation of "substantially," when read in the context of the '981 patent, is that the claim is open to at least some degree of additional color change beyond that described in the definition of the term "photostable."

In view of the above discussion, we determine that the broadest reasonable interpretation of the term "substantially photostable" is that the material may undergo a controlled color change to desired color, some minimal discoloration, even to an undesirable color, from the controlled

Case IPR2013-00102
Patent 7,267,828 B2

color, and even some degree beyond a "minimal discoloration," and still be considered "substantially [i.e., essentially] photostable."

## B. Patentability of Original Claims

To prevail in its challenges to the patentability of claims, the petitioner must establish facts supporting its challenges by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). The Court of Appeals for the Federal Circuit summarized the analytical framework for determining whether prior art anticipates a claim as follows:

> If the claimed invention was "described in a printed publication" either before the date of invention, 35 U.S.C. § 102(a), or more than one year before the U.S. patent application was filed, 35 U.S.C. § 102(b), then that prior art anticipates the patent. Although § 102 refers to "the invention" generally, the anticipation inquiry proceeds on a claim-by-claim basis. *See Hakim v. Cannon Avent Group, PLC*, 479 F.3d 1313, 1319 (Fed. Cir. 2007). To anticipate a claim, a single prior art reference must expressly or inherently disclose each claim limitation. *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998). But disclosure of each element is not quite enough—this court has long held that "[a]nticipation requires the presence in a single prior art disclosure of all elements of a claimed invention *arranged as in the claim.*" *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983) (citing *Soundscriber Corp. v. United States*, 175 Ct.Cl. 644, 360 F.2d 954, 960 (1966) (emphasis added)).

*Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1334–35 (Fed. Cir. 2008). We must analyze prior art references as a skilled artisan would. *See Scripps Clinic & Res. Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991) *overruled on other grounds by Abbott Labs. v. Sandoz, Inc.*, 556 F.3d 1282 (Fed. Cir. 2009) (to anticipate, "[t]here must be no difference

14
**A80**

Case IPR2013-00102
Patent 7,267,828 B2

between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention").

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). The level of ordinary skill in the art usually is evidenced by the references themselves. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995); *In re Oelrich*, 579 F.2d 86, 91 (CCPA 1978).

For an obviousness analysis, prior art references must be "considered together with the knowledge of one of ordinary skill in the pertinent art." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (quoting *In re Samour*, 571 F.2d 559, 562 (CCPA 1978)). Moreover, "it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d 825, 826 (CCPA 1968). That is because an obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."

Case IPR2013-00102
Patent 7,267,828 B2

*KSR*, 550 U.S. at 418; *see also In re Translogic Tech., Inc.*, 504 F.3d at
1259.

We analyze the instituted grounds of unpatentability in accordance
with the above-stated principles.

> 1. *Claims 1-5, 7, 10, and 11 as anticipated and/or obvious*
>    *over Kreidl (Ex. 1002)*

Kreidl discloses a disinfectant material being impregnated with light-
stabilized silver halide compositions. Ex. 1002, 1,1:2-5, 39-46. Kreidl
discloses a method in which bandage gauze is soaked in silver nitrate
solution, dried, and then placed in a sodium chloride solution. *Id.* at 3, 2:37-
46. In Example 5 of Kreidl, a bandage gauze is dipped into a solution of 1%
silver nitrate and dried. *Id.* at 6, 1:20-21. The bandage is then placed into a
20% sodium chloride solution for an hour, and washed. *Id.* at 6, 1:20-23.
According to Kreidl, the gauze bandage does not discolor when exposed to
light. *Id.* at 6, 1:23-24.

Example 6 is very similar to Example 5, except the bandage is
immersed in a 5% sodium chloride solution for 24 hours. *Id.* at 6, 1:25-29.
The time the gauze spends in the halide solution depends on the
concentration of the halide, such that using a 20% sodium chloride solution
only requires one hour, while a 5% solution requires 24 hours. *Id.* at 3, 2:57-
61.

Kreidl also teaches that wherever solutions are mentioned, the term
"is not to be limited to aqueous solutions but is meant to comprise other
suitable solvents such as alcohol, glycerine, carbon tetrachloride, and the
like." *Id.* at 6, 2:20-26. While Kreidl states that aqueous solutions are

Case IPR2013-00102
Patent 7,267,828 B2

preferred for silver halide preparations, it nonetheless discloses further that mixed solvents, such as diluted alcohol, may be used. *Id.* at 6, 2:26-31.

a. Claim 1-5, and 7

ConvaTec contends that Kreidl does not anticipate claim 1, and contends further that the claims are not rendered obvious by Kreidl, because the bandage gauze of Kreidl is made from cotton fibers. PO Resp. 14-21. According to ConvaTec, cotton—being made primarily of pure cellulose containing no readily ionizable groups—is incapable of carrying out ion exchange reactions and, thus Kreidl does not disclose a chemical association of silver ions with the polymer. *Id.* at 16 (citing Ex. 2029, ¶ 30).

ConvaTec presents evidence that the process of Kreidl results in the impregnation of precipitated and insoluble silver chloride into fibrous cotton gauze in a process referred to as *in situ* incorporation. *See, e.g.*, Ex. 1026, ¶¶ 14-15, 20, 26-27, 39. The insoluble silver chloride precipitate occurs when the sodium chloride is added either before or at the same time as the silver source, because the silver ions are more attracted to the chloride ions than to any negative charges associated with the polymer. *Id.*; Ex. 2029, ¶ 23. Nonetheless, both parties agree that, due to the proximity of silver chloride to the polymer, there necessarily will be adsorption of silver chloride to the polymer. Ex. 1026 ¶ 26; *see* Ex. 2029 ¶ 32.

ConvaTec further argues that "Kreidl does not appreciate the use of organic solvents for shifting the ion exchange equilibria, and 'driv[ing] the exchange of sodium for silver' in the incorporation of silver into the polymer." PO Resp. 17 and 21.

ConvaTec's arguments are substantially directed to an interpretation of the phrase "incorporate . . . into" and "binding" as requiring an ionic

Case IPR2013-00102
Patent 7,267,828 B2

exchange of the silver onto only anionic polymer fibers. We reject that interpretation of the claim language as set forth above, and thus, we are not persuaded by ConvaTec's arguments. Although ConvaTec's evidence shows that ionic exchange is not possible for the cotton fibers and the lower alcohol content described in Kreidl, the claims are not so limited, and encompass any adsorption of the silver taught by Kreidl to the cotton, which is an unmodified polysaccharide expressly recited in the claims. Both parties agree that adsorption of silver chloride onto the cotton fiber occurs, which is encompassed by the term "incorporate . . . into" and "binding" recited in the claims. Ex. 1026 ¶ 26; Ex. 2029 ¶ 32.

Kreidl expressly states that the resulting silverized antimicrobial materials do not discolor when exposed to light. Ex. 1002, 6, 1:23-24. ConvaTec has not presented any persuasive evidence to undermine that teaching.

ConvaTec further argues that Kreidl does not exemplify a solution comprising an organic solvent, and the use thereof constitutes inappropriate picking and choosing of embodiments for a finding of anticipation. PO Resp. 17 (citing Ex. 2029 ¶ 31 (calling the use of an organic solvent an "afterthought")). Alternatively, ConvaTec argues that Kreidl's preference for aqueous solutions teaches away from the skilled artisan adding an organic solvent. *Id.* at 20-21.

Smith & Nephew contends that Kreidl expressly discloses the use of an organic solvent, particularly diluted alcohol, with the silver source. Pet. 31-35, 39-42; Ex. 1002, 6, 2:20-31. As discussed above, the claims do not require any particular concentration of an organic solvent.

Case IPR2013-00102
Patent 7,267,828 B2

We are not persuaded that the use of an organic solvent in addition to water is not taught expressly by Kreidl. The disclosure in Kreidl is not limited to only the examples, and a disclosure that the described solutions may comprise an organic solvent is sufficient. *See Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1324 n. 6 (Fed. Cir. 2003) ("The anticipation analysis asks solely whether the prior art reference discloses and enables the claimed invention, and not how the prior art characterizes that disclosure or whether alternatives are also disclosed.").

Moreover, it would have been obvious to one of ordinary skill in the art to have selected an organic solvent as part of the silver nitrate solution taught by Kreidl based on the explicit teaching in Kreidl. We are not persuaded that the disclosure of an aqueous solution as preferred constitutes a teaching away. *Merck & Co. v. Biocraft Labs., Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989) ("[A]ll disclosures of the prior art, including unpreferred embodiments, must be considered.") (quoting *In re Lamberti,* 545 F.2d 747, 750 (CCPA 1976)). Disclosed examples and preferred embodiments do not constitute a teaching away from a broader disclosure of non-preferred embodiments. *In re Susi*, 440 F.2d 442, 446 n.3CCPA 1971).

ConvaTec presents no additional arguments as to dependent claims 2-5 and 7, other than those discussed above as to claim 1. Based on our review of the evidence presented by Smith & Nephew we conclude that Smith & Nephew has established by a preponderance of evidence that Kreidl anticipates claim 1-5, and 7 under 35 U.S.C. §102(b). We conclude further that, when weighed with the evidence of secondary considerations, discussed below, Smith & Nephew has shown by a preponderance of the evidence that claims 1-5, and 7 would have been obvious over Kreidl.

Case IPR2013-00102
Patent 7,267,828 B2

### b. Claims 10 and 11

Claim 10 is drawn to the method of claim 1, "wherein the desired silver concentration is between 0.1 and 20 wt %," and claim 11 recites that "the desired silver concentration is between 1 and 20 wt %." Kreidl teaches that "[a]s a rule, for a standard bandage gauze not more than about 4% silver nitrate should be retained on the fiber. . ." Ex. 1002, 3, 2:41-44. Stephen L. Coulter ("Coulter Declaration," Ex. 1026, ¶ 27) testifies that levels of silver below 4% are within the ranges of silver claimed in claims 10 and 11.

ConvaTec argues that claims 10 and 11 are not anticipated by Kreidl, as Kreidl does not disclose the level of silver in the finished product but "merely discloses that a bandage gauze was 'dipped into 1% AgNO$_3$ solution.'" PO Resp. 24 (*citing* Ex. 1002, 6, 1:20-29).

ConvaTec does not challenge the Coulter Declaration in its Response, nor does ConvaTec show why the Declaration is incorrect in its conclusions. We thus credit the Declaration of Dr. Coulter.

For those reasons, we conclude that Smith & Nephew has established by a preponderance of evidence that Kreidl renders claims 10 and 11 unpatentable as anticipating under 35 U.S.C. §102(b). We conclude further that, when weighed with the evidence of secondary considerations, discussed below, Smith & Nephew has shown by a preponderance of the evidence that claims 10 and 11 would have been obvious over Kreidl.

### 2. *Claim 9 as obvious over Kreidl (Ex. 1002) in view of Bahia (Ex. 1005)*

Claim 9 depends from claim 1 and further recites "wherein said organic solvent is selected from the group consisting of industrial

Case IPR2013-00102
Patent 7,267,828 B2

methylated spirit, denatured ethanol, methanol, acetone, isopropyl alcohol and ethanol."

Kreidl describes a solution comprising a "diluted alcohol" but does not disclose any of the recited alcohols of claim 9.  Ex. 1002, 6, 2:30-31.  Smith & Nephew contends:

> Bahia discloses that industrial methylated spirits and industrial alcohol (ethanol) are suitable solvents for use in processing wound dressings, Bahia at 13:24-25, and that an antiseptic can be added in alcohol containing wash compositions.  Bahia at 13:10-18, 14:29-33.  It would have been obvious to use industrial methylated spirits or ethanol as the alcohol in the process of Kreidl as these were well known forms of alcohol used to wash wound dressings at the time of the invention as demonstrated by Bahia.

Pet. 35.

ConvaTec's arguments for patentability are similar to those discussed above regarding the anticipation of claim 1, namely that, unlike Bahia, Kreidl considers the use of an alcohol as an "afterthought," while the carboxymethylcellulose (CMC) described in Bahia would be capable of ionic exchange with silver ions and would dissolve in an aqueous solution.  PO Resp. 22-23.  According to ConvaTec, the teachings of Bahia cannot be combined properly with the teachings of Kreidl because of the "vast differences between the . . . processes disclosed in Bahia and Kreidl."  *Id.* at 23-24.

As above, ConvaTec's arguments are presented as if the claims require an ionic exchange between the silver and the polymer, which we have determined they do not.  Moreover, ConvaTec provides no persuasive evidence that Smith & Nephew's reasoning is in error.  Thus, we agree with Smith & Nephew that it would have been obvious to one of ordinary skill in

21
**A87**

Case IPR2013-00102
Patent 7,267,828 B2

the art to have used the ethanol of Bahia as the alcohol solvent described for the bandage gauze in Kreidl, because Bahia is evidence that ethanol was a known solvent for wound dressings.  *See KSR*, 550 U.S. at 417 (The question to be asked is "whether the improvement is more than the predictable use of prior art elements according to their established functions.").

We conclude that, when weighed with the evidence of secondary considerations, discussed below, Smith & Nephew has shown by a preponderance of the evidence that claim 9 would have been obvious over Kreidl in view of Bahia.

> *3.  Claims 10-14 as obvious over Kreidl (Ex. 1002), Walder (Ex. 1004), Ronan (Ex. 1006), and Romans (Ex. 1003)*

### a.  Claims 10 and 11

As to claims 10 and 11, those claims have been discussed above in the analysis of the challenge over Kreidl alone.  Therefore, we need not address those claims further.

### b.  Claims 12 and 13

Claims 12 and 13 specify the time during which the dressing material is exposed to a silver nitrate solution.  Smith & Nephew acknowledges that Examples 5 and 6 of Kreidl do not disclose the duration in which the gauze is exposed to the silver nitrate solution.  Pet. 37.  Smith & Nephew relies on Walder, Ronan, and Romans, which each teach exposing a polymer to a silver nitrate solution for a duration of time encompassed by the ranges set forth in claims 12 and 13.  *Id.*  Smith & Nephew, therefore, contends that it would have been within the level of skill of the ordinary artisan to "have readily appreciated that the amount of time for which the polymer must be

Case IPR2013-00102
Patent 7,267,828 B2

exposed to silver nitrate will depend on the type and dimensions of the polymer subject to *in situ* silver chloride precipitation and the level of silver chloride in the final product," rendering claims 12 and 13 obvious. *Id.* (*citing* Coulter Dec., Ex. 1026, ¶¶ 68, 70).

ConvaTec's arguments that each of Walder, Ronan, and Romans fails to teach ionic exchange of silver with a polymer (PO Resp. 25-28) are not persuasive for the reasons discussed above.

ConvaTec further argues that Walder cannot properly be combined with Kreidl, because Walder describes only an aqueous silver nitrate solution. PO Resp. 25. ConvaTec also argues that Romans cannot properly be combined with Kreidl because Romans is directed to "non-analogous products, such as ointments and skin antiseptics," and discloses a preferred silver concentration outside of the claimed range. PO Resp. 28.

ConvaTec's arguments are not persuasive. ConvaTec has not shown why the aqueous solution of Walder or the differences described in Romans are a basis for determining that the skilled artisan would not consider the silver nitrate exposure times disclosed therein as being suitable for the process described in Kreidl, as Smith & Nephew has shown that each of Walder, Ronan, and Romans is directed to incorporating the antimicrobial properties of silver into a polymer. Moreover, ConvaTec's arguments fail to direct us to any persuasive additional arguments regarding the teachings of Ronan.

We thus conclude that, when weighed with the evidence of secondary considerations, discussed below, Smith & Nephew has shown by a preponderance of the evidence that claims 12 and 13 would have been obvious over Kreidl, Walder, Ronan, and Romans.

Case IPR2013-00102
Patent 7,267,828 B2

### c. Claim 14

Claim 14 further recites the time during which the polymer is exposed to the binding agents in step (c) of claim 1. Smith & Nephew notes that Kreidl teaches exposing the gauze to a sodium chloride solution for one hour when a 20% sodium chloride solution is used, and for 24 hours when a 5% sodium chloride solution is used. Pet. 37-38. Smith & Nephew asserts that Kreidl teaches that the amount of time the material is soaked in a sodium chloride solution is a result-effective variable. *Id.* (citing Ex. 1002, 3, 2:44-51). Smith & Nephew contends it would have been obvious to vary the time the gauze of Kreidl is soaked in the sodium chloride solution, such as soaking for 5 to 30 minutes, because Kreidl specifically teaches that it is a result-effective variable. *Id.* (citing Coulter Dec., Ex. 1026, ¶ 70).

ConvaTec's Response demonstrates no error in Smith & Nephew's challenge to patentability to claim 14 over those arguments discussed above. PO Resp. 24-28. Namely, ConvaTec's arguments do not respond to Smith & Nephew's evidence and argument that the amount of time the material is exposed to an agent that facilitates the binding of silver is a result-effective variable based on the teachings of Kreidl.

We thus conclude that, when weighed with the evidence of secondary considerations, discussed below, Smith & Nephew has shown by a preponderance of the evidence that claim 16 would have been obvious over Kreidl, Walder, Ronan, and Romans.

Case IPR2013-00102
Patent 7,267,828 B2

### 4. *Claims 8 and 9 as obvious over Kreidl (Ex. 1002), Bahia (Ex. 1005), and Ronan (Ex. 1006)*

As to claim 9, we already determined that it is rendered obvious over Kreidl and Bahia for the reasons discussed above. Therefore, we do not address this claim further.

Claim 8 further recites that the polymer comprises "a carboxymethylcellulose [CMC], an alginate or a mixture thereof." Smith & Nephew has presented a detailed argument that "it would have been obvious to replace the cotton gauze of Kreidl with the gel fiber [CMC] dressing of Bahia, or to apply the Kreidl process to provide the silver chloride as an antiseptic in the gel fiber dressing of Bahia." Pet. 51-53. ConvaTec's Response demonstrates no error in Smith & Nephew's challenge to the patentability of these dependent claims over those arguments discussed above with respect to claim 1 and claim 9 above. Namely, ConvaTec argues that Ronan's aqueous solution would not allow for incorporation of silver ions into the polymer by ionic exchange. PO Resp. 29-30. ConvaTec further argues that, unlike Bahia, Kreidl considers the use of an alcohol as an "afterthought," while the CMC described in Bahia would be capable of ionic exchange with silver ions and would dissolve in an aqueous solution. PO Resp. 30.

As above, ConvaTec's arguments are presented as if the claims require an ionic exchange between the silver and the polymer, which we have determined they do not. We agree with Smith & Nephew that it would have been obvious to one of ordinary skill in the art to have used the CMC polymer of Bahia for the bandage gauze in Kreidl, because the skilled artisan would have been aware of the advantages of Bahia's wound dressing,

Case IPR2013-00102
Patent 7,267,828 B2

namely in promoting healing, ease of handling and translucency. Pet. 51-52. *See KSR*, 550 U.S. at 417 (The question to be asked is "whether the improvement is more than the predictable use of prior art elements according to their established functions.").

We thus conclude that, when weighed with the evidence of secondary considerations, discussed below, Smith & Nephew has shown by a preponderance of the evidence that claims 8 and 9 would have been obvious over Kreidl, Bahia, and Ronan.

> 5. *Claims 1-5, 7, 8, and 10-13 as anticipated or obvious over*
> *Ronan (Ex. 1006), as evidenced by Kreidl (Ex. 1002) and*
> *Romans (Ex. 1003)*

Ronan discloses a method of making an antiseptic article, in which the article is immersed in an infiltration solution comprising an aqueous solution of silver acetate, and then immersed into a solution that contains an anion, such as chloride. Ex. 1006, 4:40-56. The infiltration solution may contain up to about 50% of a water miscible solvent such as an alcohol, glycol, ether, or ester solvent. *Id.* at 5:20-25.

Ronan provides an example in which calcium alginate hydrogel tubing is soaked for one hour in an aqueous 1% silver acetate solution, and then soaked in an aqueous calcium chloride solution for an hour. *Id.* at 7, Example 3.

ConvaTec contends that Ronan discloses insoluble alginate cross-linked hydrogels that are not designed for ion-exchange, and thus, Ronan does not disclose or suggest "incorporation" of silver onto anionic polymers substrates. PO Resp. 32 (citing Ex. 2029, ¶¶ 37-38).

Case IPR2013-00102
Patent 7,267,828 B2

As discussed above with respect to Kreidl, ConvaTec's arguments are substantially directed to an interpretation of the phrase "incorporate . . . into" as requiring an ionic exchange of the silver onto only anionic polymer fibers. We are not persuaded by ConvaTec's arguments because we reject this interpretation for the reasons discussed above. Although ConvaTec's evidence shows that Ronan's alginate cross-linked hydrogels would likely be destroyed by ion exchange, the claims are not so limited, and encompass adsorption or other bonding of the silver taught by Ronan to the alginate cross-linked hydrogels, which is a type of polymer expressly recited in claim 8. Both parties agree the silver chloride is provided in the alginate polymers of Ronan, which is encompassed by the term "incorporated . . . into" recited in the claims. Ex. 1026, ¶ 46; Ex. 2029, ¶ 39.

Ronan does not state expressly that the resulting silverized antimicrobial materials do not discolor when exposed to light. Smith & Nephew contends that, because Ronan discloses a process substantially similar to the process taught by the '828 patent, it would result inherently in a material that is substantially photostable. Pet. 39 (*citing* Coulter Dec., Ex. 1026, ¶ 50). We agree with Smith & Nephew that Ronan describes a process that is essentially the same as the claimed process. The realization of a new benefit of an old process does not render that process patentable. *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1377-78 (Fed. Cir. 2005); *see also Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1376 (Fed. Cir. 2001) (stating in the context of a claimed process that was drawn to the same use comprising the same steps of the prior art, "[n]ewly discovered results of known processes directed to the same purpose are not patentable because such results are inherent"). ConvaTec has not

Case IPR2013-00102
Patent 7,267,828 B2

presented any persuasive evidence or argument to undermine this reasoning. *See*, *e.g.*, PO Resp. 33-34.

Smith & Nephew contends that Ronan expressly discloses the use of organic solvents, particularly alcohols, glycols, ether, and ester solvents, with the silver source. Pet. 39-40; Ex. 1006, 5:20-25.

ConvaTec argues that Ronan does not exemplify a solution comprising an organic solvent. According to ConvaTec, the disclosure in Ronan of "infiltration solutions" that may contain organic solvents "does not constitute a disclosure of preparing a solution comprising an organic solvent," and the use thereof constitutes inappropriate picking and choosing of embodiments for a finding of anticipation. PO Resp. 33. Alternatively, ConvaTec argues that Ronan's requirement for water soluble salts teaches away from the skilled artisan adding an organic solvent. *Id.* at 35 (citing Ex. 1006, 3:59-64).

We disagree with ConvaTec that the use of an organic solvent in addition to water is not taught by Ronan. The disclosure in Ronan is not limited to the examples, and a disclosure that the described solutions may comprise an organic solvent is sufficient. *See Hewlett-Packard*, 340 F.3d at 1324 n. 6.

Moreover, we agree with Smith & Nephew (Pet. 43) that it would have been obvious to substitute the aqueous solvent with a solvent that contained 50% alcohol as Ronan teaches that such a substitution may be made. We are not persuaded that the disclosure of water soluble salts constitutes a teaching away from including miscible organic solvents. *Merck*, 874 F.2d at 807; *In re Susi*, 440 F.2d at 446 n.3.

Case IPR2013-00102
Patent 7,267,828 B2

Smith & Nephew has presented a detailed argument that each of claims 1-5, 7, 8, and 10-13 are anticipated by or, in the alternative, would have been obvious over the teachings of Ronan. Pet. 33-43. ConvaTec's Response demonstrates no error in Smith & Nephew's challenge to patentability to any particular claim so challenged. PO Resp. 31-36. For those reasons, we conclude that Smith & Nephew has established by a preponderance of evidence that Ronan anticipates claims 1-5, 7, 8, and 10-13 under 35 U.S.C. §102(b). We conclude further, that when weighed with the evidence of secondary considerations, discussed below, Smith & Nephew has shown by a preponderance of the evidence that claims 1-5, 7, 8, and 10-13 would have been obvious over Ronan.

### 6. *Claim 9 as obvious over Ronan (Ex. 1006) and Bahia (Ex. 1005)*

Claim 9 depends from claim 1, and recites "wherein said organic solvent is selected from the group consisting of industrial methylated spirit, denatured ethanol, methanol, acetone, isopropyl alcohol and ethanol."

Ronan describes a solution comprising an "alcohol" but does not disclose any of the recited alcohols of claim 9. Smith & Nephew argues:

> Bahia discloses that industrial methylated spirits is a suitable solvent for use in processing wound dressings, Bahia at 13:24-25, and that an antiseptic can be added in alcohol containing wash compositions. Bahia at 13:10-18, 14:29-33. It would have been obvious to use industrial methylated spirits or ethanol as the alcohol in the process of Ronan as these were well known forms of alcohol used to wash wound dressings at the time of the invention as demonstrated by Bahia.

Pet. 43-44.

Case IPR2013-00102
Patent 7,267,828 B2

ConvaTec's arguments that Ronan does not teach, but instead discourages, the use of organic solvents (PO Resp. 36-37) are not persuasive for the reasons discussed above with respect to anticipation based on Ronan.

ConvaTec argues further that, unlike the alginate fibers of Ronan, the CMC described in Bahia would be capable of ionic exchange with silver ions, and thus would dissolve in an aqueous solution. *Id.* at 37. According to ConvaTec, the teachings of Bahia cannot be combined properly with the teachings of Ronan, because the Bahia process does not contain silver, and Ronan's process is "very different," and there are different "considerations necessary in treating anionic polymers." *Id.*

ConvaTec's arguments directed to ionic exchange between the silver and the polymer are not persuasive for the reasons discussed above. Further, ConvaTec has shown no error in the reasoning that it would have been obvious to one of ordinary skill in the art to have used the alginate material described in Ronan for a wound dressing. Specifically, Bahia evidences that the use of alginate hydrogels as wound dressings was known in the art, and the skilled artisan would have used the ethanol of Bahia as the alcohol solvent described in Ronan, because Bahia is evidence that ethanol was a known solvent for such wound dressings. *See KSR*, 550 U.S. at 417.

We thus conclude that, when weighed with the evidence of secondary considerations, discussed below, Smith & Nephew has shown by a preponderance of the evidence that claim 9 would have been obvious over Ronan and Bahia.

Case IPR2013-00102
Patent 7,267,828 B2

      7.  *Claims 1-5 and 7-9 are anticipated under 35 U.S.C.*
         *§ 102(e) by Gibbins '751 (Ex. 1007)*

Gibbins '751 discloses methods for incorporating silver chloride into various substrates by nucleation of silver chloride into the matrix. *See, e.g.*, Ex. 1007, 31:26 (Section heading "AGCL Colloid Nucleation in Solvent for Aquacel"); Ex. 1026 ¶ 51.

Gibbins '751 discloses a solution of a chloride salt, such as sodium chloride that is made using water combined with an alcohol solvent, such as ethanol or isopropyl alcohol, wherein the aqueous portion of the solution is not greater than 50%. Ex. 1007, 18:13-17, 28-30. A polymeric material is immersed into the chloride bath, and then immersed into a similar solution of water and an alcohol solvent that contains silver ions. *Id.* at 18:20-25 Gibbins '751 specifically teaches that the immersion sequence may also be reversed without affecting the success of the method. *Id.* at 18:30-32.

Example 24D of Gibbins '751 added silver to Aquacel® fibers.[15] *Id.* at 31, Example 24. In Example 24D of Gibbins '751, the polymer was added to a solution of sodium chloride comprising ethanol as the solvent, to which was added, after "a few seconds," a silver nitrate solution comprising ethanol as the solvent. *Id.* at 32:61-67. Gibbins '751 noted that, while the silver Aquacel® eventually turned purplish, the material did not discolor appreciably in light. *Id.* at 33:35-50.

Gibbins '751 also provides Examples 25(a) through 25(n). *Id.* at 34:4-39. In each example, reagents were prepared and used to impregnate CMC (Aquacel). *Id.* at 33:66 to 34:1. From those Examples, Gibbins '751

---

[15] Aquacel® is a trade name for carboxymethoylcellulose (CMC). Gibbins '751, 33:67-34:1; Ex. 1045, ¶ 65.

Case IPR2013-00102
Patent 7,267,828 B2

states that "[t]he stability of the material to light is controlled by the amount of NaCl, and the location and concentration of Cu ions in the material." *Id.* at 33:62-65.

Examples 25(a)-25(h) use the following notation with X used to describe amounts that vary between the different examples:

> X g NaCl in 2 ml $H_2O$, add to 50 g EtOH, add dressing, add X mL $AgNO_3$ sol., add X µl Cu.

*Id.* at 34:4-20. We interpret that notation as describing providing a sodium chloride solution in 2 ml water, to which 40 g ethanol is added. The CMC dressing is added. A silver nitrate solution then was added, followed optionally with a copper solution in ethanol. *See* Ex. 1045 ¶ 6. These examples systematically vary the sodium chloride concentration, the silver nitrate concentration and the copper concentration.

Examples 25(i)-25(l) use the following notation with X used to describe amounts that vary between the different examples:

> X g $AgNO_3$ to 100 µl $H_2O$, add to 25 g EtOH/0.0888 g NaCl in 2 ml $H_2O$, add X µ1 Cu, add to 25 g EtOH, add dressing, add $AgNO_3$ solution.

*Id.* at 34:21-33. We interpret that notation to describe first preparing a silver nitrate solution in 100 µl of water, which is added to 25 g of ethanol. Then a sodium chloride solution is prepared in 2 ml water, optionally adding copper, and added to 25 g ethanol. The CMC dressing is then added to the sodium chloride solution, followed by the silver nitrate solution. *See* Ex. 1045 ¶ 7. The concentration of silver nitrate and the copper concentration are varied in these examples.

Examples 25(m) and 25(n) use the following notation with X used to describe amounts that vary between the two examples:

Case IPR2013-00102
Patent 7,267,828 B2

> 0.006795 g AgNO$_3$ to 100 µl H$_2$O, add to 25 g EtOH, add
> dressing/X NaCl in 2 ml H$_2$O, add 0 µl Cu, add to 25 g EtOH,
> add to AgNO$_3$ solution.

*Id.* at 34:34-39.  What this notation means is at issue in this proceeding.

Based on a consistent reading of this notation with the other examples, we

agree with Smith & Nephew that this notation describes first preparing a

silver nitrate solution in 100 µl of water, to which is added to 25 g of

ethanol.  The CMC dressing is then added to the silver nitrate solution.  A

sodium chloride solution then is prepared in 2 ml water, without adding

copper, and added to 25 g ethanol.  The sodium chloride solution is then

added to the silver nitrate solution.  *See* Pet. 53-57; Paper 41 (Ex. 2047

(redacted version of Paper 41)), 6-7; *see* Ex. 1045 ¶¶ 8, 9, 20.

Gibbins '751 at column 34, line 40, further states "[a]dd 10 g H$_2$O to

25 g EtOH, add dressing."  That disclosure may be a control example, which

only adds water to ethanol, followed by adding a CMC dressing, and there is

no silver nitrate or sodium chloride added.

Each of the Examples was exposed to light and *Staph. aureus* to

determine antimicrobial activity.  Ex. 1007, 34:42-44.

Gibbins '751 states that:

> Samples that contained higher concentrations of silver
> discolored more quickly in light with most samples eventually
> turning a purplish color.  The exceptions were samples "n" and
> "o" which remained white.  With the exception of the sample
> developed from the combination in "o", the samples had an
> acceptable feel and texture.  Sample "o" was stiff following
> processing.   All samples produced the same size zone of
> inhibition on the staph plate except for sample "o", which had
> no zone of inhibition.

*Id.* at 34:46-54.  We note that there is no example "o" identified by

Gibbins '751, but that Gibbins '751 does include a possible additional

Case IPR2013-00102
Patent 7,267,828 B2

control example, as discussed above. *Id.* at 34:40. The results would be consistent with sample "o" being a control example with no expected antimicrobial activity or color change in that no silver was added.

Smith & Nephew argues that Example 25(m), as well as the disclosure in Gibbins '751 that the steps of Example 24 can be prepared in the opposite order without affecting the success of the method, anticipates claims 1-5 and 7-9 of the '828 patent. Pet. 53-57.

ConvaTec argues that Gibbins '751 intends the "immersion" or "impregnation" of "an insoluble silver chloride precipitate," which is not "the incorporation of silver ions into polymers by ion exchange." PO Resp. 39-40. According to ConvaTec, even though the CMC dressing of Gibbins '751 is capable of ionic exchange with silver, only by immersing the dressing in silver first, absence the presence of chloride ions, is the silver allowed to ionically exchange with the dressing, and Gibbins '751 "failed to teach, disclose or appreciate that the order of addition . . . was important and critical" to ionic exchange. *Id.* (*citing* Ex. 2029 ¶ 42); *see* Ex. 2029 ¶ 43. As Dr. Edgar explains, "[t]he presence of soluble sodium ions from sodium chloride will retard the exchange of sodium counterions on the anionic polymer for soluble silver ions." Ex. 2029 ¶ 43. Dr. Edgar concludes that the sequence of addition of reagents, i.e., substrate in sodium chloride, then addition of silver salt "is precisely the opposite of the sequence that would promote the incorporation or loading of a desired silver salt concentration into the polymer." *Id.*

ConvaTec's arguments are not persuasive. First, as discussed in detail above, ConvaTec's arguments are presented as if the claims required an

Case IPR2013-00102
Patent 7,267,828 B2

ionic exchange between the silver and the polymer, which we have
determined they do not.

Second, the claims of the '828 patent state that the addition of the
agent (e.g., chloride) in step (c) may be performed "during or after step (b),"
step (b) being the step of subjecting the polymer to the silver and organic
solvent solution.  Thus, the claims of the '828 patent are not limited to
separately subjecting the polymer to the silver first, followed by subjecting
the polymer to the chloride agent.

ConvaTec argues that step (b) requires "a time sufficient to
incorporate the desired silver concentration into said polymer" which
requires some ionic exchange of the silver prior to step (c), but that the ionic
exchange does not have to be complete before beginning step (c).  PO Resp.
12 (citing Ex. 2029 ¶ 26).

ConvaTec's argument is not persuasive because, as discussed above,
the "incorporation . . . into" step of step (b) is not limited to ionic exchange.
Moreover, as the claims specifically state that step (c) can take place "after
or during step (b)," as well as the evidence provided by Dr. Edgar, further
supports our interpretation of the "incorporating . . . into" language of claim
1 of the '828 patent as including interactions in addition to ionic exchange.

Finally, because Gibbins '751 discloses the same steps in the same
order recited in the claims of the '828 patent, the silver ions would
necessarily ionically exchange with the CMC polymer prior to the addition
of the sodium chloride agent, based on the evidence provided by ConvaTec.

ConvaTec contends that neither Example 24, nor Example 25(m),
discloses the same process recited in the claims of the '828 patent, but rather
should be understood to mean that the "dressing is <u>in</u> 0.0888 (presumably

Case IPR2013-00102
Patent 7,267,828 B2

grams) of sodium chloride dissolved in 2 milliliters of water prior to mixing with the silver nitrate solution." PO Resp. 40-41; *see* Ex. 2029 ¶¶ 46-48. ConvaTec argues that the "/" in the Examples means "in." For example, the stock silver aqueous solution is described in Gibbins '751 as "0.11325 g Ag/50 mL H2O," which means "0.11325 grams of silver in 50 milliliters of water." PO Resp. 40 (citing Ex. 1007, 34:2); *see also* Ex. 2029 ¶ 48.

While we agree that the stock solutions are characterized by a "/" which appears, in that instance to mean "in," we are not persuaded that the "/" means the same thing in the Examples. We find that it is the last step of each Example that best explains the order. *See* Ex. 1045 ¶¶ 23-24.

Examples 25(a)-25(h) include no "/" designations and clearly state that each of the components are additive. Examples 25(i)-25(l) recite preparing the silver nitrate solution first, a "/," then preparing the sodium chloride solution, with the "add dressing" as an additive step of the sodium chloride solution. What is most instructive, however, is that Examples 25(i)-25(l) each recites "add AgNO₃ solution" as the last additive step of the sodium chloride solution, clarifying that, despite the fact that the silver nitrate solution was prepared first, it was added to the sodium chloride solution after the dressing. *See* Ex. 1045 ¶ 24.

Examples 25(m) and 25(n) are similar to these earlier examples in that they recite preparing the silver nitrate solution first, a "/," then preparing the sodium chloride solution. They are distinguished, however, in that Examples 25(m) and 25(n) recite adding the dressing before the "/" as an additive step in preparing the silver nitrate solution, and finally recites "add *to* AgNO₃ solution" as the last step for preparing the sodium chloride solution (emphasis added). *Id.*

Case IPR2013-00102
Patent 7,267,828 B2

Smith & Nephew's interpretation of the notation used in Gibbins '751 is further supported by Example 24B, which previously concluded that "[i]t was not appropriate to pre-mix separate solutions that are later combined to form the bath for the immersion of hydrophilic matrix material for impregnating with silver" because "a heavy rapidly forming precipitate developed in the mixture." Ex. 1007, 32:22-27. Thus, ConvaTec's interpretation would have Examples 25(i)-25(j) adding the dressing to a pre-mixed solution in contravention of the earlier teaching in Gibbins '751 against pre-mixing.

Further, Smith & Nephew's interpretation is consistent with the further disclosure in Gibbins '751 that the order of immersion may be reversed without consequence to the success of impregnation (Ex. 1007, 18:30-32). Example 25(m) and Example 25(k) recite the dressing being immersed in the silver nitrate and sodium chloride solutions in the opposite order and Gibbins '751 reports no distinctions in the results for those Examples. *See* Ex. 1007, 34:28-30, 34-36, 45-54; Ex. 1045, ¶ 28.

We credit the testimony of Dr. Coulter as to the interpretations of the Examples 25(a)-25(n). Patent Owner states that "like all of the other examples in Example 25, the Aquacel substrate in 25(m) is contacted to sodium salt *prior to* admixing with soluble silver salt," but does not address the distinctions between the notations of Examples 25(a)-25(n). PO Resp. 41 (emphasis original).

Moreover, even if the steps of Example 25(m) are in the same order as Example 24D, we find it persuasive that Gibbins' 751 expressly teaches reversing the order. The reverse order of Example 24D clearly reads on the steps of claim 1. Thus, we agree with Smith & Nephew that the same

process is recited in claim 1 and is described in the '828 patent in the reverse order of Example 24D and that the resulting material necessarily would be "substantially photostable."

ConvaTec further argues that, even if the steps of Example 25(m) are in the same order as recited in the claims of the '828 patent, Gibbins '751 "failed to produce a substantially photostable product." PO Resp. 41-42. In addition to the testimony of Dr. Edgar, ConvaTec relies on the testimony of Dr. Phillips in arguing that "that the 'purplish' or 'purple' color change from white of Examples 24 and 25 [of Gibbins '751] was not, in her experience, 'substantially photostable.'" PO Resp. 42-43 (*citing* Ex. 2028 ¶¶ 16, 18-21, Ex. 2029 ¶ 49).

As discussed above, the term "photostable" is defined in the '828 patent as having a "[c]ontrolled colour change to a desired colour with a minimal change thereafter." As discussed above, we interpret the term "desired colour" broadly to encompass any color that may be desirable to one of ordinary skill in the art for any purpose, and do not find sufficient evidence to particularly exclude purple as a "desired colour." Further, as also discussed above, with the definition allowing for "minimal change thereafter," and the qualifier "substantially" in the claim, we interpret the phrase "substantially photostable" to mean that the material may undergo a controlled colour change to desired color, some minimal discoloration, even to an undesirable colour, from the controlled colour, and even some degree beyond a "minimal discoloration," and still be considered "substantially photostable."

Accordingly, we do not find ConvaTec's arguments persuasive. Gibbins '751 states that "[s]amples that contained higher concentrations of

Case IPR2013-00102
Patent 7,267,828 B2

silver discolored more quickly in light with most samples eventually turning a purplish color.  The exceptions were samples 'n' and 'o' which remained white." Ex. 1007, 34:46-49.  Gibbins '751 states also that its materials "possess antimicrobial activity and do not appreciably discolor in the presence of light." *Id.* at 33:49-50.  A controlled color change to "purplish" would not be excluded from the phrase "substantially photostable" because purple is not excluded as a "desirable color" within the meaning of the '828 patent.

Even if purple were shown to be an undesirable color, Gibbins '751 reports a change to "purplish" or having "[p]urple, specks." *Id.* at 33:37-43, 34:46-49.  Such a description indicates only a substantially minimal color change to purple that is encompassed by the broad language recited in the claims and the broad definition of "photostable" in the '828 patent.

Smith & Nephew has presented a detailed argument that each of claims 1-5 and 7-9 are anticipated by the teachings of Gibbins '751.  Pet. 53-57.  ConvaTec's Response demonstrates no error in Smith & Nephew's challenge to the patentability to any particular claim so challenged.  PO Resp. 38-43.  For those reasons, Smith & Nephew has established by a preponderance of evidence that Gibbins '751 anticipates claims 1-5 and 7-9 under 35 U.S.C. §102(e).

8. *Claims 10-13 as obvious over Gibbins '751 (Ex. 1007),*
   *Walder (Ex. 1004), Ronan (Ex. 1006), Romans (Ex. 1003),*
   *and Kreidl (Ex. 1002)*

Claim 10 is drawn to the method of claim 1, "wherein the desired silver concentration is between 0.1 and 20 wt %," and claim 11 recites that "the desired silver concentration is between 1 and 20 wt %."  Smith &

Case IPR2013-00102
Patent 7,267,828 B2

Nephew argues that Walder, Ronan, and Romans teach "that the levels of silver within the claimed ranges would have been considered desirable at the time of the invention[,]" and that "silver concentrations within the claimed ranges would have been desirable for antimicrobial effect[,] and a skilled person would have sought to optimize these levels."  Pet. 57.

Claims 12 and 13 specify the time during which the material is exposed to a silver nitrate solution.  Smith & Nephew acknowledges that Gibbins '751 does not expressly disclose the duration in which the gauze is exposed to the silver nitrate solution.  Pet. 58.  Smith & Nephew relies on Walder, Ronan, and Romans, each of which teaches exposing a polymer to a silver nitrate solution for a duration of time encompassed by the ranges set forth in claims 12 and 13.  *Id.*  Smith & Nephew contends, therefore, that it would have been within the level of skill of the ordinary artisan to "have readily appreciated that the amount of time for which the polymer must be exposed to silver nitrate will depend on the type and dimensions of the polymer subject to *in situ* silver chloride precipitation and the level of silver chloride in the final product," rendering claims 12 and 13 obvious.  *Id.* (*citing* Coulter Dec., Ex. 1026 ¶¶ 68, 70).

ConvaTec argues that Walder, Ronan, and Romans cannot properly be combined with Gibbins '751 because (1) they each describe only an aqueous silver solution; (2) "Walder relates to anti-infective urinary catheters" and Romans is directed to "non-analogous products, such as ointments and skin antiseptics," and (3) Romans discloses a preferred silver concentration outside of the claimed range.  PO Resp. 44-45.  According to ConvaTec, because of

Case IPR2013-00102
Patent 7,267,828 B2

> the significant differences in the methods described in the
> challenged claims of the '828 patent and the processes
> described in Walder, Ronan, and Romans, a person of skill in
> the art would have had no reasonable expectation of success in
> the claimed processes over the cited combination.

*Id.*

ConvaTec's arguments are not persuasive. ConvaTec failed to show the differences between the processes described in Walder, Ronan, and Romans are a basis for determining that the skilled artisan would not consider the silver concentrations or silver nitrate exposure times disclosed therein as being suitable for the process described in Gibbins '751, given that each of Walder, Ronan, and Romans is directed to incorporating the antimicrobial properties of silver into a polymer. Moreover, ConvaTec's arguments do not respond to Smith & Nephew's evidence and argument that the silver concentration and the amount of time for which the polymer must be exposed to silver nitrate are result-effective variables based on the teachings of Walder, Ronan, and Romans.

We thus conclude that, when weighed with the evidence of secondary considerations, discussed below, Smith & Nephew has shown by a preponderance of the evidence that claims 10-13 would have been obvious over Gibbins '751, Walder, Ronan, Romans, and Kreidl.

### 9. *Claim 14 as obvious over Gibbins '751 (Ex. 1007) and Kreidl (Ex. 1002)*

Claim 14 further recites the time during which the polymer is exposed to the binding agents in step (c) of claim 1. Smith & Nephew notes that Gibbins '751 does not disclose the duration of exposure to sodium chloride in its process. Pet. 58-59. Smith & Nephew asserts that Kreidl teaches that

Case IPR2013-00102
Patent 7,267,828 B2

the amount of time the material is soaked in a sodium chloride solution is a result-effective variable. *Id.* at 59 (citing Ex. 1002, 3, 2:44-51). Smith & Nephew contends it would have been obvious to optimize the time the gauze of Kreidl is soaked in the sodium chloride solution, such as soaking for 5 to 30 minutes, because Kreidl specifically teaches that it is a result-effective variable. *Id.* (citing Coulter Dec., Ex. 1026 ¶ 70).

ConvaTec argues that Kreidl discloses exposure times are far outside the claimed range: "For example, when having about 1% silver nitrate retained on the fibers of such a bandage gauze a cold treatment in a 20% sodium chloride solution for one hour or in a 5% solution for twenty-four hours will give good results." PO Resp. 46 (citing Ex. 1002, 3, 2:57-61).

ConvaTec's arguments do not respond to Smith & Nephew's evidence and argument that the amount of time the material is exposed to an agent that facilitates the binding of silver is a result-effective variable based on the teachings of Kreidl. The time periods outside of the claimed range recited in Kreidl are exemplary only, and do not overcome the suggestion in Kreidl that the skilled artisan would have optimized the time the gauze is soaked in the sodium chloride solution, depending on the temperature, concentration, or desired completeness of the ensuing reaction.

We thus conclude that, when weighed with the evidence of secondary considerations, discussed below, Smith & Nephew has shown by a preponderance of the evidence that claim 14 would have been obvious over Gibbins '751 and Kreidl.

### 10. Secondary Considerations of Nonobviousness

Before we can determine that the obviousness determinations above render the challenged claims unpatentable, we must consider the evidence of

Case IPR2013-00102
Patent 7,267,828 B2

obviousness anew in light of any evidence of secondary considerations of nonobviousness presented by ConvaTec. *See Graham.*, 383 at 17-18 ("Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012) ("This objective evidence must be 'considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art.'") (quoting *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538-39 (Fed. Cir. 1983)).

ConvaTec presents the following evidence of commercial success, industry acclaim, long-felt but unsolved need, and copying. PO Resp. 47-58.

### *(1) Commercial Success*

Commercial success involves establishing success in the marketplace of a product encompassed by the claims, as well as a nexus between the commercial product and the claimed invention. "Evidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311-12 (Fed. Cir. 2006). "For objective evidence to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention." *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995).

While objective evidence of nonobviousness lacks a nexus if it exclusively relates to a feature that was "known in the prior art," *Ormco*

Case IPR2013-00102
Patent 7,267,828 B2

*Corp.*, 463 F.3d at 1312, the obviousness inquiry centers on whether "'the claimed invention as a whole' would have been obvious, 35 U.S.C. § 103," *Rambus Inc. v. Rea*, 731 F.3d. 1248, 1257-58 (Fed. Cir. 2013).

With regard to whether a nexus has been established between the products upon which commercial success has been based and the claimed invention, ConvaTec's arguments are based on ConvaTec's AQUACEL® Ag product line.  PO Resp. 48-49.  Ms. Fiona Adams testified that she is "aware of and familiar with the AQUACEL® Ag line," which she "understand[s] contain products manufactured using the methods claimed in the '981 and '828 patents."  Ex. 2030 ¶¶ 3-4 (*see* Ex. 2045 (redacted version of Ex. 2030)).  Ms. Adams testifies as to the reason for success of AQUACEL® Ag as follows:

> ConvaTec's success with AQUACEL® Ag products came about because it created a new commercial opportunity that was not realized previously in the wound dressing field.  Although silverised wound dressings, including Smith & Nephew's ACTICOAT product, were previously available, the market was not established.  It was only with the introduction of AQUACEL Ag products and its unique features that customers expanded the market and purchased these products.  AQUACEL Ag products created a commercially viable opportunity for this segment, doubling the size of the market in the US within just two years and taking dominant share in under a year from launch.

*Id.* at ¶ 9.

The patent owner has the burden of showing that the commercial success derives from a feature recited in the claims, in this case, for example, the particular process steps or the resulting photostability.  *Tokai Corp., v. Easton Enters. Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011).  In order to establish a proper nexus, the patent owner must offer proof that the

Case IPR2013-00102
Patent 7,267,828 B2

sales were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter. *See Microsoft v. Proxyconn, Inc.*, IPR2012-00026, slip op. at 4 (PTAB Mar. 8, 2013) (Paper 32).  We have considered the testimony of Ms. Adams (Ex. 2045), which purports to show that the AQUACEL® Ag product line includes the features of claim 1 of the '828 patent.  ConvaTec has not shown, however, that the sales of the AQUACEL® Ag product line are a result of the claimed invention.

Ms. Adams provides no supporting evidence that the features recited in the claims of the '828 patent are responsible for the success of the commercial AQUACEL® Ag products.  Ms. Adams provides no details of the manufacturing process for AQUACEL® Ag products as supporting evidence that the products are manufactured using the steps recited in the claims.  Upon cross-examination, Ms. Adams testified that she has no technical knowledge of the patents and could not confirm whether specific products in the AQUACEL® Ag line were covered by the claims of the '828 patent.  Ex. 1049, 29:18-31:9; *see* Ex. 1048 (Ex. 2046 (redacted version of Ex. 1048)), 105:14-20.  Considering we have no evidence of the manufacturing process for any of the products in the AQUACEL® Ag product line, we have no means to assess whether any of the products are covered by the claims of the '828 patent.

We have considered ConvaTec's evidence of commercial success, but find it of insufficient weight and relevance to deem it persuasive as to the merits of the claimed invention, particularly when we consider it within the totality of the evidence before us.

Case IPR2013-00102
Patent 7,267,828 B2

*(2) Industrial Acclaim*

ConvaTec presents evidence that the company has received praise for "the development of innovative technologies that produce a major improvement in business performance and/or patient benefit." PO Resp. 49 (*citing* Ex. 2013). For example, ConvaTec presents evidence that "many studies and publications have praised the Aquacel Ag line and demonstrated its effectiveness in antimicrobial wound care," namely due to "the reduction of pain, dressing changes, and decreased length of hospital stays." PO Resp. 49; *see generally id.* at 50-53 (citing Ex. 2045 ¶¶ 12-21 and supporting documentation). ConvaTec also presents evidence of "the dramatic recovery of patients treated with AQUACEL® Ag." *Id.* at 53-54 (citing Ex. 2025).

As with commercial success, evidence of industrial acclaim is only relevant to a determination of nonobviousness when it is directed to the merits of the invention claimed. Secondary considerations may presumptively be attributed to the claimed invention only where the product being claimed "embodies the claimed features, and is coextensive with them." *Ormco Corp.,* 463 F.3d at 1311-12 (quoting *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.,* 229 F.3d 1120, 1130 (Fed. Cir. 2000)).

Although ConvaTec cites comments lauding ConvaTec as an innovator, as well as the effectiveness of the AQUACEL® Ag product line, ConvaTec has not explained how such praise is directed to any particular feature of the method recited in the claims. For example, ConvaTec has not shown that the evidence of praise is directed to a particular step recited in the claims or to the photostability of the product. We have thus considered ConvaTec's evidence of industrial acclaim, but find it of insufficient weight

and relevance to deem it persuasive as to the merits of the claimed invention, particularly when we consider it within the totality of the evidence before us.

*(3) Long-felt but unmet need*

The relevance of long-felt need and the failure of others to the issue of obviousness depend on several factors.  First, the need must have been a persistent one that was recognized by those of ordinary skill in the art.  *Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1382 (Fed. Cir. 1983); *see In re Gershon*, 372 F.2d 535, 539 (CCPA 1967).  Second, the long-felt need must not have been satisfied by another before the invention by applicant.  *Newell Companies, Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988) ("[O]nce another supplied the key element, there was no long-felt need or, indeed, a problem to be solved.").  Third, the invention must in fact satisfy the long felt need.  *In re Cavanagh*, 436 F.2d 491, 496 (CCPA 1971) ("[I]t was still incumbent upon appellant, if he wished by this method to rebut the inference of obviousness arising from the similarity of his process to the prior art, to bring forward evidence of his satisfaction of the need.").

ConvaTec presents evidence of the need for "a less painful and traumatic treatment of burn wounds" and that the AQUACEL® Ag product line has "reduced number of required dressing changes, decreased pain, and earlier patient discharge as compared with the traditional SSD [silver sulfadiazine] treatment."  PO Resp. 55 (citing Ex. 2026, Ex. 2017, Ex. 2016).  ConvaTec then argues that its evidence of "clinical and research results," "commercial success," and dominant market share are additional evidence of "a long-felt need in the field for an efficacious and cost-effective

Case IPR2013-00102
Patent 7,267,828 B2

silverized wound dressing which reduced patient discomfort and decreased hospital stays." *Id.* at 55-56.

ConvaTec's evidence of a long-felt but unmet need is not persuasive. While ConvaTec describes advantages of the AQUACEL® Ag product line over a traditional "silver sulfadiazine (SSD) ointment," ConvaTec has not demonstrated that advantages of the claimed invention are not met by silverized hydrogels of the prior art, such as that taught by Gibbins '751. Moreover, ConvaTec has not shown that the evidence of long-felt and unmet need is solved by the particular steps recited in the claims, or to the photostability of the product, to the extent they are distinguishable from the prior art of record.

We have considered ConvaTec's evidence of long-felt but unmet need, and find it of insufficient weight and relevance to deem it persuasive as to the merits of the claimed invention particularly when we consider it within the totality of the evidence before us.

### *(4) Copying*

Although, "copying by a competitor may be a relevant consideration in the secondary factor analysis[,]" "[n]ot every competing product that arguably fails within the scope of a patent is evidence of copying." *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004). Copying, as objective evidence of nonobviousness, requires evidence of effort to replicate a specific product. *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010); *Iron Grip*, 392 F.3d at 1325.

ConvaTec argues that "[d]irect evidence of copying by Petitioner Smith & Nephew also exists . . . ." PO Resp. 56. ConvaTec provides evidence of an FDA statement that Smith & Nephew's Durafiber Ag is

Case IPR2013-00102
Patent 7,267,828 B2

"substantially equivalent" to ConvaTec's Aquacel Ag product and has "similar design, materials and manufacturing methods." *Id*. (*citing* Ex. 2001). ConvaTec also produces evidence that "Smith & Nephew admitted [in a submission against the European equivalent of the patent at issue in the instant proceeding] that it has no other non-infringement argument in relation to the process it uses to produce its silverised Durafiber wound dressing" other than arguments based on amended claim language not present in this proceeding. *Id.* at 57 (citing Ex. 2002).

ConvaTec's evidence of copying is not persuasive. A statement of "similar manufacturing methods" is not sufficient to demonstrate that Smith & Nephew's Durafiber product is identical to AQUACEL® Ag, is made using the particular steps of the claimed invention, or even that it has the recited photostability. Moreover, even if Smith & Nephew's Durafiber Ag is made using the exact same process as any of ConvaTec's AQUACEL® Ag products, ConvaTec has not shown that the AQUACEL® Ag product line is manufactured according to the steps of the claims of the '828 patent, or has the claimed photostability. Further, ConvaTec has not produced any evidence of the actual manufacturing process for Smith & Nephew's Durafiber Ag product, and we are not persuaded that a decision not to pursue an alternative litigation strategy in its submission against the European equivalent of the patent at issue in the instant proceeding is sufficient evidence of a process that includes the steps and recited photostability of the claims of the '828 patent.

We have considered ConvaTec's evidence of copying but find it of insufficient weight and relevance to deem it persuasive as to the merits of

Case IPR2013-00102
Patent 7,267,828 B2

the claimed invention, particularly when we consider it within the totality of the evidence before us.

*Determination with respect to obviousness*

After weighing all the evidence of obviousness and nonobviousness of record, on balance, we conclude that the strong evidence of obviousness outweighs the weak evidence of nonobviousness.   For the foregoing reasons, we determine that Smith & Nephew has demonstrated by a preponderance of the evidence that claims 1-5 and 7-14 are unpatentable over the prior art of record.

### C. Motion to Amend

ConvaTec filed a Motion to Amend.  Paper 25.  For the reasons set forth below, ConvaTec's Motion to Amend is *denied*.

As the moving party, ConvaTec bears the burden of proof to establish that it is entitled to the relief requested.  37 C.F.R. § 42.20(c).  Entry of the proposed amendment, therefore, is not automatic, but only upon ConvaTec's having demonstrated the patentability of the proposed substitute claims.

ConvaTec requests cancellation of claim 1, to be replaced with proposed substitute claim 15, reproduced below, with underlined text indicating material inserted relative to original claim 1, and bracketed text indicating material deleted relative to original claim 1:

> 15. A method of preparing a light stabilized material comprising a gel-forming fiber selected from the group consisting of a hydrophilic, amphoteric or anionic polymer, or a mixture thereof, having antimicrobial activity comprising the steps of

Case IPR2013-00102
Patent 7,267,828 B2

> a) preparing a solution comprising an organic solvent and a source of silver in a quantity sufficient to provide a desired silver concentration in said light stabilized material;
>
> b) subjecting the gel-forming fiber [a hydrophilic, amphoteric or anionic polymer, or a mixture thereof,] to said solution for a time sufficient to [incorporate] load the desired silver concentration into said [polymer] gel-forming fiber; and
>
> c) subjecting the gel-forming fiber [a hydrophilic, amphoteric or anionic polymer, or a mixture thereof,] during or after step (b), to one or more agents which facilitate the binding of said silver into said [polymer] gel-forming fiber, wherein the silver is [substantially] photostable in the light stabilized material upon drying of said material, but will dissociate from the light stabilized material upon hydration of said material.

Paper 25 at 2-3 (emphasis removed, alterations).

### 1. Written Description Support

Pursuant to 37 C.F.R. § 42.121(b)(1), a motion to amend in an *inter partes* review must set forth "[t]he support in the original disclosure of the patent for each claim that is added or amended."

In our Order dated July 3, 2013, we pointed ConvaTec's attention to *Nichia Corp. v. Emcore Corp.*, IPR2012-00005, slip op. at 4 (PTAB June 13, 2013) (Paper 27), for a discussion of the burden for identifying written descriptive support for the proposed substitute claims. Paper 15 at 4.

As set forth in *Nichia*, "37 C.F.R. § 42.121(b)(1) requires the patent owner to set forth the support in the *original disclosure* of the patent for each proposed substitute claim." *Nichia*, Paper 27 at 3. Specifically,

> [T]he Board noted that the written description test is whether the original disclosure of the application relied upon reasonably conveys to a person of ordinary skill[ ] in the art that the inventor had possession of the claimed subject matter as of the filing date. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d

Case IPR2013-00102
Patent 7,267,828 B2

1336, 1351 (Fed. Cir. 2010) (en banc). Therefore, the written description support must be shown in the *original disclosure of the application* . . . that issued as the . . . patent, unless [patent owner] indicates, in its motion, that there was no change to the original disclosure when the patent issued.

*Id.*

ConvaTec, in its Motion to Amend, points to issued claim 1, as well as sections of the issued '828 patent, as support for proposed substitute claim 15. Mot. Amend 4-5. As noted above, however, that is not sufficient, as ConvaTec did not state where support could be found in the disclosure as originally filed for the substitute claims, nor did ConvaTec state in its Motion that the specification of the issued patent was identical to the specification originally filed in Application Number 10/734,784 ("the '784 application"). ConvaTec's Motion to Amend, therefore, fails on that point alone.

Moreover, proposed substitute claim 15 adds that the "hydrophilic, amphoteric or anionic polymer, or a mixture thereof," is "a gel forming fiber." ConvaTec states that the "'828 patent includes various examples of gel-forming fibers, including hydrophilic, amphoteric and anionic polymers such as AQUACEL®, or those and other polymer fibers." Mot. Amend 4 (citing Ex. 1001, 3:47-64).

The section of the '828 patent relied upon by ConvaTec states:

Accordingly, the invention provides methods of preparing a material which contains one or more hydrophilic, amphoteric or anionic polymers, wherein the polymers have antimicrobial activity. Preferably, the material containing the polymer(s) is used in a medical device, a wound dressing, or an ostomy device. Materials which are particularly adapted for the inventive method include gel-forming fibers such as Aquacel$^{TM}$

> (WO 93/12275, WO 94/16746, WO 99/64079, and U.S. Pat. No. 5,731,083), or those described in WO 00/01425 or PCT/GB 01/03147; wound dressings containing similar gel-forming fibers behind or overlying a non-continuous or perforated skin-contact layer such as Versiva$^{TM}$ (U.S. Pat. No. 5,681,579, WO 97/07758 and WO 00/41661); DuoDerm$^{TM}$ (U.S. Pat. No. 4,538,603), DuoDerm CGF$^{TM}$ (U.S. Pat. No. 4,551,490 and EP 92 999), or a blend of two or more fibres such as Carboflex$^{TM}$ (WO 95/19795). The present invention well-suited for other materials which contain carboxymethylcellulose.

Ex. 1001 3:47-64.

As set forth above, the '828 patent states that the polymer may be a hydrophilic, amphoteric, or anionic polymer. The patent goes on to state that materials that are particularly suited are gel forming fibers, and other than listing specific brand names, only lists carboxymethylcellulose as gel forming fiber. Notably, ConvaTec does not explain how that section of the '828 patent provides support for a gel forming fiber that is each of a hydrophilic, amphoteric, or an anionic gel forming polymer.

It was ConvaTec's burden to demonstrate that substitute claim 15 had written descriptive support in the original disclosure of the application that issued as the '828 patent. ConvaTec does not point us to support in the application, and in addition, has not explained how the section of the '828 patent it relies upon to support proposed substitute claim 15 provides support for the added claim limitation that the gel-forming fiber is selected from the group consisting of a hydrophilic, amphoteric, or anionic polymer, or a mixture thereof.

As we conclude that ConvaTec has not established that the disclosure of the issued '828 patent provided written descriptive support for proposed

Case IPR2013-00102
Patent 7,267,828 B2

substitute claim 15, we do not address the patentability of proposed
substitute claim 15 over the prior art.[16]

### D. Motion to Exclude Evidence

#### 1. Smith & Nephew's Motion to Exclude Evidence

A party wishing to challenge the admissibility of evidence must
identify the grounds of the objection and explain why the evidence is not
admissible.  37 C.F.R. § 42.64(c).  Here, Smith & Nephew seeks to exclude
testimony of Ms. Fiona Adams (Ex. 2045) and Ex. 2012 related to the
commercial success of ConvaTec's Aquacel Ag line of products without
identifying any rule of evidence or other authority to support its position that
the testimonial evidence in question is inadmissible.  Paper 52.  Rather,
Smith & Nephew's rationale for excluding Ms. Adams' testimony is that
ConvaTec has never established that any of the Aquacel Ag products are
covered by any of the claims of the '828 patent.  *Id.*  Contending that the
evidence is inadequate for a determination of nexus, however, is not
sufficient to establish the impropriety of the evidence, much less the
inadmissibility of the evidence under the Federal Rules of Evidence.  *See*
Office Patent Trial Practice Guide, 77 Fed. Reg. 48,758 (August 14, 2012)
(A motion to exclude may not be used to challenge the sufficiency of the
evidence to prove a particular fact.).

Accordingly, Smith & Nephew's Motion to Exclude is *denied.*

---

[16] As discussed above in the analysis of the patentability challenges of the
original claims, Patent Owner's argument as to proposed substitute claim 15
also fails on the basis that Gibbins '751 teaches a substantially identical
process, and thus would inherently produce a light stabilized antimicrobial
material as required by proposed substitute claim 15.

54

**A120**

Case IPR2013-00102
Patent 7,267,828 B2

## 2. *ConvaTec's Motion to Exclude Evidence*

ConvaTec seeks to exclude the following: (1) testimony of Dr. Stephen Coulter (Ex. 1045); (2) Ex. 1037; and (3) Ex. 1038. Paper 57 ("PO Mot. Exclude"). As the movant, ConvaTec has the burden of proof to establish that it is entitled to the requested relief. 37 C.F.R. § 42.20(c).

ConvaTec argues that the declaration testimony of Dr. Stephen Coulter should be excluded because he is not qualified to testify as an expert with respect to the claimed subject matter of the '828 patent, specifically with regards to the photostability of a wound dressing. *Id.* at 2-4. ConvaTec points to paragraph 30 of the Coulter Declaration (Exhibit 1045) as being the inadmissible portion of Dr. Coulter's testimony. ConvaTec further argues that Dr. Coulter's testimony reveals that he does not understand what a person of ordinary skill in the art would consider to be a "desired color" for a silverized wound dressing. *Id.*

We are not persuaded by ConvaTec's arguments. Initially, ConvaTec's objections to Dr. Coulter's testimony go to the weight and sufficiency of his testimonial evidence, rather than its admissibility. *See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1221 (Fed. Cir. 2006) (*citing Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1344-45 (11th Cir. 2003)); *In re TMI Litig.*, 193 F.3d 613, 692 (3d Cir. 1999) ("So long as the expert's testimony rests upon 'good grounds,' it should be tested by the adversary process—competing expert testimony and active cross-examination . . ." (quoting *Ruiz–Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir.1998))); *Wilmington v. J.I. Case Co.*, 793 F.2d 909, 920 (8th Cir.1986) ("Virtually all the inadequacies in the expert's testimony urged here by [the defendant] were brought out forcefully

Case IPR2013-00102
Patent 7,267,828 B2

at trial . . . . These matters go to the weight of the expert's testimony rather than to its admissibility."). It is within our discretion to assign the appropriate weight to be accorded to Dr. Coulter's testimonial evidence. Moreover, we have reviewed Dr. Coulter's testimony and note that the testimony in question is not relied upon in our claim construction of the term "photostable" or in our determination of what would be considered a "desired color" for a silverized wound dressing to a person of ordinary skill in the art. Thus, the objection to paragraph 30 of Dr. Coulter's testimony is moot.

Smith & Nephew relies on Exhibits. 1037 and 1038, in its opposition to ConvaTec's Motion to Amend claims, as evidence to support its conclusion that Example 25(m) of Gibbins '751 discloses the same order of addition of silver source (silver nitrate) and agent (sodium chloride) as claimed in the '828 patent. Paper 45, 9. ConvaTec argues that the Petitioner's Exhibits. 1037 and 1038 should be excluded because they are inadmissible hearsay, are not properly authenticated, or are otherwise improper under Federal Rule of Evidence 901. Paper 57, 4-6.

We find it unnecessary to consider the objections to the admissibility of Exhibits 1037 and 1038. Exhibits 1037 and 1038 were not relied upon in our determination as to the meaning of Example 25(m) of Gibbins '751. Even excluding Smith & Nephew's evidence, we have determined that Smith & Nephew has demonstrated, by a preponderance of the evidence, that the challenged claims of the '828 patent are unpatentable.

Accordingly, ConvaTec's Motion to Exclude is *dismissed* as moot.

Case IPR2013-00102
Patent 7,267,828 B2

### III.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1-5 and 7-14 of the '828 patent are unpatentable;

FURTHER ORDERED that ConvaTec's Motion to Amend is *denied*,

FURTHER ORDERED that Smith & Nephew's Motion to Exclude is *denied*;

FURTHER ORDERED that ConvaTec's Motion to Exclude is *dismissed as moot*; and

FURTHER ORDERED that because this is a final decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

Case IPR2013-00102
Patent 7,267,828 B2

SNEDDEN, *Administrative Patent Judge, concurring-in-part.*

I concur in the majority's conclusion that claims 1-5 and 7-14 are anticipated or obvious, but I dissent from the majority in their interpretation of the term "photostable." The '828 patent defines "photostable" as "controlled colour change to a desired colour with minimal change thereafter." Ex. 1001, 5:50-52. Under the majority's claim construction, the "desired colour" referenced within the meaning of "photostable" includes any color, including purple, desirable for any purpose, including aesthetic purposes. It is clear from the evidence on this record, however, that the interpretation of "desired color" should be interpreted from a more technical viewpoint—that is, color is a measure of photostability.

In this regard, the evidence on this record supports a finding that purple is not a "desired colour." Gibbins '751, for example, explains that products containing silver undergo light-mediated discoloration, which leads to discoloration of skin touching the product. Ex. 1007, 4:28-31. Gibbins '751 suggests that purple, in particular, is an undesirable color in the field of medical devices containing silver. In Example 24 of Gibbins '751, various samples of silver impregnated materials are made and subjected to a light-stability test. *Id.* at 31-33. The results are:

| Dressing | Dry | Wet |
|---|---|---|
| Ag Aquacel | White, good, eventually purplish | Brown |
| Hi Ag-Aquacel | Purple, specks | Dark gray |
| Aquacel C | White | Clear |

*Id.* at 33:36-42. The references to "eventually purplish" and "[p]urple, specks" indicate that purple is the color of silver after exposure to light.

Case IPR2013-00102
Patent 7,267,828 B2

Such discoloration is undesirable for silverized medical devices meant for coming into contact with skin.

ConvaTec also presents evidence that purple is not a "desired colour" within the meaning of "photostable."  Ex. 2028 ¶ 16; Ex. 1046, 61:5-16.  Dr. Phillips, for example, testified that a silverized wound dressing that was purple out of its package, or turned purple shortly after exposure to light, would be considered expired or not in optimal condition for clinical use.[17] Ex. 2028 ¶ 16.  Dr. Phillips testified that the "desired colour" of a silverized wound dressing is white to a "grayish white."  *See, e.g.*, Ex. 2028 ¶ 21.  *See also,* Ex. 1046 64:24–65:6, 86:13–87:3.  Smith & Nephew presents no evidence as to what color(s) would be desirable or undesirable to a person of ordinary skill in the art.  Thus, the weight of the evidence on the present record suggests that, to a person of ordinary skill in the art, the "desired colour" of a silverized wound dressing for purposes of photostablility is white to a grayish white, and that purple, specifically, is not a desirable color.

---

[17] Although the majority finds Dr. Phillips' testimony to be controverted by the disclosure in Gibbins '751 that a purplish color did not render the product ineffective for inhibiting the growth of *Staph. aureus*, there is insufficient evidence on this record suggesting that the clinical effectiveness of a product with regard to its antimicrobial properties is a surrogate for photostability.  Rather, Gibbins '751 suggests that the problem with silverized products related to photostability is discoloration because discoloration in the product causes discoloration of skin touching the product.  Ex. 1007, 4:28-31.  Thus, a purple dressing is "unsuitable for clinical use" because of its discoloration, not solely because the antimicrobial effectiveness of the products may be reduced to some unknown but less than optimal degree.

Case IPR2013-00102
Patent 7,267,828 B2

Further, I disagree with the majority's determination that "minimal change," as referenced within the meaning of "photostable," may refer to a change of color from a desirable color to an undesirable color. ConvaTec provides testimonial evidence that a color change from the "desired colour" (*e.g.*, white) to purple would not be understood to be a "minimal change" to a person of ordinary skill in the art. Pet. 13 and 53. Ex. 2028 ¶ 16-21 (Dr. Phillips concluding that "a color change from 'white' to 'purplish' is in my opinion a discoloration, and does not equate with a 'substantially photostable' product …that has minimal color change from the 'desired color' of white."); Ex. 2029 ¶ 50 (Dr. Edgar stating "I fully agree with Dr. Phillips' statements from a scientific point of view that a change in color of the product from 'white' to 'purple' would not be considered 'substantially photostable' or 'photostable.'"); *see* Ex. 1050, 19-20. Smith & Nephew presents no evidence as to what would be considered a "minimal change" to a person of ordinary skill in the art. Thus, the weight of the evidence suggests that a change of color from a desirable color to an undesirable color would not be considered a "minimal change."

The claims, however, simply do not require silver to be photostable, but require the silver to be "substantially photostable." Here, I agree with the majority that "substantially," in the context of the '828 patent, means "largely" or "essentially." Under the broadest reasonable interpretation of "substantially photostable," silver may undergo some minimal discoloration to an undesirable color and still be considered "substantially [i.e., essentially] photostable."

Using the above claim construction, I disagree with the majority's reliance on Example 25 of Gibbins '751, but agree with the outcome because

Case IPR2013-00102
Patent 7,267,828 B2

Example 24 of Gibbins '751 discloses the results of an experiment
producing a product that is substantially photostable. Specifically, Example
24 describes an experiment in which the prepared product produced purple
specks when subjected to a light-stability test. Ex. 1007, 33:37-43. A
person of ordinary skill in the art would understand a "speck" to represent a
color change within the meaning of the terms "substantially photostable."
This disclosure in Example 24, combined with other teachings in
Gibbins '751 suggesting that the order of steps used in Example 24 may be
reversed (*id.* at col. 18, ll. 30-32), reaches the "substantially photostable"
element of the claims.

        The results of Example 25 of Gibbins '751, however, describe an
experiment in which the prepared products eventually turned "purplish." *Id.*
at 34:46-54. There is insufficient evidence presented on this record to
support a finding that a disclosure of a product "eventually turning a
purplish color" would be considered a minimal color change. *See*, *id.*

        With regard to the Motion to Amend, although substitute claim 15
deletes the term "substantially," potentially addressing the problem of
finding a product producing only purple specks to be within the scope of the
claim, I agree with the majority's opinion that ConvaTec's Motion to
Amend remains deficient. Accordingly, I join the majority with regard to
the denial of the Motion to Amend.

Case IPR2013-00102
Patent 7,267,828 B2

Petitioner:

Jeff B. Vockrodt
Rodger L. Tate
Christopher H. Yaen
Hunton & Williams, LLP
jvockrodt@hunton.com
rtate@hunton.com
cyaen@hunton.com

Patent Owner:

Jeffrey Guise
Peter R. Munson
Lorelei P. Westin
Wilson Sonsini Goodrich & Rosati, PC
jguise@wsgr.com
pmunson@wsgr.com
lwestin@wsgr.com



US006669981B2

(12) **United States Patent**　　(10) Patent No.:　**US 6,669,981 B2**

Parsons et al.　　(45) Date of Patent:　**Dec. 30, 2003**

(54) **LIGHT STABILIZED ANTIMICROBIAL MATERIALS**

(75) Inventors: **David Parsons**, Wirral (GB); **Elizabeth Jacques**, Chester (GB); **Philip Bowler**, Cheshire (GB)

(73) Assignee: **Bristol-Myers Squibb Company**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/997,545**

(22) Filed: **Nov. 29, 2001**

(65) **Prior Publication Data**

US 2002/0073891 A1 Jun. 20, 2002

**Related U.S. Application Data**

(60) Provisional application No. 60/250,182, filed on Nov. 29, 2000.

(51) Int. Cl.$^7$ ........................ **A61L 27/00**; A61L 27/04; B05D 3/10

(52) U.S. Cl. ...................... **427/2.31**; 427/2.24; 427/2.1; 427/2.25; 427/2.28; 427/2.29; 427/2.3; 427/2.31; 427/337; 427/338; 427/339

(58) Field of Search ............................... 427/2.24, 2.25, 427/2.28, 2.29, 2.3, 2.31, 337–339, 2.1

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,612,337 A | * | 9/1986 | Fox et al. ................ | 119/14.09 |
| 5,326,567 A | * | 7/1994 | Capelli ....................... | 424/405 |
| 5,527,534 A | * | 6/1996 | Myhling .................... | 128/830 |
| 5,567,495 A | * | 10/1996 | Modak et al. ............. | 428/36.9 |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| WO | WO 84/01721 | | 5/1994 | |
| WO | WO 01/24839 A1 | * | 4/2001 | ........... A61L/15/22 |

* cited by examiner

*Primary Examiner*—Michael Barr
*Assistant Examiner*—Jennifer Kolb Michener
(74) *Attorney, Agent, or Firm*—John M. Kilcoyne

(57) **ABSTRACT**

Methods of enhancing the photostabilizing of silver in medical materials are described. More particularly, the methods increase the photostabilization of silver in certain materials comprising hydrophilic, amphoteric and anionic polymers by subjecting the polymers to solutions containing an organic solvent and silver, during or after which one or more agents are added which facilitate the photostablization of the material.

**20 Claims, No Drawings**

US 6,669,981 B2

**1**

# LIGHT STABILIZED ANTIMICROBIAL MATERIALS

This application claims the benefit of priority of U.S. Provisional Application No. 60/250,182, filed on Nov. 29, 2000, the entire contents of which are herein incorporated by reference.

## FIELD OF THE INVENTION

This invention relates to light stabilized antimicrobial materials and methods of preparing antimicrobial polymers for use in wound dressings and medical devices.

## BACKGROUND OF THE INVENTION

Infection is a problem associated with wounds. Infection can retard wound healing, is traumatic for the patient and can significantly increase treatment costs and time. Consequently there is a need to both prevent and treat infection resulting from wounds or wounds in conjunction with of wound dressings, or the use of other medical devices. Examples of such devices at increased risk include prosthetic devices, implants, or wound dressings used on acute or chronic exudating wounds. This can be achieved by the use of topical antimicrobial agents.

It is known to include antimicrobial agents in materials used in the manufacture of medical devices such as wound dressings, ostomy appliances and others. One such antimicrobial agent is silver which is used in various forms such as salts or other silver compounds and which can be used in the fibers, polymers, textiles and adhesive components used in the fabrication of such devices. A problem with silver-containing materials is that they are typically sensitive to light which causes uncontrolled discoloration of the silver-containing material. Numerous efforts have been made to render such materials photostable, however there is still a need to enhance the photostabilization of silver in certain materials comprising hydrophilic, amphoteric and anionic polymers. This is especially true where such polymers are used in medical devices. Accordingly, improved light stabilized silver-containing polymers and methods for their manufacture have been sought.

U.S. Pat. No. 5,770,255 describes methods of forming anti-microbial coatings on the surface of medical devices. The coatings described include metal ions such as silver. However, this process requires higher than ambient gas pressures and low temperatures, which are inconvenient and costly. Further this process results in a distinct disadvantage that the coating alters the dimension of the medical device. Such changes in sizes of medical devices such as implants can affect the usefulness of the product. In addition, metal ions present as coatings on the surface of medical devices such as dressings may render the product toxic.

U.S. Pat. No. 5,326,567 describes methods of making silver-containing compositions for use in medical applications. The compositions contain acrylic polyether polymers such as polyethylene glycol and are coupled with silver nitrate. However, this system is only suitable for use in solutions and is very sensitive to solvent and salt conditions. Further, this system is unlikely to be sufficiently robust to survive sterilization, which is essential for wound dressings. Additionally, this system is unsuccessful when applied to fibrous or hydrocolloid wound dressings.

U.S. Pat. No. 3,422,183 discloses the use of ultraviolet irradiated silver fluoride compositions in items such as bandages. The ultraviolet treatment reportedly enhances the activity of the silver, but the problem of photostability is not

**2**

resolved. Further, this process is problematic with respect to the safety of fluoride compounds in contact with wounds, particularly using concentrations of fluoride compounds that would be required to achieve efficacy.

U.S. Pat. No. 4,646,730 discloses light stable polyvinylpyrrolidene/silver sulfadiazine (PVP/SSD) hydrogel dressings, where the gel is formed by utilizing electron beam irradiation to crosslink the PVP. Photostabilization is reportedly provided adding magnesium trisilicate to the gel, and preferably by also adding hydrogen peroxide and/or polyacrylic acid. This process requires specialized equipment to carry out the beam irradiation. Further, this process uses a hydrogel and therefore would be incompatible with other wound dressing types and technologies.

WO 00/01973 describes stabilized antimicrobial compositions containing silver for use in wound dressings. The silver is in the form of a complex with a primary, secondary or tertiary amino and the complex is associated to one or more hydrophilic polymers. However, the method of processing limits the type of products that can be produced and also alters the release rate of silver. This process is better adapted to hydrocolloid products which, due to the adhesive matrix, suffers from low availability of silver. This system is unsuitable for application to water swellable/soluble materials once they have been formulated.

U.S. Pat. Nos. 4,906,466 and 5,413,788 disclose antimicrobial compositions suitable for topical use or wound care and which exhibit suppression of light instability. The compositions comprise an antimicrobial silver compound deposited on a physiologically inert oxidic synthetic support material in particulate form, such as titanium oxide. However, the resultant product has been found be susceptible to darkening due to the reduction of the silver compound to metallic silver. Further, the use of insoluble particulates such as titanium oxide as a support is not desirable in wound healing products because the particulates are considered to be foreign bodies and must be removed.

U.S. Pat. No. 4,446,124 relates to the use of ammoniated SSD incorporated into animal tissue to prepare burn dressings. The SSD is incorporated into the tissue by soaking the tissue in an ammoniacal SSD solution or suspension. While the ammonium solution is reported to increase the concentration of silver which can be incorporated into the dressing, photostabilization is not mentioned and is unlikely. Further, this process uses animal tissue as the substrate, which is undesirable for use in wounds.

In accordance with the present invention, a novel method for the preparation of light stabilized silver-containing hydrophilic, amphoteric and anionic polymers is disclosed. This invention describes simple and inexpensive methods for the preparation of such polymers that provide effective and non toxic antimicrobial activity in a water swellable material that can be terminally sterilized.

## SUMMARY OF THE INVENTION

The present invention is directed to methods of preparing a material which contains one or more hydrophilic, amphoteric or anionic polymers, where the material has antimicrobial activity. Preferably, the material containing the polymer (s) is used in a medical device, a wound dressing, or an ostomy device. Also included in the present invention are polymers and materials prepared by the methods described herein. The present invention is advantageous over the prior art because it is easily applicable to water soluble and/or water swellable materials.

In the inventive method, a solution is prepared comprising an organic solvent and a source of silver. Typically, the

US 6,669,981 B2

3

source of silver is initially dissolved in water, and a solution is formed by mixing water with the organic solvent. The quantity of silver should be sufficient to provide a desired silver concentration in the material. Appropriate sources of silver include silver salts, such as silver nitrate, silver chloride, silver sulphates, silver lactate, silver bromide, silver acetate silver carbonate, silver iodide, silver citrate, silver laurate, silver deoxycholate, silver salicylate, silver paraaminobenzoate, silver paraaminosalicylate, and/or mixtures thereof Other appropriate sources of silver include but are not limited to any simple water and/or alcohol soluble silver salt.

Next, the polymer is subjected to the solution for a time that is sufficient to incorporate the desired silver concentration. During or after the period wherein the polymer is subjected to the solution, the polymer is subjected to one or more agents which facilitate the binding of the silver and the polymer together. Suitable agents include ammonia, ammonium salts, thiosulphates, chlorides, and/or peroxides. In one preferred embodiment, the agent is aqueous ammonium chloride.

The resultant material is substantially photostable upon drying of the material. However, the material will dissociate to release the silver if the material is rehydrated.

## DETAILED DESCRIPTION OF THE INVENTION

We have found that it is possible to stabilize silver in polymers which are used in medical-related materials. This gives the advantage that the materials exhibit anti-microbial activity while being less susceptible to photo-degradation or light-sensitivity. Such a light-stabilized medical material is particularly suitable for use in wound dressings, that create a moist wound healing environment particularly those used for moderately or heavily exuding wounds such as chronic or acute wounds. Other medical materials which benefit from the methods described herein include ostomy products, ostomy appliances, or other medical materials that are exposed to potentially infectious agents.

Accordingly, the invention provides methods of preparing a material which contains one or more hydrophilic, amphoteric or anionic polymers, wherein the polymers have anti-microbial activity. Preferably, the material containing the polymer(s) is used in a medical device, a wound dressing, or an ostomy device. Materials which are particularly adapted for the inventive method include gel-forming fibers such as Aquacel™ (WO 93/12275, WO 94/16746, WO 99/64079, and U.S. Pat. No. 5,731,083), orthose described in WO 00/01425 or PCT/GB 01/03147; wound dressings containing similar gel-forming fibers behind or overlying a non-continuous or perforated skin-contact layer such as Versiva™ (U.S. Pat. No. 5,681,579, WO 97/07758 and WO 00/41661); DuoDerm™ (U.S. Pat. No. 4,538,603), Duo-Derm CGF™ (U.S. Pat. No. 4,551,490 and EP 92 999), or a blend of two or more fibres such as Carboflex™ (WO 95/19795). The present invention well-suited for other materials which contain carboxymethylcellulose. Further, the present invention is advantageous over the prior art because it is easily applicable to water soluble and/or water swellable materials.

Polymers suitable for the present invention include, but are not limited to, polysaccharides or modified polysaccharides, polyvinylpyrrolidone, polyvinyl alcohols, polyvinyl ethers, polyurethanes, polyacrylates, polyacrylamides, collagen, gelatin, or mixtures thereof. In preferred embodiments, the polymers contain carboxymeth-

4

ylcellulose (CMC) such as sodium CMC. In one embodiment, the polymer can be a polysaccharide comprising a carboxymethylcellulose or alginate, or a mixture of carboxymethylcellulose and alginate. In other embodiments, the polymers contain gel-forming fibers comprising sodium CMC, and which can be incorporated into wound dressings such as Aquacel™ (ConvaTec, Skillman, N.J.).

In the inventive method, a solution is prepared comprising an organic solvent and a source of silver. The solution should be prepared in a quantity sufficient to provide the desired silver concentration in the resulting product. The polymer is then subjected to the solvent/silver solution so as to incorporate the silver into the polymer. The treated polymer is subjected to one or more agents such that the silver-containing material is made photostable, and further where the silver will thereafter dissociate upon rehydration of the material.

The organic solvent can be any known solvent. Examples of appropriate solvents include but are not limited to industrial methylated spirit (IMS, principally ethanol), ethanol, methanol, acetone and isopropyl alcohol.

The source of the silver can be any convenient source. Examples of appropriate sources of silver include silver salts, such as silver nitrate, silver chloride, silver sulphates, silver lactate, silver bromide, silver acetate silver carbonate, silver iodide, silver citrate, silver laurate, silver deoxycholate, silver salicylate, silver paraaminobenzoate, silver paraaminosalicylate and/or mixtures thereof Other appropriate sources of silver include but are not limited to any simple water and/or alcohol soluble silver salt.

The quantity of silver should be sufficient to provide a desired silver concentration in the material. The final concentration of silver in the material is between about 0.1% and 20% by weight, for example, by weight of the resultant medical dressing. In some embodiments, the concentration of silver is between 0.1–10%, 1–10%, 10–20%, 5–20%, 5–10% or 0.1–1%. In one preferred embodiment, the final concentration of silver is between about 1 and 5% by weight of the dressing. Preferably, the concentration in the treatment solution is from 0.001 g/g of polymer to 0.2 g/g of polymer, more preferably from 0.01 g/g of polymer to 0.05 g/g of polymer. Preferably, where the source of silver is most facilely initially dissolved in water rather than the neat organic solvent, then added in an appropriate amount to give the desired concentration of silver in the final weight of polymer.

Water can be used in the present invention, especially for the purposes of initial solubilization of silver before addition of the silver to the organic solvent. The amount of water should be sufficient such that the silver is adequately dissolved in solution, but not so much to result in hydration of the polymer. While excess amounts of silver can be present in suspension, for example forming a reserve, amounts effective for incorporation into the polymer should be in solution. Such amounts would be easily determinable to those of ordinary skill in the art without undue experimentation. However, the amount of water used is no greater than 50/50 w/w of water to alcohol.

The length of time that the material is subjected to the solution is a period sufficient to incorporate the desired silver concentration into the polymer. Preferably, the material is subjected to the solution between 1 and 120 minutes. In some embodiments, the incubation time is between 1 and 60 minutes. In other embodiments, the incubation time is between 15 and 45 minutes. In still other embodiments, the incubation time is between 10–60, 10–45, 15–30, 5–15 or

US 6,669,981 B2

5

10–20 minutes. Generally, the length of time necessary to subject the material to the solution will depend on the material used and can be easily determined by one of ordinary skill in the art.

Temperatures between 0 to 100° C. are appropriate for the present invention but preferably ambient temperatures are used. Different temperatures can be used at different stages within the range stated.

During or after the period wherein the polymer is subjected to the solution, it is subjected to one or more agents which facilitate photostabilization. Suitable agents include ammonia, ammonium salts, thiosulphates, chlorides, and/or peroxides. Preferred agents are ammonium salts such as ammonium chloride, ammonium acetate, ammonium carbonate, ammonium sulphate and metal halides such as sodium, potassium, calcium, magnesium and zinc chlorides. The agents can optionally include mixtures of the above salts. In one preferred embodiment, the agent is added to the treatment mixture as aqueous ammonium salt solution such as ammonium chloride, or is added separately.

The quantity of agent used will depend on the amount of polymer-containing material being prepared and the total volume of solution. Preferably, the agent is present in a concentration between 0.01 and 50% of the total volume of treatment. In some embodiments, the concentration of agent is between 0.01–25%, 0.01–10%, 0.01–5%, 0.1–5%, 0.1–25%, 0.1–10%, 1–25%, 1–10%, 1–5%, 5–25%, 10–25% or 25–50% of the total volume of treatment.

Once the facilitating agent is applied, treatment is continued for another period of time, e.g., an additional 5–30 minutes, or for a time sufficient to allow photostabilization to occur.

It is also an important aspect of the present invention that the silver is dissolved in an organic solvent to solubilize the silver salt and prevent hydration of the polymer. The silver salt can be added directly to the solvent and stirred gently until dissolved. The photostabilizing step of the process can either follow the silver-loading step or can be initiated during the course of the silver-loading step.

In addition to the articles mentioned herein, the present invention is suitable for use in medical articles such as wound dressings and skin care products.

By the term "loading" herein, is meant, ionic exchange of the cation to the polymer with silver ions.

The term, "photostable" for purposes of the present invention is meant, Controlled colour change to a desired colour with minimal change thereafter.

"Binding" as meant in the present invention, refers to the formation of a photostable compound.

The resultant polymeric material is substantially photostable upon drying. However, the material will dissociate to release the silver if the material is rehydrated.

In an exemplary process, an Aquacel™ wound dressing (e.g. 20 g), commercially available from ConvaTec, can be placed in, e.g., 127.5 ml of IMS/water (77.5:50 v/v). A silver nitrate solution is prepared, for example, with water and silver nitrate in concentrations to provide the desired final concentrations of silver in the Aquacel™ dressing (e.g., 0.0316 g/mL in water, with 10 mL added to the IMS/water solution). Final concentrations of silver in the dressings can range between 0.1% and 20% by weight of the dressing. Preferably these concentrations are between 1 and 5%. The dressing is subjected to the IMS/silver nitrate for a desired time, e.g., 15–45 minutes. Preferably after this silver treatment, sodium chloride in a concentration between 0.01

6

and 50% (preferably between 1 and 10%) is added to the IMS/silver nitrate bath and treatment is continued for another period of time, e.g., an additional 5–30 minutes.

Aquacel™ wound dressings having between 1 and 5% by dressing weight of silver have been found to be photostable and possess excellent anti-microbial activity. Further, irradiation does not adversely affect such silver dressings.

All publications and references, including but not limited to patents and patent applications, cited in this specification are herein incorporated by reference in their entirety as if each individual publication or reference were specifically and individually indicated to be incorporated by reference herein as being fully set forth.

What is claimed is:

1. A method of preparing a light stabilized antimicrobial material comprising the steps of
   a) preparing a solution comprising an organic solvent and a source of silver in a quantity sufficient to provide a desired silver concentration in the light stabilized antimicrobial material;
   b) subjecting a polymer to the solution for a time sufficient to incorporate the desired silver concentration into the polymer, wherein the polymer is selected from the group consisting of a polysaccharide, a modified polysaccharide, a polyvinylpyrrolidone, a polyvinyl alcohol, a polyvinyl ether, a polyurethane, a polyacrylate, a polyacrylamide, a collagen, a gelatin, and a mixture thereof; and
   c) subjecting the polymer, during or after step (b), to one or more agents which facilitate the binding of the silver on the polymer;
   wherein the silver is substantially photostable in the light stabilized antimicrobial material when dry, but will dissociate from the light stabilized antimicrobial material upon hydration of the light stabilized antimicrobial material.

2. The method of claim 1, further comprising:
   d) using the light stabilized antimicrobial material in a medical device.

3. The method of claim 1, further comprising:
   d) using the light stabilized antimicrobial material in a wound dressing.

4. The method of claim 1, further comprising:
   d) using the light stabilized antimicrobial material in an ostomy device.

5. The method of claim 1, wherein the source of silver comprises a silver salt.

6. The method of claim 5, wherein the silver salt is selected from the group consisting of silver nitrate, silver chloride, silver sulphate, silver lactate, silver bromide, silver acetate and mixtures thereof.

7. The method of claim 1, wherein the one or more agents is selected from the group consisting of ammonium salts, thiosulphates, chlorides and peroxides.

8. The method of claim 7, wherein the one or more agents is a metal halide.

9. The method of claim 7, wherein the one or more agents comprises an ammonium salt selected from ammonium chloride, ammonium acetate, ammonium carbonate, ammonium sulphate and mixtures thereof.

10. The method of claim 1, wherein the polysaccharide comprises a carboxymethylcellulose, an alginate, or a mixture thereof.

11. The method of claim 1, wherein the organic solvent is selected from the group consisting of industrial methylated spirit, denatured ethanol, methanol, acetone, isopropyl alcohol and ethanol.

US 6,669,981 B2

7

**12**. The method of claim **1**, wherein the desired silver concentration is between 0.1 and 20 wt %.

**13**. The method of claim **1**, wherein the desired silver concentration is between 1 and 20 wt %.

**14**. The method of claim **1**, wherein the time sufficient to incorporate the desired silver concentration into the polymer is between 1 and 120 minutes.

**15**. The method of claim **1**, wherein the time sufficient to incorporate the desired silver concentration into the polymer is between 1 and 60 minutes.

**16**. The method of claim **1**, wherein the polymer in step (c) is subjected to the one or more agents for 5 to 30 minutes.

**17**. A method of preparing a light stabilized antimicrobial material comprising the steps of

a) preparing a solution comprising an organic solvent and a source of silver in a quantity sufficient to provide a desired silver concentration in the light stabilized antimicrobial material;

b) subjecting a polymer to the solution for a time sufficient to incorporate the desired silver concentration into the polymer; and

8

c) subjecting the polymer, after step (b), to one or more agents which facilitate the binding of the silver on the polymer;

wherein the silver is substantially photostable in the light stabilized antimicrobial material when dry, but will dissociate from the light stabilized antimicrobial material upon hydration of the light stabilized antimicrobial material.

**18**. The method of claim **17**, further comprising:

d) using the light stabilized antimicrobial material in a medical device.

**19**. The method of claim **17**, further comprising:

d) using the light stabilized antimicrobial material in a wound dressing.

**20**. The method of claim **17**, wherein the polymer comprises a carboxymethylcellulose, an alginate, or a mixture thereof.

* * * * *



US007267828B2

(12) **United States Patent**       (10) **Patent No.:**    **US 7,267,828 B2**
Parsons et al.                           (45) **Date of Patent:**      *Sep. 11, 2007

(54) **LIGHT STABILIZED ANTIMICROBIAL MATERIALS**

(75) Inventors: **David Parsons**, Wirral (GB); **Elizabeth Jacques**, Chester (GB); **Philip Bowler**, Cheshire (GB)

(73) Assignee: **Bristol-Myers Squibb Company**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 781 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/734,784**

(22) Filed: **Dec. 12, 2003**

(65) **Prior Publication Data**

US 2004/0126433 A1     Jul. 1, 2004

**Related U.S. Application Data**

(62) Division of application No. 09/997,545, filed on Nov. 29, 2001, now Pat. No. 6,669,981.

(60) Provisional application No. 60/250,182, filed on Nov. 29, 2000.

(51) **Int. Cl.**
    *A61K 9/70*       (2006.01)
    *A61K 9/14*       (2006.01)
    *A61K 31/28*     (2006.01)

(52) **U.S. Cl.** ..................... **424/443**; 424/485; 424/486; 424/487; 424/488; 514/495

(58) **Field of Classification Search** .................... None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,785,106 A | | 3/1957 | Mendelsohn |
| 4,612,337 A | * | 9/1986 | Fox et al. ...................... 514/38 |
| 4,728,323 A | | 3/1988 | Matson |
| 5,326,567 A | * | 7/1994 | Capelli ........................ 424/405 |
| 5,527,534 A | * | 6/1996 | Myhling .................... 424/430 |
| 5,567,495 A | * | 10/1996 | Modak et al. ............. 428/36.9 |
| 5,662,913 A | | 9/1997 | Capelli |
| 5,709,870 A | | 1/1998 | Yoshimura et al. |
| 6,669,981 B2 | * | 12/2003 | Parsons et al. ............ 427/2.31 |
| 2002/0172709 A1 | | 11/2002 | Nielson et al. |
| 2004/0001880 A1 | | 1/2004 | Bowler et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | WO 92/18098 | 10/1992 | |
| WO | WO 84/01721 | 5/1994 | |
| WO | WO 96/01119 | 1/1996 | |
| WO | WO 98/06260 | 2/1998 | |
| WO | WO 01/24839 A1 | * | 4/2001 |
| WO | WO 02/078755 A2 | | 10/2002 |

* cited by examiner

*Primary Examiner*—Raymond J. Henley, III
(74) *Attorney, Agent, or Firm*—John M. Kilcoyne

(57)         **ABSTRACT**

Methods of enhancing the photostabilizing of silver in medical materials are described. More particularly, the methods increase the photostabilization of silver in certain materials comprising hydrophilic, amphoteric and anionic polymers by subjecting the polymers to solutions containing an organic solvent and silver, during or after which one or more agents are added which facilitate the photostablization of the material.

**14 Claims, No Drawings**

US 7,267,828 B2

1

# LIGHT STABILIZED ANTIMICROBIAL MATERIALS

This application is a division of U.S. patent application Ser. No. 09/997,545, filed Nov. 29, 2001, now U.S. Pat. No. 6,669,981, which claims the benefit of priority of U.S. Provisional Application No. 60/250,182, filed Nov. 29, 2000, the entire contents of which are herein incorporated by reference.

## FIELD OF THE INVENTION

This invention relates to light stabilized antimicrobial materials and methods of preparing antimicrobial polymers for use in wound dressings and medical devices.

## BACKGROUND OF THE INVENTION

Infection is a problem associated with wounds. Infection can retard wound healing, is traumatic for the patient and can significantly increase treatment costs and time. Consequently there is a need to both prevent and treat infection resulting from wounds or wounds in conjunction with of wound dressings, or the use of other medical devices. Examples of such devices at increased risk include prosthetic devices, implants, or wound dressings used on acute or chronic exudating wounds. This can be achieved by the use of topical antimicrobial agents.

It is known to include antimicrobial agents in materials used in the manufacture of medical devices such as wound dressings, ostomy appliances and others. One such antimicrobial agent is silver which is used in various forms such as salts or other silver compounds and which can be used in the fibers, polymers, textiles and adhesive components used in the fabrication of such devices. A problem with silver-containing materials is that they are typically sensitive to light which causes uncontrolled discoloration of the silver-containing material. Numerous efforts have been made to render such materials photostable, however there is still a need to enhance the photostabilization of silver in certain materials comprising hydrophilic, amphoteric and anionic polymers. This is especially true where such polymers are used in medical devices. Accordingly, improved light stabilized silver-containing polymers and methods for their manufacture have been sought.

U.S. Pat. No. 5,770,255 describes methods of forming anti-microbial coatings on the surface of medical devices. The coatings described include metal ions such as silver. However, this process requires higher than ambient gas pressures and low temperatures, which are inconvenient and costly. Further this process results in a distinct disadvantage that the coating alters the dimension of the medical device. Such changes in sizes of medical devices such as implants can affect the usefulness of the product. In addition, metal ions present as coatings on the surface of medical devices such as dressings may render the product toxic.

U.S. Pat. No. 5,326,567 describes methods of making silver-containing compositions for use in medical applications. The compositions contain acrylic polyether polymers such as polyethylene glycol and are coupled with silver nitrate. However, this system is only suitable for use in solutions and is very sensitive to solvent and salt conditions. Further, this system is unlikely to be sufficiently robust to survive sterilization, which is essential for wound dressings. Additionally, this system is unsuccessful when applied to fibrous or hydrocolloid wound dressings.

2

U.S. Pat. No. 3,422,183 discloses the use of ultraviolet irradiated silver fluoride compositions in items such as bandages. The ultraviolet treatment reportedly enhances the activity of the silver, but the problem of photostability is not resolved. Further, this process is problematic with respect to the safety of fluoride compounds in contact with wounds, particularly using concentrations of fluoride compounds that would be required to achieve efficacy.

U.S. Pat. No. 4,646,730 discloses light stable polyvinylpyrrolidene/silver sulfadiazine (PVP/SSD) hydrogel dressings, where the gel is formed by utilizing electron beam irradiation to crosslink the PVP. Photostabilization is reportedly provided adding magnesium trisilicate to the gel, and preferably by also adding hydrogen peroxide and/or polyacrylic acid. This process requires specialized equipment to carry out the beam irradiation. Further, this process uses a hydrogel and therefore would be incompatible with other wound dressing types and technologies.

WO 00/01973 describes stabilized antimicrobial compositions containing silver for use in wound dressings. The silver is in the form of a complex with a primary, secondary or tertiary amino and the complex is associated to one or more hydrophilic polymers. However, the method of processing limits the type of products that can be produced and also alters the release rate of silver. This process is better adapted to hydrocolloid products which, due to the adhesive matrix, suffers from low availability of silver. This system is unsuitable for application to water swellable/soluble materials once they have been formulated.

U.S. Pat. No. 4,906,466 and 5,413,788 disclose antimicrobial compositions suitable for topical use or wound care and which exhibit suppression of light instability. The compositions comprise an antimicrobial silver compound deposited on a physiologically inert oxidic synthetic support material in particulate form, such as titanium oxide. However, the resultant product has been found to be susceptible to darkening due to the reduction of the silver compound to metallic silver. Further, the use of insoluble particulates such as titanium oxide as a support is not desirable in wound healing products because the particulates are considered to be foreign bodies and must be removed.

U.S. Pat. No. 4,446,124 relates to the use of ammoniated SSD incorporated into animal tissue to prepare burn dressings. The SSD is incorporated into the tissue by soaking the tissue in an ammoniacal SSD solution or suspension. While the ammonium solution is reported to increase the concentration of silver which can be incorporated into the dressing, photostabilization is not mentioned and is unlikely. Further, this process uses animal tissue as the substrate, which is undesirable for use in wounds.

In accordance with the present invention, a novel method for the preparation of light stabilized silver-containing hydrophilic, amphoteric and anionic polymers is disclosed. This invention describes simple and inexpensive methods for the preparation of such polymers that provide effective and non toxic antimicrobial activity in a water swellable material that can be terminally sterilized.

## SUMMARY OF THE INVENTION

The present invention is directed to methods of preparing a material which contains one or more hydrophilic, amphoteric or anionic polymers, where the material has antimicrobial activity. Preferably, the material containing the polymer(s) is used in a medical device, a wound dressing, or an ostomy device. Also included in the present invention are polymers and materials prepared by the methods described

US 7,267,828 B2

**3**

herein. The present invention is advantageous over the prior art because it is easily applicable to water soluble and/or water swellable materials.

In the inventive method, a solution is prepared comprising an organic solvent and a source of silver. Typically, the source of silver is initially dissolved in water, and a solution is formed by mixing water with the organic solvent. The quantity of silver should be sufficient to provide a desired silver concentration in the material. Appropriate sources of silver include silver salts, such as silver nitrate, silver chloride, silver sulphates, silver lactate, silver bromide, silver acetate silver carbonate, silver iodide, silver citrate, silver laurate, silver deoxycholate, silver salicylate, silver paraaminobenzoate, silver paraaminosalicylate, and/or mixtures thereof. Other appropriate sources of silver include but are not limited to any simple water and/or alcohol soluble silver salt.

Next, the polymer is subjected to the solution for a time that is sufficient to incorporate the desired silver concentration. During or after the period wherein the polymer is subjected to the solution, the polymer is subjected to one or more agents that facilitate the binding of the silver and the polymer together. Suitable agents include ammonia, ammonium salts, thiosulphates, chlorides, and/or peroxides. In one preferred embodiment, the agent is aqueous ammonium chloride.

The resultant material is substantially photostable upon drying of the material. However, the material will dissociate to release the silver if the material is rehydrated.

## DETAILED DESCRIPTION OF THE INVENTION

We have found that it is possible to stabilize silver in polymers which are used in medical-related materials. This gives the advantage that the materials exhibit anti-microbial activity while being less susceptible to photo-degradation or light-sensitivity. Such a light-stabilized medical material is particularly suitable for use in wound dressings, that create a moist wound healing environment particularly those used for moderately or heavily exuding wounds such as chronic or acute wounds. Other medical materials which benefit from the methods described herein include ostomy products, ostomy appliances, or other medical materials that are exposed to potentially infectious agents.

Accordingly, the invention provides methods of preparing a material which contains one or more hydrophilic, amphoteric or anionic polymers, wherein the polymers have antimicrobial activity. Preferably, the material containing the polymer(s) is used in a medical device, a wound dressing, or an ostomy device. Materials which are particularly adapted for the inventive method include gel-forming fibers such as Aquacel™ (WO 93/12275, WO 94/16746, WO 99/64079, and U.S. Pat. No. 5,731,083), or those described in WO 00/01425 or PCT/GB 01/03147; wound dressings containing similar gel-forming fibers behind or overlying a noncontinuous or perforated skin-contact layer such as Versiva™ (U.S. Pat. No. 5,681,579, WO 97/07758 and WO 00/41661); DuoDerm™ (U.S. Pat. No. 4,538,603), DuoDerm CGF™ (U.S. Pat. No. 4,551,490 and EP 92 999), or a blend of two or more fibres such as Carboflex™ (WO 95/19795). The present invention well-suited for other materials which contain carboxymethylcellulose. Further, the present invention is advantageous over the prior art because it is easily applicable to water soluble and/or water swellable materials.

**4**

Polymers suitable for the present invention include, but are not limited to, polysaccharides or modified polysaccharides, polyvinylpyrrolidone, polyvinyl alcohols, polyvinyl ethers, polyurethanes, polyacrylates, polyacrylamides, collagen, gelatin, or mixtures thereof. In preferred embodiments, the polymers contain carboxymethylcellulose (CMC) such as sodium CMC. In one embodiment, the polymer can be a polysaccharide comprising a carboxymethylcellulose or alginate, or a mixture of carboxymethylcellulose and alginate. In other embodiments, the polymers contain gelforming fibers comprising sodium CMC, and which can be incorporated into wound dressings such as Aquacel™ (ConvaTec, Skillman, N.J.).

In the inventive method, a solution is prepared comprising an organic solvent and a source of silver. The solution should be prepared in a quantity sufficient to provide the desired silver concentration in the resulting product. The polymer is then subjected to the solvent/silver solution so as to incorporate the silver into the polymer. The treated polymer is subjected to one or more agents such that the silver-containing material is made photostable, and further where the silver will thereafter dissociate upon rehydration of the material.

The organic solvent can be any known solvent. Examples of appropriate solvents include but are not limited to industrial methylated spirit (IMS, principally ethanol), ethanol, methanol, acetone and isopropyl alcohol.

The source of the silver can be any convenient source. Examples of appropriate sources of silver include silver salts, such as silver nitrate, silver chloride, silver sulphates, silver lactate, silver bromide, silver acetate silver carbonate, silver iodide, silver citrate, silver laurate, silver deoxycholate, silver salicylate, silver paraaminobenzoate, silver paraaminosalicylate and/or mixtures thereof. Other appropriate sources of silver include but are not limited to any simple water and/or alcohol soluble silver salt.

The quantity of silver should be sufficient to provide a desired silver concentration in the material. The final concentration of silver in the material is between about 0.1% and 20% by weight, for example, by weight of the resultant medical dressing. In some embodiments, the concentration of silver is between 0.1-10%, 1-10%, 10-20%, 5-20%, 5-10% or 0.1-1%. In one preferred embodiment, the final concentration of silver is between about 1 and 5% by weight of the dressing. Preferably, the concentration in the treatment solution is from 0.001 g/g of polymer to 0.2 g/g of polymer, more preferably from 0.01 g/g of polymer to 0.05 g/g of polymer. Preferably, where the source of silver is most facilely initially dissolved in water rather than the neat organic solvent, then added in an appropriate amount to give the desired concentration of silver in the final weight of polymer.

Water can be used in the present invention, especially for the purposes of initial solubilization of silver before addition of the silver to the organic solvent. The amount of water should be sufficient such that the silver is adequately dissolved in solution, but not so much to result in hydration of the polymer. While excess amounts of silver can be present in suspension, for example forming a reserve, amounts effective for incorporation into the polymer should be in solution. Such amounts would be easily determinable to those of ordinary skill in the art without undue experimentation. However, the amount of water used is no greater than 50/50 w/w of water to alcohol.

The length of time that the material is subjected to the solution is a period sufficient to incorporate the desired silver concentration into the polymer. Preferably, the material is

US 7,267,828 B2

5

6

subjected to the solution between 1 and 120 minutes. In some embodiments, the incubation time is between 1 and 60 minutes. In other embodiments, the incubation time is between 15 and 45 minutes. In still other embodiments, the incubation time is between 10-60, 10-45, 15-30, 5-15 or 10-20 minutes. Generally, the length of time necessary to subject the material to the solution will depend on the material used and can be easily determined by one of ordinary skill in the art.

Temperatures between 0 to 100° C. are appropriate for the present invention but preferably ambient temperatures are used. Different temperatures can be used at different stages within the range stated.

During or after the period wherein the polymer is subjected to the solution, it is subjected to one or more agents which facilitate photostabilization. Suitable agents include ammonia, ammonium salts, thiosulphates, chlorides, and/or peroxides. Preferred agents are ammonium salts such as ammonium chloride, ammonium acetate, ammonium carbonate, ammonium sulphate and metal halides such as sodium, potassium, calcium, magnesium and zinc chlorides. The agents can optionally include mixtures of the above salts. In one preferred embodiment, the agent is added to the treatment mixture as aqueous ammonium salt solution such as ammonium chloride, or is added separately.

The quantity of agent used will depend on the amount of polymer-containing material being prepared and the total volume of solution. Preferably, the agent is present in a concentration between 0.01 and 50% of the total volume of treatment. In some embodiments, the concentration of agent is between 0.01-25%, 0.01-10%, 0.01-5%, 0.1-5%, 0.1-25%, 0.1-10%, 1-25%, 1-10%, 1-5%, 5-25%, 10-25% or 25-50% of the total volume of treatment.

Once the facilitating agent is applied, treatment is continued for another period of time, e.g., an additional 5-30 minutes, or for a time sufficient to allow photostabilization to occur.

It is also an important aspect of the present invention that the silver is dissolved in an organic solvent to solubilize the silver salt and prevent hydration of the polymer. The silver salt can be added directly to the solvent and stirred gently until dissolved. The photostabilizing step of the process can either follow the silver-loading step or can be initiated during the course of the silver-loading step.

In addition to the articles mentioned herein, the present invention is suitable for use in medical articles such as wound dressings and skin care products.

By the term "loading" herein, is meant, ionic exchange of the cation to the polymer with silver ions.

The term, "photostable" for purposes of the present invention is meant, Controlled colour change to a desired colour with minimal change thereafter.

"Binding" as meant in the present invention, refers to the formation of a photostable compound.

The resultant polymeric material is substantially photostable upon drying. However, the material will dissociate to release the silver if the material is rehydrated.

In an exemplary process, an Aquacel™ wound dressing (e.g. 20 g), commercially available from ConvaTec, can be placed in, e.g., 127.5 ml of IMS/water (77.5:50 v/v). A silver nitrate solution is prepared, for example, with water and silver nitrate in concentrations to provide the desired final concentrations of silver in the Aquacel™ dressing (e.g., 0.0316 g/mL in water, with 10 mL added to the IMS/water solution). Final concentrations of silver in the dressings can range between 0.1% and 20% by weight of the dressing. Preferably these concentrations are between 1 and 5%. The

dressing is subjected to the IMS/silver nitrate for a desired time, e.g., 15-45 minutes. Preferably after this silver treatment, sodium chloride in a concentration between 0.01 and 50% (preferably between 1 and 10%) is added to the IMS/silver nitrate bath and treatment is continued for another period of time, e.g., an additional 5-30 minutes.

Aquacel™ wound dressings having between 1 and 5% by dressing weight of silver have been found to be photostable and possess excellent antimicrobial activity. Further, irradiation does not adversely affect such silver dressings.

All publications and references, including but not limited to patents and patent applications, cited in this specification are herein incorporated by reference in their entirety as if each individual publication or reference were specifically and individually indicated to be incorporated by reference herein as being fully set forth.

What is claimed is:

**1**. A method of preparing a light stabilized material comprising a hydrophilic, amphoteric or anionic polymer, or a mixture thereof, having antimicrobial activity comprising the steps of

a) preparing a solution comprising an organic solvent and a source of silver in a quantity sufficient to provide a desired silver concentration in said light stabilized material;

b) subjecting a hydrophilic, amphoteric or anionic polymer, or a mixture thereof, to said solution for a time sufficient to incorporate the desired silver concentration into said polymer; and

c) subjecting the hydrophilic, amphoteric or anionic polymer, or a mixture thereof, during or after step (b), to one or more agents which facilitate the binding of said silver into said polymer, wherein the silver is substantially photostable in the light stabilized material upon drying of said material, but will dissociate from the light stabilized material upon hydration of said material.

**2**. The method of claim **1**, wherein said source of silver comprises a silver salt.

**3**. The method of claim **2**, wherein said silver salt is selected from the group consisting of silver nitrate, silver chloride, silver sulphates, silver lactate, silver bromide, silver acetate and mixtures of said salts.

**4**. The method of claim **1**, wherein said one or more agents is selected from the group consisting of ammonium salts, thiosulphates, chlorides and peroxides.

**5**. The method of claim **4**, wherein said one or more agents is a metal halide.

**6**. The method of claim **4**, wherein said one or more agents comprises an ammonium salt selected from ammonium chloride, ammonium acetate, ammonium carbonate, ammonium sulphate and mixtures thereof.

**7**. The method of claim **1**, wherein said polymer is selected from the group consisting of a polysaccharide, a modified polysaccharide, a polyvinylpyrrolidone, a polyvinyl alcohol, a polyvinyl ether, a polyurethane, a polyacrylate, a polyacrylamide, a collagen, a gelatin, and a mixture thereof.

**8**. The method of claim **1**, wherein said polymer comprises a polysaccharide selected from a carboxymethylcellulose, an alginate or a mixture thereof.

**9**. The method of claim **1**, wherein said organic solvent is selected from the group consisting of industrial methylated spirit, denatured ethanol, methanol, acetone, isopropyl alcohol and ethanol.

**A137**

US 7,267,828 B2

7

**10**. The method of claim **1**, wherein the desired silver concentration is between 0.1 and 20 wt %.

**11**. The method of claim **1**, wherein the desired silver concentration is between 1 and 20 wt %.

**12**. The method of claim **1**, wherein the time sufficient to incorporate the desired silver concentration into the polymer is between 1 and 120 minutes.

8

**13**. The method of claim **1**, wherein the time sufficient to incorporate the desired silver concentration into the polymer is between 1 and 60 minutes.

**14**. The method of claim **1**, wherein the polymer in step (c) is subjected to the one or more agents for 5 to 30 minutes.

\* \* \* \* \*

Trials@uspto.gov                                    Paper 27
571-272-7822                                   Date: August 21, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

SMITH & NEPHEW, INC.
Petitioner

v.

CONVATEC TECHNOLOGIES, INC.
Patent Owner

———————

Case IPR2013-00097 (LMG)
Patent 6,669,981

———————

Before LORA M. GREEN, RAE LYNN P. GUEST, and
SHERIDAN K. SNEDDEN, *Administrative Patent Judges.*

GREEN, *Administrative Patent Judge.*

**DECISION**
Motion For Additional Discovery
*37 C.F.R. § 42.51*

## I.    INTRODUCTION

Patent Owner filed a motion for additional discovery (Paper 23),[1] which Petitioner opposes (Paper 21).

The motion is ***denied***.


## II.    BACKGROUND

ConvaTec seeks additional discovery of a full and complete copy of Smith & Nephew's 510(k) submission and subsequent approval of Durafiber ® AG to the U.S. Food and Drug Administration ("FDA") (Paper 23 at 1).  ConveTec additionally requests non-public data and/or information used to support Smith & Nephew's 510(k) submission that relates to failure to produce the medical device by a method other than one encompassed by claims 1-8 and 10-20 of Patent 6,669,981 ("the '981 patent"); and/or any evidence of copying of those claims of the '981 patent (*id.* at 2).

ConvaTec also requests discovery of all data and/or information in the possession of Smith & Nephew relating to its submission for a declaration on non-infringement in the United Kingdom, such as documents relating to copying of the methods claimed in the '981 patent to make and commercially produce Durafiber® Ag (*id.* at 2-3).

ConvaTec argues that, in the UK proceeding, Smith & Nephew made confidential statements suggesting that after attempting work-up experiments to produce a Durafiber® Ag, it resorted to the methods of EP '510 to create the product in an earlier time frame (*id.* at 4 (citing Ex. 2004)).  Thus, ConvaTec additionally requests discovery of all data and/or information related to Smith &

---

[1] Paper 23 refers to ConvaTec's Amended Motion for additional discovery.

IPR2013-00097
Patent 6,669,981

Nephew's failure to produce Durafiber® Ag by a method other than a method encompassed by claims 1-8 and 10-20 of the '981 patent (*id.* at 3-4).

Finally, ConvaTec requests discovery of laboratory notebooks, protocols, or other documents that relate to ConvaTec's failure to produce Durafiber® Ag by a method other than a method encompassed by claims 1-8 and 10-20 of the '981 patent, as well as of copying of a method encompassed by claims 1-8 and 10-20 of the '981 patent (*id.* at 4).

### III.    ANALYSIS

An important Congressional objective in passing the Leahy-Smith America Invents Act was to provide a quick and cost effective alternative to federal district court patent litigation. *See* H. Rep. No. 112-98, at 45-48 (2011). With that goal in mind, the statute passed by Congress and the rules implementing the statute provide for limited discovery. *See* 35 U.S.C. § 316(a)(5)(A); 37 C.F.R. § 42.51(b). Additional discovery is available, but in *inter partes* review, only what is necessary in the interest of justice. *See* 35 U.S.C. § 316(a)(5)(B); 37 C.F.R. § 42.51(b)(2). The legislative history makes it clear that the interest of justice should be limited to minor discovery and special circumstances. 154 CONG. REC. S9988-89 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl). In light of this, and given the time deadlines imposed by Congress on these proceedings, the Board will be conservative in granting leave for additional discovery. *Id.*

The Board set forth factors to be considered in determining whether the additional discovery is in the interest of justice. *See Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, IPR2012-00001, Paper 20. These factors ("*Garmin* factors") are: (1) there is more than a possibility and a mere allegation that useful information will be discovered; (2) the proposed discovery does not seek litigation

IPR2013-00097
Patent 6,669,981

positions or the underlying basis for those positions; (3) the requested information is not available through other means; (4) any instructions associated with the discovery are easily understandable; and (5) the discovery is not overly burdensome to answer. *See* Order – Authorizing Motion for Additional Discovery, IPR2012-00001, Paper 20 at 2-3.

ConvaTec contends that the discovery request is relevant to the secondary considerations of copying and failure of others, and the discovery requests are tailored those specific considerations of non-obviousness (Paper 23 at 5-6).

Under Federal Circuit jurisprudence, not every competing product that arguably falls within the scope of a patent is evidence of copying, because otherwise every infringement suit would automatically confirm the nonobviousness of a patent. *Wyers v. Master Lock Co.*, 616 F.3d 1231 (Fed. Cir. 2010); *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004). Copying as objective evidence of nonobviousness requires evidence of effort to replicate a specific product. *Wyers*, 616 F.3d at 1246; *Iron Grip Barbell Co.*, 392 F.3d at 1325.

While ConvaTec argues that Smith & Nephew copied a method encompassed by the challenged claims of the '981 patent, ConvaTec does not assert that Smith & Nephew attempted to copy a specific product by that method (*see, e.g.*, Paper 21 at 7-11).

Moreover, when considering the *Garmin* factors, ConvaTec has not provided sufficient explanation and evidence that, in fact, something useful will be uncovered if discovery is authorized. ConvaTec cites the Summary of Safety and Effectiveness and substantial equivalence decision by the FDA for Smith & Nephew's 501(k) submission for Durafiber® Ag dressing as evidence of copying (Paper 23 at 8-9 (citing Exhibit 2001)). Exhibit 2001 states that the "subject device

4

**A1201**

and the predicate device Aquacel Ag (K080383) have similar design, materials and manufacturing methods" (Ex. 2001 at 4). ConvaTec contends that statement provides "at the very least a strong inference that Smith & Nephew copied one or more of the methods claimed in the '981 method" (Paper 23 at 8-9).

Smith & Nephew responds that the "FDA Website states '[a] claim of substantial equivalence does not mean that the new and predicate devices must be identical'" (Paper 21 at 10 (citing Ex. 1027)). Specifically, Smith & Nephew asserts that in ConvaTec's own 510(k) application for Aquacel® Ag identifies Aquacel® as the predicate device, even though it does not contain any silver (*id.* (citing Ex. 1028)).

Thus, in view of ConvaTec's own 510(k), a statement of substantial equivalence by the FDA is not sufficient evidence that in fact something useful will be uncovered if discovery is authorized. That is, Aquacel Ag®, which contains silver ions and which ConvaTec asserts had a manufacturing method that is similar to Smith & Nephew's Durafiber® Ag, would also have a manufacturing method that is similar to Aquacel®, which does not contain silver ions and thus would fall outside the methods of the challenged claim of '981 patent. Thus, a statement of substantial equivalence by the FDA is not sufficient evidence of copying to meet the *Garmin* factor (1) that there is more than a possibility and a mere allegation that useful information will be discovered.

ConvaTec also contends that, in Smith & Nephew's declaration of non-infringement in the UK courts, Smith & Nephew only relied on the precise concentration of the binding agent to distinguish its claims the method claimed in the EP patent (Paper 23 at 10 (citing Ex. 2003 at 3, ¶ 7)). According to ConvaTec, Smith & Nephew's declarations and admissions during the UK proceeding suggest

IPR2013-00097
Patent 6,669,981

that Smith & Nephew's process for producing Durafiber® Ag fall with the scope of the challenged method claims (*id.*).

Smith & Nephew responds that ConvaTec is mischaracterizing what occurred in the UK proceeding (Paper 21 at 11). According to Smith & Nephew, in order to simplify the proceeding, it elected to only go forward on the noninfringement ground related to the concentration level of the agent (*id.* (citing Ex. 1029 at 5, ll. 6-13)).

Exhibit 2003 is the Third Witness statement of Morag Macdonald, who was authorized to make the statement on behalf of ConvaTec (Ex. 2003 at 1, ¶ 1). Mr. Macdonald testified:

> [A]t the hearing for directions in this summary judgment application Smith & Nephew admitted that it has no other non-infringement argument in relation to the process it uses to produce its silverised Durafiber wound dressing. As a result Smith & Nephew amended its Claim Form and Particulars of Claim to limit the relief it seeks in this action to whether the use of 0.77% concentration of binding agent falls within the scope of protection of the Patent.

(*Id.* at 3, ¶ 7.)

Exhibit 1029 is a transcript of the proceedings in the UK infringement suit before Mr. Justice Floyd. Counsel for Smith & Nephew stated:

> To simplify it, we would accept for the purposes of this patent in this jurisdiction that, as it were, the only non-infringement point that would arise after our process description is the level of binding agent. In other words, it is the construction point or nothing.

(Ex. 1029 at 5, ll. 6-10).

Upon review of the exhibits, we agree with Smith & Nephew that it did not admit that it copied one of ConvaTec's processes, but for the concentration range, but that the issue regarding the concentration range arose as a way to simplify the

6

**A1203**

IPR2013-00097
Patent 6,669,981

UK proceedings. Thus, we conclude that Smith & Nephew's reliance on the concentration range of the binding agent in the UK proceeding is not sufficient evidence of copying to meet *Garmin* factor (1) that there is more than a possibility and a mere allegation that useful information will be discovered.

As to failure by others, ConvaTec asserts that it possesses confidential information from the same UK proceeding that suggests that Smith & Nephew tried to utilize methods that were not encompassed by the challenged claims of the '981 patent (Paper 23 at 11 (citing Ex. 2004)).

An allegation of failure of others, however, is not evidence of nonobviousness unless it is shown that widespread efforts of skilled workers having knowledge of the prior art had failed to find a solution to the problem. *In re Allen*, 324 F.2d 993, 997 (CCPA 1963). Absent in ConvaTec's motion is a threshold amount of evidence tending to show widespread failure to solve the problem addressed by the challenged claims. Evidence of failure by Smith & Nephew's efforts is not sufficient to demonstrate widespread efforts and failure.

Finally, ConvaTec's requests are overly burdensome and would require a significant expenditure of time, along with human and financial resources. For example, request 5 asks for discovery of "[l]aboratory notebook and other documents containing data and/or information that indicates Smith and Nephew's: a) failure to produce Durafiber® Ag by a method other than a method encompassed by any one of claims 1-8 and 10-20 of ConvaTec's '981 patent; and/or b) copying a method encompassed by of any one of claims 1-8 and 10-20 of ConvaTec's '981 patent" (Ex. 2005 at 3). We agree with Smith & Nephew that the requests are broad in scope, and are not limited to certain custodians or types of documents or data (Paper 21 at 15).

IPR2013-00097
Patent 6,669,981

IV.    CONCLUSION

For the reasons set forth above, we conclude that ConvaTec has not met its burden to show that the additional discovery is necessary in the interest of justice.

V.    ORDER

It is:

**ORDERED** that motion for additional discovery is *denied*.

Petitioner:

Jeff B. Vockrodt
Rodger L. Tate
Christopher H. Yaen
Hunton & Williams, LLP
jvockrodt@hunton.com
rtate@hunton.com
cyaen@hunton.com

Patent Owner:

Jeffrey Guise
Peter R. Munson
Lorelei P. Westin
Wilson Sonsini Goodrich & Rosati, PC
jguise@wsgr.com
pmunson@wsgr.com
lwestin@wsgr.com

Trials@uspto.gov                                        Paper 24
571-272-7822                                    Date: August 21, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

SMITH & NEPHEW, INC.
Petitioner

v.

CONVATEC TECHNOLOGIES, INC.
Patent Owner

————————

Case IPR2013-00102 (LMG)
Patent 7,267,828

————————

Before LORA M. GREEN, RAE LYNN P. GUEST, and
SHERIDAN K. SNEDDEN, *Administrative Patent Judges.*

GREEN, *Administrative Patent Judge.*

**DECISION**
Motion For Additional Discovery
*37 C.F.R. §42.51*

**A1206**

## I.    INTRODUCTION

Patent Owner filed a motion for additional discovery (Paper 20),[1] which Petitioner opposes (Paper 18).

The motion is ***denied***.

## II.    BACKGROUND

ConvaTec seeks additional discovery of a full and complete copy of Smith & Nephew's 510(k) submission and subsequent approval of Durafiber ® AG to the U.S. Food and Drug Administration ("FDA") (Paper 20 at 1-2).  ConveTec additionally requests non-public data and/or information used to support Smith & Nephew's 510(k) submission that relates to failure to produce the medical device by a method other than one encompassed by claims 1-5 and 7-14 of Patent No. 7,267,828 ("the '828 patent"); and/or any evidence of copying of those claims of the '828 patent (*id.* at 2).

ConvaTec also requests discovery of all data and/or information in the possession of Smith & Nephew relating to its submission for a declaration on non-infringement in the United Kingdom, such as documents relating to copying of the methods claimed in the '828 patent to make and commercially produce Durafiber® Ag (*id.* at 2-3).

ConvaTec argues that, in the UK proceeding, Smith & Nephew made confidential statements suggesting that after attempting work-up experiments to produce a Durafiber® Ag, it resorted to the methods of EP '510 to create the product in an earlier time frame (*id.* at 4 (citing Ex. 2004)).  Thus, ConvaTec additionally requests discovery of all data and/or information related to Smith &

---

[1] Paper 20 refers to ConvaTec's Amended Motion for additional discovery.

IPR2013-00102
Patent 7,267,828

Nephew's failure to produce Durafiber® Ag by a method other than a method
encompassed by claims 1-5 and 7-14 of the '828 patent (*id.* at 3-4).

Finally, ConvaTec requests discovery of laboratory notebooks, protocols, or
other documents that relate to ConvaTec's failure to produce Durafiber® Ag by a
method other than a method encompassed by claims 1-5 and 7-14 of the '828
patent, as well as of copying of a method encompassed by claims 1-5 and 7-14 of
the '828 patent (*id.* at 4).

III.    ANALYSIS

An important Congressional objective in passing the Leahy-Smith America
Invents Act was to provide a quick and cost effective alternative to federal district
court patent litigation.  *See* H. Rep. No. 112-98, at 45-48 (2011).  With that goal in
mind, the statute passed by Congress and the rules implementing the statute
provide for limited discovery.  *See* 35 U.S.C. § 316(a)(5)(A); 37 C.F.R. § 42.51(b).
Additional discovery is available, but in *inter partes* review, only what is necessary
in the interest of justice.  *See* 35 U.S.C. § 316(a)(5)(B); 37 C.F.R. § 42.51(b)(2).
The legislative history makes it clear that the interest of justice should be limited to
minor discovery and special circumstances.  154 CONG. REC. S9988-89 (daily ed.
Sept. 27, 2008) (statement of Sen. Kyl).  In light of this, and given the time
deadlines imposed by Congress on these proceedings, the Board will be
conservative in granting leave for additional discovery.  *Id.*

The Board set forth factors to be considered in determining whether the
additional discovery is in the interest of justice.  *See Garmin Int'l, Inc. v. Cuozzo
Speed Techs. LLC*, IPR2012-00001, Paper 20.  These factors ("*Garmin* factors")
are: (1) there is more than a possibility and a mere allegation that useful
information will be discovered; (2) the proposed discovery does not seek litigation

IPR2013-00102
Patent 7,267,828

positions or the underlying basis for those positions; (3) the requested information is not available through other means; (4) any instructions associated with the discovery are easily understandable; and (5) the discovery is not overly burdensome to answer. *See* Order – Authorizing Motion for Additional Discovery, IPR2012-00001, Paper 20 at 2-3.

ConvaTec contends that the discovery request is relevant to the secondary considerations of copying and failure of others, and the discovery requests are tailored those specific considerations of non-obviousness (Paper 20 at 5-6).

Under Federal Circuit jurisprudence, not every competing product that arguably falls within the scope of a patent is evidence of copying, because otherwise every infringement suit would automatically confirm the nonobviousness of a patent. *Wyers v. Master Lock Co.*, 616 F.3d 1231 (Fed. Cir. 2010); *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004). Copying as objective evidence of nonobviousness requires evidence of effort to replicate a specific product. *Wyers*, 616 F.3d at 1246; *Iron Grip Barbell Co.*, 392 F.3d at 1325.

While ConvaTec argues that Smith & Nephew copied a method encompassed by the challenged claims of the '828 patent, ConvaTec does not assert that Smith & Nephew attempted to to copy a specific product by that method (*see, e.g.*, Paper 18 at 7-11).

Moreover, when considering the *Garmin* factors, ConvaTec has not provided sufficient explanation and evidence that, in fact, something useful will be uncovered if discovery is authorized. ConvaTec cites the Summary of Safety and Effectiveness and substantial equivalence decision by the FDA for Smith & Nephew's 501(k) submission for Durafiber® Ag dressing as evidence of copying (Paper 20 at 8-9 (citing Exhibit 2001)). Exhibit 2001 states that the "subject device

IPR2013-00102
Patent 7,267,828

and the predicate device Aquacel Ag (K080383) have similar design, materials and manufacturing methods" (Ex. 2001 at 2). ConvaTec contends that statement provides "at the very least a strong inference that Smith & Nephew copied one or more of the methods claimed in the '828 method" (Paper 20 at 8-9).

Smith & Nephew responds that the "FDA Website states '[a] claim of substantial equivalence does not mean that the new and predicate devices must be identical'" (Paper 18 at 10 (citing Ex. 1027)). Specifically, Smith & Nephew asserts that in ConvaTec's own 510(k) application for Aquacel® Ag identifies Aquacel® as the predicate device, even though it does not contain any silver (*id.* (citing Ex. 1028)).

Thus, in view of ConvaTec's own 510(k), a statement of substantial equivalence by the FDA is not sufficient evidence that in fact something useful will be uncovered if discovery is authorized. That is, Aquacel Ag®, which contains silver ions and which ConvaTec asserts had a manufacturing method that is similar to Smith & Nephew's Durafiber® Ag, would also have a manufacturing method that is similar to Aquacel®, which does not contain silver ions and thus would fall outside the methods of the challenged claim of '828 patent. Thus, a statement of substantial equivalence by the FDA is not sufficient evidence of copying to meet *Garmin* factor (1) that there is more than a possibility and a mere allegation that useful information will be discovered.

ConvaTec also contends that, in Smith & Nephew's declaration of non-infringement in the UK courts, Smith & Nephew only relied on the precise concentration of the binding agent to distinguish its claims the method claimed in the EP patent (Paper 20 at 10 (citing Ex. 2003 at 3, ¶ 7)). According to ConvaTec, Smith & Nephew's declarations and admissions during the UK proceeding suggest

IPR2013-00102
Patent 7,267,828

that Smith & Nephew's process for producing Durafiber® Ag fall with the scope of the challenged method claims (*id.*).

Smith & Nephew responds that ConvaTec is mischaracterizing what occurred in the UK proceeding (Paper 18 at 11). According to Smith & Nephew, in order to simplify the proceeding, it elected to only go forward on the noninfringement ground related to the concentration level of the agent (*id.* (citing Ex. 1029 at 5, ll. 6-13)).

Exhibit 2003 is the Third Witness statement of Mr. Morag Macdonald, who was authorized to make the statement on behalf of ConvaTec (Ex. 2003 at 1, ¶ 1). Mr. Macdonald testified:

> [A]t the hearing for directions in this summary judgment application Smith & Nephew admitted that it has no other non-infringement argument in relation to the process it uses to produce its silverised Durafiber wound dressing. As a result Smith & Nephew amended its Claim Form and Particulars of Claim to limit the relief it seeks in this action to whether the use of 0.77% concentration of binding agent falls within the scope of protection of the Patent.

(*Id.* at 3, ¶ 7.)

Exhibit 1029 is a transcript of the proceedings in the UK infringement suit before Mr. Justice Floyd. Counsel for Smith & Nephew stated:

> To simplify it, we would accept for the purposes of this patent in this jurisdiction that, as it were, the only non-infringement point that would arise after our process description is the level of binding agent. In other words, it is the construction point or nothing.

(Ex. 1029 at 5, ll. 6-10).

Upon review of the exhibits, we agree with Smith & Nephew that it did not admit that it copied one of ConvaTec's processes, but for the concentration range, but that the issue regarding the concentration range arose as a way to simplify the

IPR2013-00102
Patent 7,267,828

UK proceedings. Thus, we conclude that Smith & Nephew's reliance on the concentration range of the binding agent in the UK proceeding is not sufficient evidence of copying to meet the *Garmin* factor (1) that there is more than a possibility and a mere allegation that useful information will be discovered.

As to failure by others, ConvaTec asserts that it possesses confidential information from the same UK proceeding that suggests that Smith & Nephew tried to utilize methods that were not encompassed by the challenged claims of the '828 patent (Paper 20 at 11 (citing Ex. 2004)).

An allegation of failure of others, however, is not evidence of nonobviousness unless it is shown that widespread efforts of skilled workers having knowledge of the prior art had failed to find a solution to the problem. *In re Allen*, 324 F.2d 993, 997 (CCPA 1963). Absent in ConvaTec's motion is a threshold amount of evidence tending to show widespread failure to solve the problem addressed by the challenged claims was widespread. Evidence of failure by Smith & Nephew's efforts alone is not sufficient to demonstrate widespread efforts and failure.

Finally, ConvaTec's requests are overly burdensome and would require a significant expenditure of time, along with human and financial resources. For example, request 5 asks for discovery of "[l]aboratory notebook and other documents containing data and/or information that indicates Smith and Nephew's: a) failure to produce Durafiber® Ag by a method other than a method encompassed by any one of claims 1-5 and 7-14 of ConvaTec's '828 patent; and/or b) copying a method encompassed by of any one of claims 1-5 and 7-14 of ConvaTec's '981 patent" (Ex. 2005 at 3). We agree with Smith & Nephew that the requests are broad in scope, and are not limited to certain custodians or types of documents or data (Paper 18 at 15).

IPR2013-00102
Patent 7,267,828

## IV.   CONCLUSION

For the reasons set forth above, we conclude that ConvaTec has not met its burden to show that the additional discovery is necessary in the interest of justice.

## V.   ORDER

It is:

**ORDERED** that motion for additional discovery is *denied*.

Petitioner:

Jeff B. Vockrodt
Rodger L. Tate
Christopher H. Yaen
Hunton & Williams, LLP
jvockrodt@hunton.com
rtate@hunton.com
cyaen@hunton.com

Patent Owner:

Jeffrey Guise
Peter R. Munson
Lorelei P. Westin
Wilson Sonsini Goodrich & Rosati, PC
jguise@wsgr.com
pmunson@wsgr.com
lwestin@wsgr.com

**A1213**

**PROOF OF SERVICE**

I, Richard Torczon, hereby certify that on November 14, 2014, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on November 14, 2014, the attached document was Electronically Mailed to the following person(s):

Bradley T. Lennie
Hunton & Williams LLP
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037
Tel: (202) 955-1914
Fax: (202)778-2201
Email: blennie@hunton.com

Jeffrey B. Vockrodt
Hunton & Williams LLP
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037
Tel.: (202) 419-2021
Fax: (202) 778-2201
Email: jvockrodt@hunton.com

Christopher H. Yaen
Hunton & Williams LLP
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037
Tel.: (202) 955-1926
Fax: (202) 778-2201
Email: cyaen@hunton.com

David A. Kelly
Hunton & Williams LLP
600 Peachtree Street, NE
Atlanta, GA 30308
Tel.: (404) 888-4280
Fax: (404) 888-4190
Email: dkelly@hunton.com

Upon acceptance by the Court of the e-filed document, six paper copies of the Confidential Brief will be filed with the Court, within the time provided in the Court's rules.

In addition, two copies of the Confidential Brief will be sent via Federal Express to Plaintiff-Appellant's Counsel, identified above, within that same time frame.


November 14, 2014                    */s/ Richard Torczon*
                                     Richard Torczon
                                     Counsel for Appellant
                                     ConvaTec Technologies Inc.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

(1)     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 9,314 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

(2)     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

November 14, 2014                                  */s/ Richard Torczon*
                                                                Richard Torczon
                                                                Counsel for Appellant
                                                                ConvaTec Technologies Inc.